**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JUN 1 6 2021

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

LORRAINE HATCHER, on behalf of herself
and all other similarly situated                                    **PLAINTIFF**

v.                              Case No. 4:21-CV-00520-BRW

DLP PROPERTY MANAGEMENT, LLC
d/b/a PROSPER RIVERDALE, DLP REAL
ESTATE MANAGEMENT, LLC, CHERYL
CRAIG, KAREN ROBERTSON, DON
WENNER, ROBERT PETERSON, and
EBONY JOSHUA                                                        **DEFENDANTS**

This case assigned to District Judge _Wilson_
and to Magistrate Judge _Ray_

## NOTICE OF REMOVAL

Defendants DLP Real Estate Management, LLC ("DLP Real Estate Management"), Cheryl

Craig ("Ms. Craig"),  Don Wenner ("Mr. Wenner"), Ebony Joshua ("Ms. Joshua"), and Robert

Peterson ("Mr. Peterson") (hereinafter collectively, the "Defendants") pursuant to 28 U.S.C. §§

1332, 1441, and 1446, remove this action from the Circuit Court of Pulaski County, Arkansas,

where it is pending as Case No. 60CV-21-2858, to the United States District Court for the Eastern

District of Arkansas, Central Division. As grounds for this removal, Defendants state:

1.      Plaintiff Lorraine Hatcher ("Plaintiff") filed the present action against DLP

Property Management, LLC ("DLP Property Management"), Karen Robertson ("Ms. Robertson"),

and Ms. Craig in the Circuit Court of Pulaski County, Arkansas on May 7, 2021.  Plaintiff filed a

First Amended Complaint on May 14, 2021, naming these same three defendants.

2.      DLP Property Management and Karen Robertson have no connection with and are

completely unrelated from the entities and persons involved with the apartment complexes at issue

in Plaintiff's Complaint.  They were mistakenly named as defendants in this action.

3.      Upon information and belief, Plaintiff amended her complaint a second time on May 28, 2021, after learning that DLP Property Management and Ms. Robertson were mistakenly named.  If those two defendants (who are Arkansas residents) were not proper parties, complete diversity of citizenship would exist.

4.      To avoid federal jurisdiction, Plaintiff amended the Complaint to add DLP Real Estate Management, Mr. Wenner, Mr. Peterson, Prosper Riverdale, and Ms. Joshua as Defendants.

5.      DLP Real Estate Management, Mr. Wenner, and Mr. Peterson are all Florida residents.

6.      Prosper Riverdale is not an entity that can sue or be sued.  It is merely the name of the apartment complex in which Plaintiff resides.  Plaintiff has attempted to name Prosper Riverdale as a defendant solely to avoid federal diversity jurisdiction.

7.      Ebony Joshua was the onsite property manager at the apartment complex and was named as a defendant solely for the purpose of defeating diversity jurisdiction.  No allegations in the second amended complaint are directed at Ms. Joshua such that any cause of action could be sustained.

8.      A certified mail package to Ms. Craig containing the Complaint was delivered to the apartment complex on May 17, 2021.[1]  Certified mail packages to Mr. Peterson, Mr. Wenner, and DLP Real Estate Management were delivered to DLP Real Estate Management's corporate headquarters in Florida on June 7, 2021.  In accordance with 28 U.S.C. § 1446(a), copies of the summons and three complaints (Original, First Amended, and Second Amended) are attached as Exhibit 1.  No other process, pleading, or order has been served by or on Defendants in the state-court action.

---

[1] Ms. Craig and other defendants have not been properly served.  All Defendants are reserving all defenses including improper service of process.

9. Venue is proper in the Eastern District of Arkansas because this District embraces Pulaski County, Arkansas, the place where the state-court action was pending.

10. This notice of removal is timely filed under the provisions of 28 U.S.C. § 1446(b).

11. The complaint is one that properly could have been filed in this Court under 28 U.S.C. § 1332, and removal is therefore appropriate. 28 U.S.C. § 1441(a).

## DIVERSITY OF CITIZENSHIP

12. In order for an action filed in state court to be removable based on diversity-of-citizenship jurisdiction: "(1) all properly joined and served defendants must file a notice of removal with the district court within 30 days of receipt of the state-court summons and complaint; (2) the parties' citizenship must be completely diverse—i.e., each plaintiff must be of diverse citizenship from each defendant—both at the time the suit was filed in state court and when the petition for removal was filed; (3) there must be $75,000 in controversy; and (4) none of properly joined and served defendants can be a citizen of the forum State." *Duncan v. Exxon Mobil Corp.*, 968 F.Supp.2d 996, 998-999 (E.D. Ark. 2013); *see* 28 U.S.C. § 1332.

13. The amount-in-controversy requirement is satisfied because Plaintiffs allege damages in excess of the federal jurisdictional requirement of $75,000. *See* Exhibit 1, Second-Amended Complaint at ¶ 21 (asserting an amount in controversy not to exceed the sum or value of $4,999, 999); *see also* 28 U.S.C. § 1332; *Bell v. Hershey Co.*, 557 F.3d 953, 959 (8th Cir. 2009).

14. There is also complete diversity of citizenship. At all times pertinent, including the time of the filing of Plaintiff's Complaint in the Circuit Court of Pulaski County, Arkansas, and the time of the filing of this notice of removal, diversity of citizenship has existed between Plaintiffs and all Defendants because: (1) Plaintiff was and is an Arkansas citizen residing in Pulaski County, Arkansas (Ex. 1, Second Amended Complaint, ¶ 1); and (2) all properly joined

3

Defendants are Florida residents. DLP Real Estate Management was and is currently a foreign corporation formed, existing, and incorporated under the laws of the state of Florida with its principal place of business in St, Augustine, Florida. Ms. Craig is an employee of DLP Real Estate Management and is a Florida resident. Mr. Wenner is the CEO of DLP Real Estate's parent company, DLP Real Estate Capital, Inc. Mr. Peterson is the CFO of DLP Real Estate Capital, Inc. Both Mr. Wenner and Mr. Robertson are Florida residents.

15.     Prosper Riverdale is not an entity that can sue or be sued. As such, it has no place of residence and is an improper defendant.

16.     Plaintiff is not of diverse citizenship from Ms. Joshua, who, upon information and belief, is an Arkansas citizen residing in Pulaski County. Ms. Joshua, however, has been fraudulently joined in this action.

17.     Plaintiff is not of diverse citizenship from DLP Property Management, who is an Arkansas-registered limited liability company formed and existing under the laws of the state of Arkansas with its principal place of business in Cabot, Arkansas. However, DLP Property Management has been fraudulently joined in this action. Ms. Robertson is the registered agent of DLP Property Management and has also been fraudulently joined in this action. Neither of these Defendants has any connection to the apartment complexes at issue in this case and were mistakenly named.

## FRAUDULENT JOINDER

### A.     Standards

18.     Fraudulent joinder is a narrow exception to the complete diversity rule, allowing a court to retain jurisdiction where a nondiverse defendant has been fraudulently joined. *See Shepherd v. Baptist Health*, 916 F.Supp.2d 891, 898 (E.D. Ark. 2012).

4

19.     Fraudulent joinder occurs when a plaintiff files a frivolous or otherwise illegitimate claim against a non-diverse defendant solely to prevent removal. *Id.* To establish fraudulent joinder, a defendant must establish that there is no "reasonable basis for predicting that the state law might impose liability based upon the facts involved." *Id.* "[I]t is well established that if it is clear under governing state law that the complaint does not state a cause of action against the non-diverse defendant, the joinder is fraudulent and federal jurisdiction of the case should be retained." *Iowa Public Service Co. v. Medicine Bow Coal Co.*, 556 F.2d 400, 406 n.6 (8th Cir. 1977).

**B.     Application to this Case.**

20.     Regarding Ms. Joshua, Plaintiff merely alleges that she "is a manager, employed by, and authorized to bring suit on behalf of, DLP Real Estate Management, LLC…to enforce property rights, including, but not limited to unlawful detainer and/or eviction. On six occasions, Ebony Joshua represented herself as "owner" of apartment units in properties owned and managed by DLP REM, LLC in legal pleadings filed in Pulaski County Circuit Court.…" Ex. 1, Second Amended Complaint, ¶¶ 8-9. There are no other allegations directed at Ms. Joshua in the Second Amended Complaint that could support any cause of action against her.

21.     Specifically, Plaintiff alleges that:

- Water and sewer charges as imposed by Defendant are per se fraudulent, deceptive, and unreasonable.

- Water service outages are not abated in monthly billing statements, nor are there adjustments to the cost for sewer services.

- Defendant has conspired with other landlords/property managers to perpetrate this fraudulent billing scheme on rental housing consumers. Defendant maintains a practice of

serving tenants with unlawful detainer, and/ or three-day (3) notice to quit for failure to pay the utility charges they unilaterally and arbitrarily assess.

- Defendants' practice of re-selling CAW's water and sewer services violate the [Arkansas Deceptive Trade Practices Act] ADTPA §4-88-107(a)(1) in that Defendant knowingly makes false representations regarding the water usage and the cost of providing the service.

- Defendant's practice of re-selling CAW' s water and sewer services violate the ADTPA §4-88-107(a)(2) in that Defendants conceal, suppress, or omit a material fact or facts concerning how the rate billed to Plaintiff is apportioned or calculated.

- Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(10) in that Defendants commit any other unconscionable, false, or deceptive act, such as failing to disclose that it makes money off Plaintiff by reselling water and sewer services above that which is established by regulation or law imposed on CAW and passed on to its direct customers.

Ex. 1, Second Amended Complaint, ¶¶ 49-55.

22.      To prevail on a private cause of action under the ADTPA, a claimant must prove individually that he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under the ADTPA.  Ark. Code Ann. § 4-88-113; *see also Forever Green Athletic Fields, Inc. v. Lasiter Const., Inc.,* 2011 Ark. App. 347, 18, 384 S.W.3d 540, 552 (2011) (interpreting the ADTPA and holding that "[b]ased on the language of section 4–88–113(f), there must be a causal connection between the *violation* of the Deceptive Trade Practices Act and the *injury*").  Accordingly, a private cause of action under ADTPA does not arise absent a showing of both a violation of the statute and resultant damages. *See id.*

6

23.     Here, Plaintiff has no reasonable basis in law or fact for an ADTPA claim against Ms. Joshua because there are no allegations in the Complaint that she took any particular action. Plaintiff's Complaint cannot establish that Ms. Joshua committed a violation of the act or that Plaintiff was damaged because of the violation.

24.     Plaintiff's Complaint alleges that Ms. Joshua has appeared as a Plaintiff in unlawful detainer actions "on behalf of DLP Real Estate Management, LLC." This is the only alleged fact concerning any action of Ms. Joshua, and this fact is wholly irrelevant to the issues in Plaintiff's Second Amended Complaint. While Plaintiff's allegations refer to "Defendant" and "Defendants" interchangeably, Ms. Joshua never sold Plaintiff water. Therefore, if Plaintiff alleges the "practice of reselling water" violated the ADTPA, Plaintiff has not pled or shown how *Ms. Joshua* specifically committed a violation of the ADTPA. This flaw alone is fatal because Plaintiff cannot state a private cause of action under the ADTPA absent an alleged violation. Accordingly, "the complaint does not state a cause of action against the non-diverse defendant, the joinder is fraudulent and federal jurisdiction of the case should be retained." *Iowa Public Service Co. v. Medicine Bow Coal Co.*, 556 F.2d 400, 406 n.6 (8th Cir. 1977).

25.     Because Plaintiff has not pled how Ms. Joshua violated the ADTPA, Plaintiff has not pled or alleged any damages resulting from a violation of the ADTPA by Ms. Joshua. Plaintiff alleges that she "[I]s denied a satisfactory rating to prospective creditors based on a delinquent status of utility payments to ConService and/ or Defendants." Ex. 1, Second Amended Complaint, ¶¶ 58. But this damage does not relate to Ms. Joshua's alleged actions.

26.     Plaintiff's Complaint does not state an ADTPA cause of action against a non-diverse defendant, Ms. Joshua. Plaintiff's Complaint fails to explain what acts Ms. Joshua engaged in that violated the ADTPA, nor does it explain how Plaintiff was damaged by Ms. Joshua's

actions. As a result, Plaintiff failed to allege facts setting forth a cause of action for violation of ADTPA. Without a cause of action, there is no "reasonable basis for predicting that the state law might impose liability based upon the facts involved." Ms. Joshua has been fraudulently joined in this action.

27.     Under Arkansas law, a civil conspiracy is a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means, to the injury of another. *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969). A plaintiff alleging a claim for civil conspiracy must state a prima facie case for the underlying tort to support a conspiracy claim. *Tuohey v. Chenal Healthcare, LLC*, 173 F. Supp. 3d 804, 812 (E.D. Ark. 2016) (citation omitted).

28.     Plaintiff alleges that "Defendant has conspired with other landlords/property managers to perpetrate this fraudulent billing scheme on rental housing consumers." But this allegation fails to state a cause of action for civil conspiracy against Ms. Joshua because it fails to state a claim for the only possible underlying torts—ADTPA violations. *See Lane v. Chowning*, 610 F.2d 1385, 1390 (8th Cir.1979) (denying an appeal from a directed verdict and holding "We have already determined that Lane has failed to establish either a factual or a legal basis for recovery on any of his several allegations. It follows, then, that no overt act has been established which is a necessary element in establishing the existence of a civil conspiracy.").

29.     Plaintiff's Second Amended Complaint does not set forth any separate counts or causes of action. However, regardless of what causes of action Plaintiff may think she has against Ms. Joshua, no facts have been alleged regarding her actions to support any claim or cause of action against her.

8

30.    Finally, Plaintiff's claims do not state any causes of action against DLP Property Management or Karen Robertson because DLP Property Management is not affiliated with Prosper Riverdale or DLP Real Estate in any way. DLP Property Management took no part in the alleged events giving rise to this lawsuit. Plaintiff's counsel has admitted that DLP Property Management, and by extension, Ms. Robertson, were mistakenly named Defendants. *See Trail Dr., LLC v. Silver Hill Financial LLC*, 4:11CV00173 SWW, 2011 WL 4002247, at *3 (E.D. Ark. Aug. 31, 2011) (retaining diversity over a claim where the wrong defendant was named and stating, "It is undisputed that [this defendant] took no part in events giving rise to this lawsuit, and the Court finds no factual or legal support for Plaintiffs' claim against the non-diverse defendant. Accordingly, [this defendant's] residency is properly disregarded for the purpose of determining diversity jurisdiction.").

31.    Because Ms. Joshua, Ms. Robertson, and DLP Property Management were fraudulently joined, this Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332. This action is removable pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

32.    Defendants will serve on counsel for Plaintiff a true and correct copy of this notice of removal and will file a notice of removal with the clerk of the Circuit Court of Pulaski County. *See* 28 U.S.C. § 1446(d).

WHEREFORE, Defendants DLP Real Estate Management LLC, Cheryl Craig, Don Wenner, Ebony Joshua, and Robert Peterson hereby remove this action to this Court and pray that this Court exercise jurisdiction over this matter and grant to Defendants all proper relief to which they are entitled.

Respectfully submitted,

Michael N. Shannon (Bar No. 92186)
Bria Blair Guthridge (Bar No. 2020179)
Attorneys for Defendants
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
Phone: (501) 379-1700
Facsimile: (501) 379-1701
mshannon@qgtlaw.com
bguthridge@qgtlaw.com

By:_____
    Bria Blair Guthridge

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June 2021, I have served the foregoing by U.S. Mail, postage prepaid, upon the following counsel of record:

Lorraine Hatcher
Attorney at Law
P.O. Box 21294
Little Rock, AR 72221
Telephone: (501) 681-2402
E-mail: lorrainehatcher@yahoo.com

_____
Bria Blair Guthridge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**LORRAINE HATCHER, on behalf of herself
and all other similarly situated.**                                           **PLAINTIFF**

**v.**                              **Case No. _____**

**DLP Real Estate Management LLC; Cheryl Craig;
Don Wenner; Robert Peterson; DLP Property Management, LLC;
Karen Robertson; and Ebony Joshua.**                          **DEFENDANTS**

# EXHIBIT 1 TO
# NOTICE OF REMOVAL

Michael N. Shannon (92186)
Bria Blair Guthridge (2020179)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
Voice: (501) 379-1700
Facsimile: (501) 379-1701
mshannon@qqtlaw.com
bguthridge@qgtlaw.com

*Attorneys for DLP Real Estate Management, LLC*

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-May-07 09:39:04
60CV-21-2858
C06D05 : 11 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## CIVIL DIVISION

**LORRAINE HATCHER, on behalf of herself**
**and all others in a class similarly situated**                                    **PLAINTIFF**

### CASE NO. 60CV-21-

**vs.**

**DLP PROPERTY MANAGEMENT, LLC**
**d/b/a PROSPER RIVERDALE, CHERYL**
**CRAIG, and KAREN ROBERTSON**                                    **DEFENDANTS**

### COMPLAINT

Plaintiff, Lorraine Hatcher, on behalf of herself and all others similarly situated,

brings her Complaint for damages based on the Arkansas Deceptive Trade Practices

Act, codified at Ark. Code Ann. §§4-88-107 *et seq.*, and states that:

### I.    PARTIES

1. Plaintiff is an individual residing in Little Rock, Arkansas, within Pulaski County.

2. Defendant, DLP Property Management, LLC, (hereinafter, "DLP"), is a

corporation authorized to do business within the state of Arkansas with its

principal place of business located in Little Rock, Arkansas.  Its agent for service

of process is Karen Robertson at 20 Hunters Cove, Cabot, Arkansas 72023.

3. Based upon information and belief, Defendant Karen Robertson is a managing member or officer of DLP Property Management, LLC.

4. Upon information and belief, DLP is engaged in the business of leasing, managing, and maintaining real property, and own and manage the property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202 (hereinafter "Property"), as well as Prosper Pleasant Valley, located at 1602 Green Mountain Drive, Little Rock, Arkansas 72211.

5. Defendants DLP and Karen Robertson have conducted business in Arkansas through entities the company owns, operates, and controls. Defendants have engaged in fraudulent, deceptive and unlawful acts in the state of Arkansas.

## II.    JURISDICTION

6. This Court has jurisdiction pursuant to Ark. Code Ann. §16-13-201(a). This Court also has jurisdiction pursuant to Rule 23 of the Arkansas Rules of Civ. P.

7. allegations set forth herein relevant to these causes of action occurred at all times in Little Rock, Arkansas.

8. Jurisdiction and venue are both proper in this Court.

9. The named Plaintiff and potential Class Members assert no federal question. The state law causes of action asserted herein are not federally pre-empted.

10. The named Plaintiff and potential Class Members assert that the amount in controversy will not exceed the sum or value of $4,999,999, including compensatory damages, restitution, interest, costs and attorney's fees. Plaintiff specifically waives any right to any amount in controversy which exceeds

$4,999,999, including compensatory damages, restitution, interest, costs and attorney's fees. The aggregate amount in controversy of the potential Class Members' claims does not and will not exceed $4,999,999.

### III.    INTRODUCTION

11. Plaintiff brings this action on behalf of herself and all other persons similarly situated. Plaintiff will fairly and adequately protect the interests of the potential class and is an adequate representative of the class of persons defined herein. Plaintiff is interested in the outcome of this lawsuit and understands the importance of adequately representing every potential member of the class described herein.

12. The proposed class is defined as all persons who paid utility fees ("Utility Fees") to Defendants and their agent for billing, ConService, from the date of filing this Complaint forward and for the immediately preceding five (5) years ("potential Class Period").

13. Defendants lease residential apartment homes at their properties located at 2100 Rebsamen Park Rd, Little Rock, Pulaski County, Arkansas, 72202, and 1602 Mountain Drive, Little Rock, Pulaski County, Arkansas, 72211.

14. Defendants' apartment homes include one-, two-, and three-bedroom units.

15. A lease agreement is required of a tenant of Defendants' apartment homes and may be of variable length.

16. The proposed class is defined as all persons who executed lease agreements of one month or longer from the date of filing this Complaint forward and for the

immediately preceding five (5) years prior to filing, including both former, and existing tenants.

17. On or about August 1, 2020, Plaintiff executed a Lease contract (hereinafter "Lease") for property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202, Apartment 528, Pulaski County, Arkansas.  The term of the lease was for thirteen months and was executed by Defendant's agent.  Attached as Exhibit "A" is a true and correct copy of the aforesaid Agreement.

18. The number of tenants, both former and existing, who agreed to the lease terms illustrated in the Exhibit referenced in the preceding paragraph, is so numerous that it is impracticable to bring all before the Court within a reasonable time, and a class action is therefore superior to other methods for the fair and efficient adjudication of this controversy.

19. There are common questions of law and fact affecting the potential members of the class.  Such common questions predominate over any questions affecting only individual potential class members.  These questions include, but are not limited to: (1) Whether the Defendants engaged in a uniform practice of deferring billing for utilities, namely water and sewer to ConService; (2) Whether the rates charged for water and sewer were apportioned based on actual usage by the occupant(s) of each leased unit; (3) Whether the rate(s) charged each tenant exceeded the rate authorized for the same rate of consumption by the direct provider of water and sewer services, Central Arkansas Water (hereinafter, "CAW"); (4) Whether the of re-billing water and sewer services constitutes an unlawful practice of re-selling of

water and sewer services without metering the actual usage; (5) Whether Defendants' actions violate §4-88-107(a)(9) and (a)(10) of the Arkansas Deceptive Trade Practices Act; (6) Whether the charging of arbitrary amounts through a third-party billing agent, with an additional fee tacked on violated the Arkansas Deceptive Trade Practices Act; (7) by the way they handled and charged fees to every potential member of the class; and (8) whether, the uniform practice of imposing late fees constituted unlawful coercion and intimidation; (9) whether the uniform practice of threatening eviction on three (3) days' notice constituted unlawful coercion and intimidation.

20. Claims of the named Plaintiff are typical of the claims of other potential members of the class in that they all arise from Defendants' normal business practice of including the obligation for utility payments in each lease agreement, and deferring utility billing to their third-party vendor, ConService without notice to the tenant as to the manner for determining, and the amount, to be billed for utility services.

21. Proceeding as a Class Action is superior to individual cases. Although the aggregate damages sustained by the potential Class are significant, the individual damages incurred by each potential Class Member are too small to warrant the expense of individual lawsuits.

IV.   ALLEGATIONS

22. Plaintiff is the sole occupant of her apartment home, a three bedroom, two bath unit.

23. Rent for the unit is $933 monthly, due on the first of every month, and collected by Defendant through its electronic online payment portal.

24. A term of the Lease requires Plaintiff, as tenant, to pay for utilities, including electricity, gas, water, and sewage.  Utility charges for electricity and gas are separately metered and billed to Plaintiff directly by Entergy (Arkansas), and Centerpoint Energy, respectively.

25. ConService, a utility billing agent for Defendant bills Plaintiff separately for the remaining utilities.

26. ConService generates a monthly statement that is mailed to Plaintiff coinciding with when rent is due on or before the first of each month.

27. Since on or about September 2020, ConService has sent Plaintiff a bill for $93 each and every month.  The statement itemizes charges as follows: pest control - $3.00; sewer - $62.04; trash 5 - $7.00; water - $17.96; and a service fee - $3.00.  From month to month, the only variable in the billing statement are the amounts charged for sewer and water, but the aggregate total charged remains exactly $93 (somewhat coincidentally, ten percent (10%) of my rent.

28. Upon information and belief, there are no separate meters for each apartment unit to record actual usage for water or sewage.

29. Upon information and belief, water is provided by Central Arkansas Water.  CAW is responsible for water mains in and for the City of Little Rock, and connects the properties herein described to its water and sewer lines.

30. CAW is a regulated direct provider of water and sewer services to Defendant. CAW determines the manner, means, and rates applicable to the provision of its services to Defendant, and is held to regulatory standards of quality and pricing.

31. CAW bills Defendant for water and sewer services provided to its property based on monthly meter readings that reflect actual usage.

32. Upon information and belief, CAW does not contract separately with Defendant to resell its water or sewer services to individual units or customers other than DLP at the property addresses listed herein.

33. The manner, means, quality, and or rate for water provided to the property addresses listed herein is within the sole purview of CAW.

34. Defendant imposes arbitrary amounts on Plaintiff for water and sewer utilities. The amounts charged do not correlate to the amount actually consumed. The frequency and existence of water outages and poor maintenance become Plaintiff's cross to bear with no recourse to CAW, the water and sewer system provider.

35. The practice of arbitrarily assessing water and sewer rates was not disclosed to Plaintiff at the time the lease was executed.

36. The calculus for determining the amount to bill Plaintiff for water and sewer services was not disclosed to Plaintiff at the time the lease was executed.

37. Each monthly billing generated by ConService and sent to Plaintiff by U.S. Mail constitutes a fraudulent misrepresentation of the actual cost of the services enumerated on the statement.

38. Water and sewer charges as imposed by Defendant are *per se* fraudulent, deceptive, and unreasonable.

39. Water service outages are not abated in monthly billing statements, nor are there adjustments to the cost for sewer services.

40. Defendant has conspired with other landlords/property managers to perpetrate this fraud on rental housing consumers.

41. Defendant maintains a practice of serving tenants with unlawful detainer, and/or three-day (3) notice to quit for failure to pay the utility charges they unilaterally and arbitrarily assess.

42. Defendants' practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(1) in that Defendant knowingly makes false representations regarding the water usage and the cost of providing the service.

43. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(2) in that Defendants conceal, suppress, or omit a material fact or facts concerning how the rate billed to Plaintiff is apportioned or calculated.

44. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(10) in that Defendants commit any other unconscionable, false, or deceptive act, such as failing to disclose that it makes money off Plaintiff by reselling water and sewer services above that which is established by regulation or law imposed on CAW.

45. Defendants assess a late fee in the amount of $100 for any month in which the water, sewer and other charges billed by ConService are not paid by Plaintiff.

46. The imposition of the late fee referenced in the preceding paragraph, creates a delinquency and adverse rating on the overall tenancy of Plaintiff.

47. Plaintiff is denied a satisfactory rating to prospective creditors based on a delinquent status of utility payments to ConService and/or Defendants.

48. Upon information and belief, there are numerous tenants, both former and current, who have been harmed by the practices herein described.

49. Questions of law and fact are common to the class of tenants, both former and current, who have been harmed by the practices herein described committed by Defendants.

50. Upon information and belief, Defendants own more than one property, other than that described herein, and subjected to tenants, both former and current, to this deceptive, fraudulent, and unlawful practice.

51. Defendants have conspired with other rental property owners to uniformly, and systematically engage in the practices described herein for the purpose of remaining competitive, unjustly enriching themselves, and harming the class of tenants, both former and current.

52. Plaintiff, on behalf of herself and those similarly situated seeks an Order certifying this cause of action as a class action.

WHEREFORE, Plaintiff, Lorraine Hatcher, herself, and on behalf of all others similarly situated, prays this Court certify this cause as a class action; award actual damages in an amount to be proved at trial; award punitive damages as provided for by statute; for any and all other compensatory damages

to be determined by this court; pre- and post-judgment interest at the prevailing rate; reasonable attorney's fees and costs; and all other just and equitable relief to which Plaintiff, and on behalf of all others similarly situated, may be entitled.

Respectfully submitted,

BY:_____

LORRAINE HATCHER, Attorney at Law,
AR SUP CT # 2003-009
Plaintiff, and on behalf of all others similarly situated
P.O. Box 21294
Little Rock, AR 72221
Phone: (501) 681-2402
e-mail: lorrainehatcher@yahoo.com

**EXHIBIT A**

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

CHERYL  CRAIG
2100 Rebsamen Park Rd
Little Rock, AR  72202

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Crystal Hill, DC

Date: 05/13/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 05/13/2021

No. 60CV-21-2858 This summons is for CHERYL  CRAIG (name of Defendant).


PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____

[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:
_____

❑ I was unable to execute service because:
_____
_____

My fee is $ ____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

                               By: _____
                               [Signature of server]


                               _____
                               [Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
                               [Signature of server]


                               _____
                               [Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____


                               _____
                               Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

 DLP PROPERTY MANAGEMENT LLC
DBA DBA PROSPER RIVERDALE
2100 Rebsamen Park Rd
Little Rock, AR  72202

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Crystal Hill, DC

Date: 05/13/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 05/13/2021

No. 60CV-21-2858 This summons is for   DLP PROPERTY MANAGEMENT LLC (name of Defendant).


PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____

[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:

_____


❑ I was unable to execute service because:

_____

_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

DLP REAL MANAGEMENT, LLC
605 Palencia Club Drive
Saint Augustine, FL  32095

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Jane Valenzuela, DC

Date: 06/01/2021

**NOTICE OF RIGHT TO CONSENT**
**TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE**

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 06/01/2021

No. 60CV-21-2858 This summons is for DLP REAL MANAGEMENT, LLC (name of Defendant).


## PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____

[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:

_____

❑ I was unable to execute service because:

_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

                               By: _____
                               [Signature of server]


                               _____
                               [Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
                               [Signature of server]


                               _____
                               [Printed name]

Address: _____
         _____

Phone: _____

Subscribed and sworn to before me this date: _____


                               _____
                               Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____
_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

EBONY JOSHUA
2100 Rebsamen Park Rd
Little Rock, AR  72202

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Jane Valenzuela, DC

Date: 06/01/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 06/01/2021

No. 60CV-21-2858 This summons is for EBONY JOSHUA (name of Defendant).

PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual
at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____
[date] I left the summons and complaint in the close proximity of the defendant by
_____ [describe how the
summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a
member of the defendant's family at least 18 years of age, at _____
[address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____
[name of individual], an agent authorized by appointment or by law to receive service of summons on
behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the
defendant maintains and office or other fixed location for the conduct of business, during normal
working hours I left the summons and complaint with
_____

[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons
and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as
shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the
summons and complaint by first-class mail to the defendant together with two copies of a notice and
acknowledgment and received the attached notice and acknowledgment form within twenty days after
the date of mailing.

❑ Other [specify]:
_____

❑ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

                                By: _____
                                [Signature of server]


                                _____
                                [Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
                                [Signature of server]


                                _____
                                [Printed name]

Address: _____
         _____

Phone: _____

Subscribed and sworn to before me this date: _____


                                _____
                                Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____
_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

DON WENNER
605 Palencia Club Drive
Saint Augustine, FL  32095

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Jane Valenzuela, DC

Date: 06/01/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 06/01/2021

No. 60CV-21-2858 This summons is for DON WENNER (name of Defendant).

PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:
_____

❑ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

KAREN  ROBERTSON
20 Hunters Cove
Cabot, AR  72023

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Crystal Hill, DC

Date: 05/13/2021

**NOTICE OF RIGHT TO CONSENT**
**TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE**

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 05/13/2021

No. 60CV-21-2858 This summons is for KAREN  ROBERTSON (name of Defendant).


PROOF OF SERVICE


❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or


❑ After making my purpose to deliver the summons and complaint clear, on _____
[date] I left the summons and complaint in the close proximity of the defendant by
_____ [describe how the
summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or


❑ On _____ [date] I left the summons and complaint with _____, a
member of the defendant's family at least 18 years of age, at _____
[address], a place where the defendant resides; or


❑ On _____ [date] I delivered the summons and complaint to _____
[name of individual], an agent authorized by appointment or by law to receive service of summons on
behalf of _____ [name of defendant]; or


❑ On _____ [date] at _____ [address], where the
defendant maintains and office or other fixed location for the conduct of business, during normal
working hours I left the summons and complaint with
_____
[name and job description]; or


❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons
and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as
shown by the attached signed return receipt.


❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the
summons and complaint by first-class mail to the defendant together with two copies of a notice and
acknowledgment and received the attached notice and acknowledgment form within twenty days after
the date of mailing.


❑ Other [specify]:
_____


❑ I was unable to execute service because:
_____
_____


My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]


_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
[Signature of server]


_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____


_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

PROSPER RIVERDALE
2100 Rebsamen Park Rd
Little Rock, AR  72202

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

Jane Valenzuela, DC

Date: 06/01/2021

**NOTICE OF RIGHT TO CONSENT**
**TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE**

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 06/01/2021

No. 60CV-21-2858 This summons is for PROSPER RIVERDALE (name of Defendant).


## PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with
_____
[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:
_____

❑ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]


_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
[Signature of server]


_____
[Printed name]

Address: _____
_____

Phone: _____

Subscribed and sworn to before me this date: _____


_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____
_____

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**HON. WENDELL GRIFFEN - 5TH DIVISION 6TH CIRCUIT**

LORRAINE HATCHER V DLP PROPERTY MGNT LLC ET AL

60CV-21-2858

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

ROBERT PETERSON
605 Palencia Club Drive
Saint Augustine, FL 32095

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lorraine Hatcher
P O Box 21294
Little Rock, AR  72221

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

Address of Clerks Office

TERRI HOLLINGSWORTH, CIRCUIT CLERK
CIRCUIT COURT OF PULASKI COUNTY
401 W. MARKHAM
LITTLE ROCK, AR  72201

CLERK OF COURT

*JValenzuela*

Jane Valenzuela, DC

Date: 06/01/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 06/01/2021

No. 60CV-21-2858 This summons is for ROBERT PETERSON (name of Defendant).

## PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with

_____

[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:

_____

❑ I was unable to execute service because:

_____
_____

My fee is $ ____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-May-14 15:32:23
60CV-21-2858
C06D05 : 11 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## CIVIL DIVISION

**LORRAINE HATCHER, on behalf of herself**
**and all others in a class similarly situated**                    **PLAINTIFF**

### CASE NO. 60CV-21-2858

**vs.**

**DLP PROPERTY MANAGEMENT, LLC**
**d/b/a PROSPER RIVERDALE, CHERYL**
**CRAIG, and KAREN ROBERTSON**                    **DEFENDANTS**

### FIRST AMENDED COMPLAINT

**Plaintiff files this First Amended Complaint to add Exhibit A: Lease**

**Agreement, previously omitted from the original Complaint filed on May 7, 2021.**

Plaintiff, Lorraine Hatcher, on behalf of herself and all others similarly situated,

brings her Complaint for damages based on the Arkansas Deceptive Trade Practices

Act, codified at Ark. Code Ann. §§4-88-107 *et seq.*, and states that:

### I.    PARTIES

1. Plaintiff is an individual residing in Little Rock, Arkansas, within Pulaski County.

2. Defendant, DLP Property Management, LLC, (hereinafter, "DLP"), is a

   corporation authorized to do business within the state of Arkansas with its

principal place of business located in Little Rock, Arkansas. Its agent for service of process is Karen Robertson at 20 Hunters Cove, Cabot, Arkansas 72023.

3.  Based upon information and belief, Defendant Karen Robertson is a managing member or officer of DLP Property Management, LLC.

4.  Upon information and belief, Cheryl Craig is a manager authorized to issue eviction notices on behalf of Defendant DLP.

5.  Upon information and belief, DLP is engaged in the business of leasing, managing, and maintaining real property, and own and manage the property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202 (hereinafter "Property"), as well as Prosper Pleasant Valley, located at 1602 Green Mountain Drive, Little Rock, Arkansas 72211.

6.  Defendants DLP, Cheryl Craig, and Karen Robertson have conducted business in Arkansas through entities the company owns, operates, and controls. Defendants have engaged in fraudulent, deceptive and unlawful acts in the state of Arkansas.

## II.    JURISDICTION

7.  This Court has jurisdiction pursuant to Ark. Code Ann. §16-13-201(a). This Court also has jurisdiction pursuant to Rule 23 of the Arkansas Rules of Civ. P.

8.  Allegations set forth herein relevant to these causes of action occurred at all times in Little Rock, Arkansas.

9.  Jurisdiction and venue are both proper in this Court.

10. The named Plaintiff and potential Class Members assert no federal question. The state law causes of action asserted herein are not federally pre-empted.

11. The named Plaintiff and potential Class Members assert that the amount in controversy will not exceed the sum or value of $4,999,999, including compensatory damages, restitution, interest, costs and attorney's fees. Plaintiff specifically waives any right to any amount in controversy which exceeds $4,999,999, including compensatory damages, restitution, interest, costs and attorney's fees. The aggregate amount in controversy of the potential Class Members' claims does not and will not exceed $4,999,999.

## III.    INTRODUCTION

12. Plaintiff brings this action on behalf of herself and all other persons similarly situated. Plaintiff will fairly and adequately protect the interests of the potential class and is an adequate representative of the class of persons defined herein. Plaintiff is interested in the outcome of this lawsuit and understands the importance of adequately representing every potential member of the class described herein.

13. The proposed class is defined as all persons who paid utility fees ("Utility Fees") to Defendants and their agent for billing, ConService, from the date of filing this Complaint forward and for the immediately preceding five (5) years ("potential Class Period").

14. Defendants lease residential apartment homes at their properties located at 2100 Rebsamen Park Rd, Little Rock, Pulaski County, Arkansas, 72202, and 1602 Mountain Drive, Little Rock, Pulaski County, Arkansas, 72211.

15. Defendants' apartment homes include one-, two-, and three-bedroom units.

16. A lease agreement is required of a tenant of Defendants' apartment homes and may be of variable length.

17. The proposed class is defined as all persons who executed lease agreements of one month or longer from the date of filing this Complaint forward and for the immediately preceding five (5) years prior to filing, including both former, and existing tenants.

18. On or about August 1, 2020, Plaintiff executed a Lease contract (hereinafter "Lease") for property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202, Apartment 528, Pulaski County, Arkansas. The term of the lease was for thirteen months and was executed by Defendant's agent. Attached as Exhibit "A" is a true and correct copy of the aforesaid Agreement.

19. The number of tenants, both former and existing, who agreed to the lease terms illustrated in the Exhibit referenced in the preceding paragraph, is so numerous that it is impracticable to bring all before the Court within a reasonable time, and a class action is therefore superior to other methods for the fair and efficient adjudication of this controversy.

20. There are common questions of law and fact affecting the potential members of the class. Such common questions predominate over any questions affecting only individual potential class members. These questions include, but are not limited to: (1) Whether the Defendants engage in a uniform practice of deferring billing for utilities, namely water and sewer to ConService; (2) Whether the rates charged for water and sewer are apportioned based on actual usage by the occupant(s) of

each leased unit; (3) Whether the rate(s) charged each tenant exceed the rate authorized for the same rate of consumption by the direct provider of water and sewer services, Central Arkansas Water (hereinafter, "CAW"); (4) Whether the re-billing of water and sewer services constitutes an unlawful practice of re-selling of water and sewer services without metering the actual usage by a non-utility provider; (5) Whether Defendants' actions  violate §4-88-107(a)(9) and (a)(10) of the Arkansas Deceptive Trade Practices Act; (6) Whether the charging of arbitrary amounts through a third-party billing agent, with an additional fee tacked on violates  the Arkansas Deceptive Trade Practices Act; (7) Whether the means or method of determining allocated charges constitutes an arbitrary, capricious and/or discriminatory practice; (8) Whether the non-disclosure of these practices violates the terms and conditions of the lease agreement; (9) Whether, the uniform practice of imposing late fees constitutes unlawful coercion and intimidation; and, (10) whether the uniform practice of threatening eviction on three (3) days' notice constitutes unlawful coercion and intimidation.

21. Claims of the named Plaintiff are typical of the claims of other potential members of the class in that they all arise from Defendants' normal business practice of including the obligation for utility payments in each lease agreement, and deferring utility billing to their third-party vendor, ConService without notice to the tenant as to the manner for determining, and the amount, to be billed for utility services.

22. Proceeding as a Class Action is superior to individual cases. Although the aggregate damages sustained by the potential Class are significant, the individual damages incurred by each potential Class Member are too small to warrant the expense of individual lawsuits.

IV.    ALLEGATIONS

23. Plaintiff is the sole occupant of her apartment home, a three bedroom, two bath unit.

24. Rent for the unit is $933 monthly, due on the first of every month, and collected by Defendant through its electronic online payment portal.

25. A term of the Lease requires Plaintiff, as tenant, to pay for utilities, including electricity, gas, water, and sewage. Utility charges for electricity and gas are separately metered and billed to Plaintiff directly by Entergy (Arkansas), and Centerpoint Energy, respectively.

26. ConService, a utility billing agent for Defendant bills Plaintiff separately for the remaining utilities.

27. ConService generates a monthly statement that is mailed to Plaintiff coinciding with when rent is due on or before the first of each month.

28. Since on or about September 2020, ConService has sent Plaintiff a bill for $93 each and every month. The statement itemizes charges as follows: pest control - $3.00; sewer - $62.04; trash 5 - $7.00; water - $17.96; and a service fee - $3.00. From month to month, the only variable in the billing statement are the amounts charged for sewer and water, but the aggregate total charged remains exactly $93.

29. Upon information and belief, there are no separate meters for each apartment unit to record actual usage for water or sewage.

30. Upon information and belief, water is provided by Central Arkansas Water. CAW is responsible for water mains in and for the City of Little Rock, and connects the properties herein described to its water and sewer lines.

31. CAW is a regulated direct provider of water and sewer services to Defendant. CAW determines the manner, means, and rates applicable to the provision of its services to Defendant, and is held to regulatory standards of quality and pricing.

32. CAW bills Defendant for water and sewer services provided to its property based on monthly meter readings that reflect actual usage.

33. Upon information and belief, CAW does not contract separately with Defendant to resell its water or sewer services to individual units or customers other than DLP at the property addresses listed herein.

34. The manner, means, quality, and or rate for water provided to the property addresses listed herein is within the sole purview of CAW.

35. Defendant imposes arbitrary amounts on Plaintiff for water and sewer utilities. The amounts charged do not correlate to the amount actually consumed. The frequency and existence of water outages and poor maintenance become Plaintiff's cross to bear with no recourse to CAW, the water and sewer system provider.

36. The practice of arbitrarily assessing water and sewer rates was not disclosed to Plaintiff at the time the lease was executed, nor are such terms otherwise itemized in the lease.

37. The calculus for determining the amount to bill Plaintiff for water and sewer services was not disclosed to Plaintiff at the time the lease was executed; spaces for that information were left blank by Defendant.

38. Each monthly billing generated by ConService and sent to Plaintiff by U.S. Mail constitutes a fraudulent misrepresentation of the actual cost of the services enumerated on the statement.

39. Water and sewer charges as imposed by Defendant are *per se* fraudulent, deceptive, and unreasonable.

40. Water service outages are not abated in monthly billing statements, nor are there adjustments to the cost for sewer services.

41. Defendant has conspired with other landlords/property managers to perpetrate this fraudulent billing scheme on rental housing consumers.

42. Defendant maintains a practice of serving tenants with unlawful detainer, and/or three-day (3) notice to quit for failure to pay the utility charges they unilaterally and arbitrarily assess.

43. Defendants' practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(1) in that Defendant knowingly makes false representations regarding the water usage and the cost of providing the service.

44. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(2) in that Defendants conceal, suppress, or omit a material fact or facts concerning how the rate billed to Plaintiff is apportioned or calculated.

45. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(10) in that Defendants commit any other unconscionable, false, or deceptive act, such as failing to disclose that it makes money off Plaintiff by reselling water and sewer services above that which is established by regulation or law imposed on CAW, and passed on to its direct customers.

46. Defendants assess a late fee in the amount of $100 for any month in which the water, sewer and other charges billed by ConService are not paid by Plaintiff.

47. The imposition of the late fee referenced in the preceding paragraph, creates a delinquency and adverse rating on the overall tenancy of Plaintiff.

48. Plaintiff is denied a satisfactory rating to prospective creditors based on a delinquent status of utility payments to ConService and/or Defendants.

49. Upon information and belief, there are numerous tenants, both former and current, who have been harmed by the practices herein described.

50. Questions of law and fact are common to the class of tenants, both former and current, who have been harmed by the practices herein described committed by Defendants.

51. Upon information and belief, Defendants own more than one property, other than that described herein, and subjected to tenants, both former and current, to this deceptive, fraudulent, and unlawful practice.

52. Defendants have conspired with other rental property owners to uniformly, and systematically engage in the practices described herein for the purpose of

remaining competitive, unjustly enriching themselves, and harming the class of tenants, both former and current.

53. Plaintiff, on behalf of herself and those similarly situated seeks an Order certifying this cause of action as a class action.

WHEREFORE, Plaintiff, Lorraine Hatcher, herself, and on behalf of all others similarly situated, prays this Court certify this cause as a class action; award actual damages in an amount to be proved at trial; award punitive damages to be determined by this court; pre-and post-judgment interest at the prevailing rate; reasonable attorney's fees and costs; and all other just and equitable relief to which Plaintiff, and on behalf of all others similarly situated, may be entitled.

A jury trial is requested.

Respectfully submitted,

BY:_____
LORRAINE HATCHER, Attorney at Law,
AR SUP CT # 2003-009
Plaintiff, and on behalf of all others similarly situated
P.O. Box 21294
Little Rock, AR 72221
Phone: (501) 681-2402
e-mail: lorrainehatcher@yahoo.com

**EXHIBIT A**

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
NA    May-14 15:32:23
60CV-21-2858
C06D05 : 21 Pages

## APARTMENT LEASE CONTRACT

Date of Lease Contract: _____ **June 24, 2020** _____
(when the lease contract is filled out)

*This is a binding document. Read carefully before signing.*

Part of a General Information

**1. PARTIES.** This Lease Contract is between *you*, the resident(s)
(list all people signing the Lease Contract):

**Lorraine A. Batcher**

_____
_____
_____
_____
_____
_____
_____
_____

and *us*, the owner: **Little Rock Ventures III, LLC**

_____
_____

*(name of apartment community or title holder).* You've
agreed to rent Apartment No. _____ **528** _____
at **2100 Rebsamen Park Rd**

*(street address)* in **Little Rock**
*(city)*, Arkansas, _____ **72202** _____
*(zip code)* (the "apartment" or the "premises") for use as a private
residence only. The terms "you" and "your" refer to all residents
listed above. The terms "we," "us," and "our" refer to the owner
listed above (or any of owner's successors' in interest or assigns).
Written notice to or from our managers constitutes notice to or
from us. If anyone else has guaranteed performance of this Lease
Contract, a separate Lease Contract Guaranty for each guarantor is
attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and
*(list all other occupants not signing the Lease Contract):*

_____
_____
_____
_____
_____
_____
_____
_____
_____

No one else may occupy the apartment. Persons not listed above
must not stay in the apartment for more than ___ **7** ___ consecutive
days without our prior written consent, and no more than twice
that many days in any one month. *If the previous space isn't filled in,
two days per month is the limit.*

**3. LEASE TERM.** The initial term of the Lease Contract begins on
the **27th** day of _____ **June** _____ **2020**, and
ends at 11:59 p.m. the **26th** day of _____ **July**
**2021** .

**Renewal.** This Lease Contract will automatically renew month-
to-month unless either party gives at least ___ **60** ___ days written
notice of termination or intent to move-out as required by paragraph
46 (Move-Out Notice). If the number of days isn't filled in, at least
30 days notice is required.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security
deposit at the time of execution of this Lease Contract for all residents
in the apartment is $ **300.00** due on or before the date this
Lease Contract is signed.

**5. KEYS.** You will be provided ___ **1** ___ apartment key(s), _____
mailbox key(s), _____ FOB(s), and/or _____ other access
device(s) for access to the building and amenities at no additional
cost at move-in. If the key, FOB, or other access device is lost or
becomes damaged during your tenancy or is not returned or is
returned damaged when you move out, you will be responsible for
the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay
$ **933.00** per month for rent, payable in advance and
without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____
_____
_____

Prorated rent of $ **124.40** is due for the remainder of *[check
one]:* ☒ 1st month or ☐ 2nd month, on _____

*Otherwise, you must pay your rent on or before the 1st day of each
month (due date) with no grace period. Cash is unacceptable without
our prior written permission. You must not withhold or offset rent
unless expressly authorized by statute. We may, at our option, require
at any time that you pay all rent and other sums in cash, certified
or cashier's check, money order, or one monthly check rather than
multiple checks.*

If you don't pay all rent on or before the **3rd** day of the month,
you'll pay a late charge of $ _____ . In the alternative, we
may simply charge you **10** % of your monthly rent payment as
a late fee. You'll also pay a charge of $ **35.00** for each
returned check or rejected electronic payment (not to exceed $30)
plus the amount of any fees charged to the Owner by any financial
institution as a result of the check not being honored, plus the late
charge. At our discretion, we may convert any and all checks via the
Automated Clearing House (ACH) system for the purposes of
collecting payment. Rent is not considered accepted, if the payment/
ACH is rejected, does not clear, or is stopped for any reason. If you
don't pay rent on time, you'll be delinquent and all remedies under
this Lease Contract will be authorized. All payment obligations
under this Lease Contract shall constitute rent under this Lease
Contract.

**7. UTILITIES.** We'll pay for the following items, if checked:

☐ water    ☐ gas    ☐ electricity    ☐ master antenna
☐ wastewater    ☐ trash    ☐ cable TV
☐ other _____

You'll pay for all other utilities, related deposits, and any charges,
fees, or services on such utilities. You must not allow utilities to be
disconnected—including disconnection for not paying your bills—
until the Lease Contract or renewal period ends. Cable channels
that are provided may be changed during the Lease Contract term
if the change applies to all residents. Utilities may be used only for
normal household purposes and must not be wasted. If your
electricity is ever interrupted, you must use only battery-powered
lighting. If the apartment is submetered for electricity, water, or
gas, a submetering addendum is attached to this Lease Contract in
compliance with state agency rules. If a master metered water bill
or any central system costs for the apartment are prorated among
our residents by an allocation formula, a utility allocation addendum
is attached in compliance with applicable law.

**8. INSURANCE.** We do not maintain insurance to cover your personal
property or personal injury.

In addition, we urge all Tenants, and particularly those residing in
coastal areas, areas near rivers, and areas prone to flooding, to
obtain flood insurance. Renter's insurance may not cover damage
to your property due to flooding. A flood insurance resource which
may be available includes the National Flood Insurance Program
managed by the Federal Emergency Management Agency (FEMA).
We are not responsible to any resident, guest, or occupant for damage
or loss of personal property or personal injury from (including but
not limited to) fire, smoke, rain, flood, water and pipe leaks, hail,
ice, snow, lightning, wind, explosions, earthquake, interruption of
utilities, theft, hurricane, negligence of other residents, occupants,
or invited/uninvited guests or vandalism unless otherwise required
by law.

We ☒ require ☐ do not require you to get your own insurance
for losses to your personal property or injuries due to theft, fire,
water damage, pipe leaks and the like. If no box is checked, renter's
insurance is not required.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, may be an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

**Special Provisions and "What If" Clauses**

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

**In office payments must be made in the form of a "POSTAL" money order or a "BANK" cashier's check ONLY.**

See any additional special provisions.

**11. LEASE DEFAULT-RELETTING CHARGES.** You'll be liable to us for a reletting charge of $_____ (not to exceed 100% of the highest monthly rent during the Lease Contract term) if you:

(1) fail to give written move-out notice as required in paragraph 46 (Move-Out Notice) or any other applicable laws; or
(2) move out without paying rent in full for the entire Lease Contract term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

*The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.*

**Not a Release.** The reletting charge is not a Lease Contract cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages; that is, our time, effort, and expense in finding and processing a replacement. Those amounts are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to violation of the Lease Contract or rules, improper use, or negligence by you or your guests or occupants. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from you or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. DISPOSITION OF PROPERTY LEFT IN YOUR APARTMENT AFTER SURRENDER, ABANDONMENT, OR EVICTION.**

**Definition of Surrender And Abandonment of Apartment.** You have "surrendered" the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where rent is paid—whichever date occurs first.

You have "abandoned" the apartment when you have not responded for 2 days to our notice left on the inside of the main entry door stating that we consider the apartment "abandoned" and one of the following have occurred: (1) everyone appears to have moved out in our reasonable judgment; (2) clothes, furniture, and personal

belongings have been substantially removed in our reasonable judgment; or (3) you've been in default for nonpayment of rent for 5 consecutive days or water, gas, or electric service for the apartment not connected in our name has been terminated. An apartment is also "abandoned" ten (10) days after the death of a sole resident.

**Entry and Disposition of Your Property.** Immediately after surrender, abandonment, or eviction, we have the right to: enter and take possession of the apartment; remove, store, sell, or throw away property left in the apartment when authorized below; and exercise other rights under paragraph 51 (Deposit Return) relating to clean-up, repairs, and security deposit deductions. We may at our discretion allow any emergency contact person named in your application or provided to us in writing to remove your abandoned property left in your apartment and take possession. We have a lien on all property left in the apartment to secure all sums you owe us.

**Removal of Your Property.** All property left in the apartment or common areas by you or others after eviction or after surrender or abandonment of the apartment may be removed by us or (law officers), at our expense. We may, at our option, allow any emergency contact person named in your application or person named in a separate writing to remove your abandoned property left in or about the apartment, including motor vehicles, and take possession.

**Storage of Your Property.** We may store but have no duty to store property removed after judicial eviction or after you have surrendered or abandoned the apartment. We're not liable for casualty loss, damage or theft of stored property. You must pay reasonable charges for our packing, removing, storing, selling, and disposing of such property.

**Redemption of Your Property.** If we've stored property under this paragraph, you may redeem it prior to sale or disposition under the following subparagraph by paying all sums you owe, including rent, late charges, reletting charges, storage, damages, attorney's fees, etc. You must pay reasonable charges for our packing, removing, and storing such property. We may require payment by cash, money order, or certified check. If you request in writing, we will provide you an accounting of amounts owed. We may return redeemed property at the place of storage, the management office, or the apartment (at our option).

**Disposition or Sale of Your Property.** Immediately after removal, we may throw away or give to a charitable organization property removed by us under this paragraph (except for animals and property removed after a death of a sole resident). If we've stored property under this paragraph, we will sell it by sale which will be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice will itemize the amounts you owe and the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. Animals removed after surrender, abandonment, or judicial eviction will not be sold; but we may board them or turn them over to local authorities or humane societies. If property is sold: the sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. Any item that cannot be sold may at our discretion be thrown away or donated to charity.

**14. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, all future rent will be automatically accelerated without notice and immediately due. We may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 (Lease Default-Reletting Charges) and 33 (Default by Resident) apply to acceleration under this paragraph.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.**
No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by any signed written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 19 (Community Policies or Rules). If, at least 5 days before the advance notice deadline referred to in paragraph 3 (Lease Term), we give you written notice of rent increases or Lease Contract changes effective when the Lease Contract term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or Lease Contract changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 46 (Move-Out Notice).

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay so long as the delay is not willful or in bad faith on our part. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment

will be ready on a specific date —you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. AD VALOREM TAXES/FEES AND CHARGES - ADDITIONAL RENT.** Unless otherwise prohibited by law, if, during the term of this Agreement, any locality, city, state, or Federal Government imposes upon Us, any fee, charge, or tax, which is related to or charged by the number of occupants, or by the apartment unit itself, such that we are charged a fee, charge, or tax, based upon your use or occupancy of the apartment, we may add this charge as Additional Rent, during the term of the Lease Contract, with thirty (30) days advance written notice to you. After this written notice (the amount or approximate amount of the charge, will be included), you agree to pay, as Additional Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

**18. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it.

**While You're Living in the Apartment**

**19. COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Any rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**20. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or heaters without our prior written approval; store anything in closets having gas appliances; cook on balconies or outside; or solicit business or contributions.

Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, and other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are charged or convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**21. PROHIBITED CONDUCT.** You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: loud or obnoxious conduct; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in a way that may alarm others; tampering with utilities or telecommunications; or bringing hazardous materials into the apartment community.

**22. PARKING.** We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**23. RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 32 (Responsibilities Of Owner), or 46 (Move-Out Notice), or any other applicable laws, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**24. MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**25. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke detectors and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and access control devices.

**Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish smoke detectors and carbon monoxide detectors only if required by any state or local government, and we'll test them and provide working batteries when you first take possession. After that, you must test the smoke detectors and the carbon monoxide detectors on a regular basis, and you must pay for and replace batteries as needed, unless the law provides otherwise. We will comply with other requirements of any applicable government entity regarding smoke detectors and carbon monoxide detectors. We may replace dead or missing batteries at your expense. You must immediately report smoke-detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable neither the smoke detectors nor the carbon monoxide detectors. You will be liable to us and others for any loss, damage, or fines from fire, smoke, or water if that condition arises from disabling or damaging the smoke detector or carbon monoxide detector, or from your failure to replace a dead battery or report malfunctions to us.

**Casualty Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, theft, or vandalism unless otherwise required by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for these services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident-report number upon request.

**26. CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You'll be given two copies of an Inventory and Condition form on or before move-in. You must note on the forms all defects or damage and return one copy to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets,

alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**27. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or nonsecurity matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. You must promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary. We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty insurance proceeds are received. Rent will not abate in whole or in part. If we believe that fire, water damage or catastrophic damage is substantial, or that mold, allergens, or hazardous materials are present in or around the apartment, or that performance of needed repairs or restoration poses a danger to you, your occupants or guests, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

**28. ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, 24 hours written notice of intent to remove the animal, and (2) following the procedures of paragraph 29 (When We May Enter). We may keep or kennel the

animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**29. WHEN WE MAY ENTER.** If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, then such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary in emergencies) if:

(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; *and*

(2) entry is for: responding to your request; making repairs or re-placements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector and carbon monoxide detector batteries; retrieving unreturned tools, equipment, or appliances; preventing waste of utilities; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials) or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; cutting off electricity according to statute; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with search or arrest warrant or in hot pursuit; allowing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

**30. JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of Lease Contract termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds may be by one check jointly payable to all residents; the check and any deduction itemizations may be mailed to one resident only.

---

## Replacements

**31. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment, or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents procure a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement subletting assignment, or granting a right or any license to occupy, then:

(1) a reletting charge *will not* be due;

(2) a reasonable administrative (paperwork) and/or transfer fee will be due, and a rekeying fee *will* be due if rekeying is requested or required; and

(3) you *will* remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

**Procedures for Replacement.** If we approve a replacement resident, then at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right of occupancy or security-deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

---

## Responsibilities of Owner and Resident

**32. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 26 (Condition of the Premises and Alterations);

(2) maintain fixtures, furniture, hot water, heating and A/C equipment;

(3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and

(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If you violate any of the above, you may terminate your tenancy and exercise other remedies only as follows: (a) you must make a written request for repair or remedy of the condition, and all rent must be current at the time; (b) after receiving your request, we have a reasonable time to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities; (c) if we haven't diligently tried to repair within a reasonable time, you must then give us written notice of intent to terminate your tenancy unless the repair is made within 7 days; and (d) if repair hasn't been made within 7 days, you may terminate your tenancy and exercise other lawful remedies. Security deposits and prorated rent will be refunded as required by law.

**33. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application or you provide false or fraudulent documentation requested by us; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined under state statute; (6) any illegal drugs or paraphernalia are found in your apartment; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 21 (Prohibited Conduct); or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government.

**Lease Renewal When A Breach or Default Has Occurred.**
In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease we may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Eviction.** If you are in default, we may file suit for Lease Contract termination or for possession after giving you three (3) days written notice of Lease Contract termination. After giving notice of Lease Contract termination, we may still accept rent, late fees or other sums due; and the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages, past or future rent, or other sums, or to file or continue with eviction proceedings.

**Acceleration.** All monthly rent for the rest of the Lease Contract term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the Lease Contract term or renewal period ends; *and* (2) you've not paid all rent for the entire Lease Contract term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.**   You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be three times the contract rent or twice the actual damages sustained by an owner, which ever is greater, and reasonable attorney's fees as provided by state statute, without notice; (3) you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the Lease Contract term—for up to one month from the date of notice of Lease Contract extension—by delivering written notice to you or your apartment while you continue to hold over.

**Remedies Cumulative.**   Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

**Other Remedies.**   Under state statute, if your rent is delinquent, you immediately forfeit all right to occupy the apartment any longer, and if we've given you ten (10) days notice in writing to vacate the apartment and you have not vacated by the 10th day, you are guilty of a misdemeanor. Each day of your unlawful presence in the

apartment constitutes a separate offense. We may report unpaid amounts to credit agencies. Upon your default and early move-out, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including suit for Lease Contract termination, possession, damages, rent, and all other monies due. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the nonprevailing party attorney's fees and all other litigation costs. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear the highest lawful rate of interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within ten (10) days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline. We may turn any returned checks over to law enforcement officials for prosecution according to law.

**Mitigation of Damages.**   If you move out early, you'll be subject to paragraph 11 (Lease Default-Reletting Charges) and all other remedies. We'll exercise customary diligence to relet and mitigate damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

## General Clauses

**34.ENTIRE AGREEMENT.**   *Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us.*

**35.NO AUTHORITY TO AMEND UNLESS IN WRITING.**
*Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.*

**36.*WRITTEN RELEASE.***   Our representatives must give you a written release when this Lease Contract entitles you to a release.

**37.NO WAIVER.**   No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances.

**38.NOTICE.**   Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo or letter that was given. All notices must be signed. Delivery of notice by us to you may be made by personal delivery to you, or mailed by registered or certified mail to you at the apartment address or, your last known place of residence, or the place held out by you as a place of receipt of notices. Proof of mailing constitutes notice without proof of receipt. You must give notice to us in writing by delivering a copy of any notice or other document to the apartment community leasing office or some other place that we designate as the place that you send us notices.

**39.MISCELLANEOUS.**
  A. Exercising one remedy won't constitute an election or waiver of other remedies.
  B. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties.
  C. All remedies are cumulative.
  D. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
  E. This Lease Contract binds subsequent owners.
  F. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
  G. All provisions regarding our nonliability and nonduty apply to our employees, agents, and management companies.
  H. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
  I. All Lease Contract obligations must be performed in the county where the apartment is located.
  J. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**40.WAIVER OF JURY TRIAL.**   To minimize legal expenses and, to the extent allowed by law, you and we agree that a trial of any lawsuit based on statute common law, and/or related to this Lease Contract shall be to a judge and not a jury.

**41.CONTACTING YOU.**   By signing this lease, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**42.OBLIGATION TO VACATE.**   If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with paragraph 3 (Lease Term), and we accept such written notice, then you are required to vacate the Apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us. Written notice to or from our managers constitutes notice to or from us. Notice of lease termination and demand for possession will be served by either hand-delivery (actual notice) or certified mail.

**43.FORCE MAJEURE.**   If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**44.PAYMENTS.**   Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 (Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction) or utility payments subject to governmental regulations) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent (which is due on the first) are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**45.ASSOCIATION MEMBERSHIP.**   We represent that either: (1) we or;(2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**46. MOVE-OUT NOTICE.** Before moving out, either at the end of the lease term, any extension of the lease term, or prior to the end of the lease term, you must give our representative advance written notice of your intention to vacate as required by paragraph 3 (Lease Term). If you move out prior to the end of the lease term, your notice does not act as a release of liability for the full term of the Lease Contract. You will still be liable for the entire Lease Contract term if you move out early under paragraph 23 (Release of Resident) except if you are able to terminate your tenancy under the statutory rights explained under paragraphs 11, or 23 (Lease Default-Reletting Charges, or Release of Resident) or any other applicable laws. All notices to vacate must be in writing and must provide the date by which you intend to vacate. If the notice does not comply with the time requirements of paragraph 3 (Lease Term), even if you move by the last date in the lease term, you will be responsible for an additional month's rent. If you fail to vacate by the date set forth in your notice, you will automatically and immediately become a holdover tenant pursuant to state law, and we will have all remedies available under this Lease Contract and state law.

**47. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease Contract term or renewal period ends unless all rent for the entire Lease Contract term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraph 11 (Lease Default-Reletting Charges) and 33 (Default by Resident). You're prohibited from applying any security deposit to rent. You won't stay beyond the date you are supposed to move-out. All residents, guests, and occupants must surrender the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**48. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**49. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**50. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector and carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false-security-alarm charges unless due to our negligence; animal-related charges under paragraph 28 (Animals); government fees or fines against us for violation (by you, your occupant, or guest) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 33 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Lease Default-Reletting Charges).

**51. DEPOSIT RETURNS.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. We'll mail you, to the forwarding address you provide, your security deposit refund (less lawful deductions) and an itemized accounting of any deductions within the time frames and parameters set forth under state law. If you fail to provide us with your forwarding address in writing, as required above, we will process the unclaimed security deposit in accordance with state law.

*Surrender and abandonment* are defined in paragraph 13 (Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction). Surrender, abandonment, and eviction ends your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and eviction affect your rights to property left in the apartment (paragraph 13 -Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction). Surrender, abandonment, and eviction do not affect our mitigation obligations (paragraph 33 - Default by Resident).

## Severability, Originals and Attachments and Signatures

**52. SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**53. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

Date form is filled out (same as on top of page 1)
**06/24/2020**

*You are legally bound by this document.*
*Please read it carefully.*

Name and address of locator service (if applicable)

Resident or Residents (all sign below)
*Lorraine Hatcher*

Owner or Owner's Representative (signing on behalf of owner)
*Ralph B Smeator IV*

Address and phone number of owner's representative for notice purposes
2100 Rebsamen Park Road

Little Rock, AR 72202
(501) 904-5300

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2) _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# PACKAGE ACCEPTANCE ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **528** , **2100 Rebsamen**
**Park Rd**
_____ (street address) in
_____ **Little Rock** _____
(city), Arkansas, _____ **72202** _____
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you wish for us to sign for, and to accept, U.S. mail and privately-delivered packages or other items on your behalf, subject to the terms and conditions set forth herein.

**4. PACKAGE ACCEPTANCE.**
**A. Generally.** You hereby authorize us and our agent to accept, on your behalf, any package or item delivered to our on-site management office during disclosed business hours, including but not limited to any package delivered by the U.S. Postal Service or by any private courier service or individual. You also specifically authorize us to sign on your behalf if the person or entity delivering said package or item requires an adult signature prior to delivery, including but not limited to the delivery of certified or registered mail. A photo I.D. is required before any packages will be released. Packages will only be released to verified Residents or approved representatives.

**B. Limitations.** You understand and agree that we may refuse to accept any package for any reason or no reason at all.

**5. TIME LIMITATION.** Due to limited storage space, we must ask that you pick up your package as soon as possible. You also agree that we shall have no duty whatsoever to hold or store any package for more than _____ **3** _____ days after receipt (accordingly, you should notify the management office if you are going to be away from the apartment home and expect to be receiving a package(s)). After said time, you agree that any such package is deemed abandoned and you authorize us to return the package to its original sender.

**6. DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF RISKS AND WAIVER.** As to any package for which we sign and/or receive on your behalf, you understand and agree that we have no duty to notify you of our receipt of such package, nor do we have any duty to maintain, protect, or deliver said package to you, nor do we have any duty to make said package available to you outside disclosed business hours. Any packages or personal property delivered to us or stored by us shall be at your sole risk, and you assume all risks whatsoever associated with any loss or damage to your packages and personal property. You, your guests, family, invitees, and agents hereby waive any and all claims against us or our agents of any nature regarding or relating to any package or item received by us, including but not limited to, claims for theft, misplacing or damaging any such package, except in the event of our or our agent's gross negligence or willful misconduct. You also agree to defend and indemnify us and our agents and hold us both harmless from any and all claims that may be brought by any third party relating to any injury sustained relating to or arising from any package that we received on your behalf. You also agree to indemnify us and our agents and hold us harmless from any damage caused to us or our agents by any package received by us for you. You also authorize us to throw away or otherwise dispose of any package that we, in our sole discretion, deem to be dangerous, noxious, or in the case of packaged food, spoiled, and waive any claim whatsoever resulting from such disposal.

**7. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is illegal, invalid or unenforceable under any applicable law, then it is the intention of the parties that (a) such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease, (b) the remainder of this Addendum shall not be affected thereby, and (c) it is also the intention of the parties to this Addendum that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Addendum a clause or provision similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
**NOT ACCEPTING PACKAGES AT THIS TIME.**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| (All residents must sign) | (Signs below) |
| _Lorraine Hatcher_ | _Ralph B Scruton IV_ |
| _____ | _____ |
| | **Date of Signing Addendum** |
| _____ | 06/24/2020 |
| _____ | |
| _____ | |

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

## ADDENDUM PROHIBITING
## SHORT-TERM SUBLETTING OR RENTAL



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **528** _____, **2100 Rebsamen**
**Park Rd** _____ in
_____ *(street address)* in
_____ **Little Rock** _____
*(city),* Arkansas, _____ **72202** _____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. SHORT TERM SUBLEASE OR RENTING PROHIBITED.**
Without limiting the prohibition in the Lease on subletting and assignment and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

**4. PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.**
You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

**5. VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

**6. REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

**7. RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

**8. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

*Lorraine Hatcher*
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

*Ralph B Streetow IV*
_____

**Date of Signing Addendum**
06/24/2020
_____

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

☑ Blue Moon eSignature Services Document ID: 223936775

## PHOTO, VIDEO, AND STATEMENT
## RELEASE ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ 528 _____, 2100 Rebsamen
Park Rd _____
_____ *(street address)* in
_____ Little Rock _____
*(city),* Arkansas, _____ 72202 _____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: June 24, 2020
Owner's name: Little Rock Ventures III, LLC
_____
_____
_____
_____

Residents *(list all residents):*
Lorraine A. Hatcher
_____
_____
_____
_____
_____
_____
_____
_____
_____

Occupants *(list all occupants):*
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such
Lease Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you,
without payment or other consideration, agree to grant us
permission to use your likeness in photographs, videos and/
or other electronic and/or digital reproductions, including
voice, in any and all of our publications, including, without
limitation, any website entries, advertising websites, social
media websites, and any other marketing materials. For
purposes of this addendum, photographs, videos, written
comments, statements, and other digital reproductions will
hereinafter be collectively referred to as "media."

**A. Consent for Minor Occupants.** By signing this
Addendum, if any minor occupants are named above, you
further certify that you are the parent, or legal guardian
of the minor occupant(s) named above, and you, without
payment or other consideration, agree to grant us
permission to use their likeness in photographs, videos
and/ or other electronic and/or digital reproductions,
including voice, in any and all of our publications, including,
without limitation, any website entries, advertising
websites, social media websites, and any other marketing
materials. For purposes of this addendum, photographs,
videos, written comments, statements, and other digital
reproductions will hereinafter be collectively referred
to as "media."

**4. PHOTO AND VIDEO RELEASE.** You hereby grant us and
our agents and affiliates (collectively, the "Released Parties")
permission and a license to take, use, reuse, and publish the
likeness of you and any minor occupants in all photographs
or other electronic and/or digital media in any and all of our
publications, including, without limitation, any website
entries, advertising websites, and any other marketing
materials. You understand and agree that these materials
will become the property of the Released Parties and will
not be returned. You agree to irrevocably authorize the
Released Parties to edit, alter, copy, exhibit, publish, or
distribute this media for any lawful purpose whatsoever
including, without limitation, promotional and advertising
uses. You waive the right to inspect or approve the finished
product, including any written or electronic copy, wherein
your likeness appears now or in the future. In addition, you
waive any right to payment, royalties, or any other
compensation arising or related to the use of the media.

**5. CONSENT TO USE YOUR NAME, LIKENESS , WRITTEN
COMMENTS, AND STATEMENTS.** You are expressly agreeing
to allow us to post your name, picture, written comments,
and  statements, and/or the names, pictures, written
comments and statements of any minor occupants in any
and all of our publications, including, without limitation, any
website entries, advertising websites, social media websites,
and any other marketing materials. You hereby grant the
Released Parties permission and a license to use, reproduce,
and publish any media on its website, social media platforms,
or in other marketing-related materials, whether in electronic
or print form.

**6. RELEASE OF LIABILITY.** You hereby release, hold harmless,
and forever discharge us from any claims or causes of actions
including, without limitation, any and all claims for libel or
violation of any right of publicity or privacy, related to our
use of the media in any and all of our publications, including
any website entries, advertising websites, social media
websites, and any other marketing material so long as the
claim or cause of action does not result from our intentional
misconduct or gross negligence. This consent and release
shall be binding upon you and your heirs, legal representatives
and assigns.

**7. REVOCATION.** You have the right to revoke your consent
to our use of your name, picture, video, voice, written
comments, or statement, and/or the name, picture, video,
voice, written comments, or statement of any minor occupants,
by written notice to us.

**8. SPECIAL PROVISIONS.** The following special provisions
control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident or Residents** | **Owner or Owner's Representative** |
|---------------------------|-------------------------------------|
| *(All residents must sign)* | *(signs below)* |

*Lorraine Hatcher*

*Ralph B Scrostin IV*

**Date of Signing Addendum**

06/24/2020

# E-SIGNATURE CERTIFICATE

*This certificate details the actions recorded during the signing of this Document.*



## DOCUMENT INFORMATION

| | |
|---|---|
| Status: | Signed |
| Document ID: | 223936775 |
| Submitted: | 06/24/20 |
| Total Pages: | 40 |
| Forms Included: | Apartment Lease Form, Lead Hazard Disclosure Addendum, Animal Addendum, All-In-One Utility Addendum, Bed Bug Addendum, Mold Information and Prevention Addendum, Asbestos Addendum, Lease Contract Buy-Out Agreement, Community Policies, Rules, & Regulations, Addendum for Rent Concession, Renter's or Liability Insurance Addendum, No-Smoking Addendum, Short-Term Subletting or Rental Prohibited, Package Acceptance Addendum, Photo, Video, and Statement Release Addendum, Crime/Drug Free Housing Addendum, Parking Addendum, Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |

## PARTIES

**Lorraine Hatcher**
signer key: 59269361&cae8982ed199b0d526c165e
IP address: 107.77.200.144
signing method: Blue Moon eSignature Services
authentication method: eSignature by email lorrainehatcher@yahoo.com
browser: Mozilla/5.0 (iPad; CPU OS 12_4_5 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.1.2 Mobile/15E148 Safari/604.1



**Ralph B Screeton IV**
signer key: e4622bdb4bcb077c63b10582d44de5ca
IP address: 10.100.10.121
signing method: Blue Moon eSignature Services
authentication method: eSignature by email prosperriverdale@dlpre.com
browser: GuzzleHttp/6.5.4 curl/7.64.0 PHP/7.3.19



## DOCUMENT AUDIT

| | | |
|---|---|---|
| 1 | 06/24/20 08:43:34 PM CDT | Lorraine Hatcher accepted Consumer Disclosure |
| 2 | 06/24/20 08:47:53 PM CDT | Lorraine Hatcher signed Apartment Lease Form |
| 3 | 06/24/20 08:49:13 PM CDT | Lorraine Hatcher dated Lead Hazard Disclosure Addendum |
| 4 | 06/24/20 08:59:16 PM CDT | Lorraine Hatcher signed Lead Hazard Disclosure Addendum |
| 5 | 06/24/20 06:00:14 PM CDT | Lorraine Hatcher initialed Lead Hazard Disclosure Addendum |
| 6 | 06/24/20 06:00:27 PM CDT | Lorraine Hatcher initialed Lead Hazard Disclosure Addendum |
| 7 | 06/24/20 09:00:39 PM CDT | Lorraine Hatcher signed Animal Addendum |
| 8 | 06/24/20 06:03:33 PM CDT | Lorraine Hatcher signed All-In-One Utility Addendum |
| 9 | 06/24/20 06:03:36 PM CDT | Lorraine Hatcher dated All-In-One Utility Addendum |
| 10 | 06/24/20 06:04:32 PM CDT | Lorraine Hatcher signed Bed Bug Addendum |
| 11 | 06/24/20 06:05:23 PM CDT | Lorraine Hatcher signed Mold Information and Prevention Addendum |
| 12 | 06/24/20 06:05:44 PM CDT | Lorraine Hatcher signed Asbestos Addendum |
| 13 | 06/24/20 06:05:40 PM CDT | Lorraine Hatcher dated Asbestos Addendum |

**DOCUMENT AUDIT CONTINUED**

| 14 | 06/24/20 06:06:14 PM CDT | Lorraine Hatcher signed Lease Contract Buy-Out Agreement |
| 15 | 06/24/20 06:07:47 PM CDT | Lorraine Hatcher signed Community Policies, Rules, & Regulations |
| 16 | 06/24/20 06:07:48 PM CDT | Lorraine Hatcher dated Community Policies, Rules, & Regulations |
| 17 | 06/24/20 06:08:32 PM CDT | Lorraine Hatcher signed Addendum for Rent Concession |
| 18 | 06/24/20 06:09:50 PM CDT | Lorraine Hatcher signed Renter's or Liability Insurance Addendum |
| 19 | 06/24/20 06:10:14 PM CDT | Lorraine Hatcher signed No-Smoking Addendum |
| 20 | 06/24/20 06:11:51 PM CDT | Lorraine Hatcher signed Short-Term Subletting or Rental Prohibited |
| 21 | 06/24/20 06:12:05 PM CDT | Lorraine Hatcher signed Package Acceptance Addendum |
| 22 | 06/24/20 06:12:47 PM CDT | Lorraine Hatcher signed Photo, Video, and Statement Release Addendum |
| 23 | 06/24/20 06:12:06 PM CDT | Lorraine Hatcher signed Crime/Drug Free Housing Addendum |
| 24 | 06/24/20 06:13:30 PM CDT | Lorraine Hatcher dated Crime/Drug Free Housing Addendum |
| 25 | 06/24/20 06:13:32 PM CDT | Lorraine Hatcher signed Parking Addendum |
| 26 | 06/24/20 06:13:52 PM CDT | Lorraine Hatcher signed Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 27 | 06/24/20 06:13:59 PM CDT | Lorraine Hatcher dated Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 28 | 06/24/20 06:14:29 PM CDT | Lorraine Hatcher submitted signed documents |
| 29 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Apartment Lease Form |
| 30 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV initialed Lead Hazard Disclosure Addendum |
| 31 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Lead Hazard Disclosure Addendum |
| 32 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Lead Hazard Disclosure Addendum |
| 33 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Animal Addendum |
| 34 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed All-In-One Utility Addendum |
| 35 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated All-In-One Utility Addendum |
| 36 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Bed Bug Addendum |
| 37 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Bed Bug Addendum |
| 38 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Mold Information and Prevention Addendum |
| 39 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Asbestos Addendum |
| 40 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Asbestos Addendum |
| 41 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Lease Contract Buy-Out Agreement |
| 42 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Community Policies, Rules, & Regulations |
| 43 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Community Policies, Rules, & Regulations |
| 44 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Addendum for Rent Concession |
| 45 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Renter's or Liability Insurance Addendum |
| 46 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed No-Smoking Addendum |
| 47 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Short-Term Subletting or Rental Prohibited |
| 48 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Short-Term Subletting or Rental Prohibited |
| 49 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Package Acceptance Addendum |
| 50 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Package Acceptance Addendum |
| 51 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Photo, Video, and Statement Release Addendum |
| 52 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Photo, Video, and Statement Release Addendum |
| 53 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Crime/Drug Free Housing Addendum |
| 54 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Crime/Drug Free Housing Addendum |
| 55 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Parking Addendum |
| 56 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Parking Addendum |
| 57 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV signed Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 58 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV dated Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 59 | 06/24/20 06:18:08 PM CDT | Ralph B Screeton IV submitted signed documents |

**ADDENDUM REGARDING MEDICAL MARIJUANA USE**
**and**
**LANDLORD'S COMMITMENT TO ENFORCEMENT OF CRIME/DRUG FREE ADDENDUM**



**1. DWELLING UNIT DESCRIPTION.**
Unit. No. _____ **528** _____, **2100 Rebsamen**
**Park Rd** _____
_____ *(street address)* in
_____ **Little Rock** _____
*(city)*, Arkansas, _____ **72202** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020** _____
Owner's name: **Little Rock Ventures III,LLC** ____
_____
_____
_____
_____

Residents *(list all residents)*:
**Lorraine A. Hatcher** _____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3.** The Arkansas Medical Marijuana Amendment of 2016,
(Arkansas Const. of 1874, Amend. 98.) permits the limited
use of medical marijuana in specific and limited circumstances.
However, this is not the case under federal law. Under federal
law, specifically the Controlled Substances Act (CSA), marijuana
is still categorized as a Schedule I substance. This means that
under federal law, the manufacture, distribution, or possession
of marijuana is strictly prohibited. Because the U.S. Department
of Housing and Urban Development is controlled by the federal
government, it agrees that the use of marijuana, whether
prescribed for medical reasons or not, is a criminal offense
and will not be protected under the fair housing laws.
Therefore, apartment complexes are not required to
accommodate the use of marijuana by a tenant who is a current
medical marijuana user. Disabled tenants who are registered
medical marijuana users, however, should not feel discouraged
to request reasonable accommodations if the need arises.

**4.** The Premises listed above follows and complies with federal
law regarding marijuana use and is, and will continue to be,
a drug free community. Possession, use, manufacture or sale
of any illegal substance, including marijuana, or any use of
marijuana by the tenant and/or guests will result in immediate
termination. If you have any questions or concerns about this
policy, please speak to management.

**5.** By signing below, the resident acknowledges his or her
understanding of the terms and conditions as stated above,
and his or her agreement to comply with those terms and
conditions.

**6. SPECIAL PROVISIONS.** The following special provisions
control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents** *(sign here)*

*Lorraine Hatcher*
_____
_____
_____
_____

**Owner or Owner's Representative** *(signs here)*

*Ralph B Scruton IV*

**Date of Signing Addendum**

06/24/2020
_____
_____
_____
_____

**Date of Signing Addendum**

06/24/2020

© 2019, National Apartment Association, Inc. - 8/2019, Arkansas

☑ Blue Moon eSignature Services Document ID: 223936775

# RESIDENT PARKING ADDENDUM



Date: ___**June 24, 2020**___
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. ___**528**___, **2100 Rebsamen**
**Park Rd** _____
_____ (street address) in
___**Little Rock**_____
(city), Arkansas, ___**72202**___ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The term of this Parking Addendum is as follows:
Begins on _____ and
ending on _____.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**RESIDENT AND OWNER AGREE AS FOLLOWS:**

3. You agree to properly register all vehicles with management. If you get a new or replacement vehicle you must notify us and complete a revised agreement.

4. If you are provided with a parking tag or sticker it must be properly installed and displayed.

5. Unless your vehicle(s) has been assigned a specific space(s) you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any marked handicap space, unless you possess a government issued handicap decal or similar signage.

6. If you are assigned a specific parking space(s) we shall assign you the space(s) and retain the right to change assigned space(s) at our sole discretion.

7. You understand and accept that we have the right at any time, without notice, to tow unauthorized or non-registered vehicles from any parking space on the property.

8. You agree to use parking spaces in accord with the terms of the Lease and Community Rules.

9. Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Community Rules will be towed at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

10. You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) is parked on any part of the property. Upon signing this agreement you knowingly accept the risk of parking any vehicle(s) on the property.

11. Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a violation of the Lease Contract.

12. You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**COST FOR PARKING**

Resident agrees to pay a onetime fee of $ _____ per vehicle on or before the _____ day of _____. In alternative resident agress to pay $ _____ monthly per vehicle due on or before the _____ day of the month. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is _____ days delinquent in paying the required parking fee.

Resident agress to pay $ ___**35.00**___ NSF fee for all checks returned for non-sufficient funds.

**VEHICLE INFORMATION**

**Vehicle 1**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 2**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 3**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

☑ Blue Moon eSignature Services Document ID: 223936775

**13. SPECIAL PROVISIONS.**

All vehicles on property must have current
tags and be in working condition, no flat
tires or broken windows. No maintenance
allowed of vehicles on property at any
time.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

*Lorraine Hatcher*
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

*Ralph B Streeter IV*
_____

**Date of Signing Addendum**

06/24/2020
_____

☑ Blue Moon eSignature Services Document ID: 223936775

# CRIME/DRUG FREE HOUSING ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**

Unit No. **520** , **2100 Rebsamen Park Rd**

_____ _(street address)_ in

**Little Rock**

_(city)_, Arkansas, **72202** _(zip code)_.

**2. LEASE CONTRACT DESCRIPTION.**

Lease Contract Date: **June 24, 2020**

Owner's name: **Little Rock Ventures III, LLC**

Residents _(list all residents)_:

**Lorraine A. Hatcher**

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

   1. Engaging in any act intended to facilitate any type of criminal activity.

   2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging such activity is a member of the household, or a guest.

   3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Arkansas and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents** _(sign here)_

_Lorraine Hatcher_

**Owner or Owner's Representative** _(signs here)_

_Ralph B Srouston IV_

**Date of Signing Addendum**

06/24/2020

**Date of Signing Addendum**

06/24/2020

© 2019, National Apartment Association, Inc. - 3/2019, Arkansas

# NO-SMOKING ADDENDUM



Date: _____ **June 24, 2020** _____
*(when this Addendum is filled out)*

*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community.
You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

**1. DWELLING UNIT DESCRIPTION.**

Unit No. ___**528**___, ___**2100 Rebsamen**___
**Park Rd**_____
_____ *(street address)* in
_____**Little Rock**_____
*(city),* Arkansas, _____**72202**_____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**

Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____

Residents *(list all residents):*
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

**4. SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

**5. SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least ___**10**___ feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☒ is ☐ is not permitted.

The following outside areas of the community may be used for smoking: _____
_____
_____
_____

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

**6. YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

**7. YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

**8. LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

☑ Blue Moon eSignature Services Document ID: 223936775

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

No smoking is permitted in the Premises. If there is any evidence of smoking in the premises you will incur a $500.00 fine.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

*Lorraine Hatcher*
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Sign here)*

*Ralph B Scruton IV*
_____

☑ Blue Moon eSignature Services Document ID: 223936775

**LEASE ADDENDUM**
**LIABILITY INSURANCE REQUIRED OF RESIDENT**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**528**_____, **2100 Rebsamen**
**Park Rd**
_____ *(street address)* in
_____**Little Rock**_____
*(city)*, Arkansas, _____**72202**_____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____

Residents *(list all residents)*:
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3. ACKNOWLEDGMENT CONCERNING INSURANCE OR
DAMAGE WAIVER.** You acknowledge that we do not
maintain insurance to protect you against personal injury,
loss or damage to your personal property or belongings, or
to cover your own liability for injury, loss or damage you (or
your occupants or guests) may cause others. You also
acknowledge that by not maintaining your own policy of
personal liability insurance, you may be responsible to others
(including us) or the full cost of any injury, loss or damage
caused by your actions or the actions of your occupants or
guests. You understand that paragraph 8 of the Lease Contract
requires you to maintain a liability insurance policy, which
provides limits of liability to third parties in an amount not
less than $ **100000.00** per occurrence. You understand
and agree to maintain at all times during the Term of the
Lease Contract and any renewal periods a policy of personal
liability insurance satisfying the requirements listed below,
at your sole expense.

**4. REQUIRED POLICY.** You are required to purchase and
maintain personal liability insurance covering you, your
occupants and guests, for personal injury and property
damage any of you cause to third parties (including damage
to our property), in a minimum policy coverage amount of

$_____,from a carrier with an AM Best rating of
A-VII or better, licensed to do business in Arkansas. The carrier
is required to provide notice to us within 30 days of any
cancellation, non-renewal, or material change in your coverage.
We retain the right to hold you responsible for any loss in
excess of your insurance coverage.

**5. We may provide you with information of an insurance
program that we make available to residents, which
provides you with an opportunity to buy renter's insurance
from a preferred company. However, you are free to
contract for the required insurance with a provider of
your choosing.**

**6. SUBROGATION ALLOWED.** You and we agree that
subrogation is allowed by all parties and that this agreement
supersedes any language to the contrary in the Lease Contract.

**7. YOUR INSURANCE COVERAGE.** You have purchased the
required personal liability insurance from the insurance
company of your choosing listed below that is licensed to do
business in this state, and have provided us with written
proof of this insurance prior to the execution and
commencement of the Lease Contract. You will provide
additional proof of insurance in the future at our request.

Insurance Company: _____

**8. DEFAULT.** Any default under the terms of this Addendum
shall be deemed an immediate, material and incurable default
under the terms of the Lease Contract, and we shall be entitled
to exercise all rights and remedies under the law.

**9. MISCELLANEOUS.** Except as specifically stated in this
Addendum, all other terms and conditions of the Lease Contract
shall remain unchanged. In the event of any conflict between
the terms of this Addendum and the terms of the Lease
Contract, the terms of this Addendum shall control.

**10. SPECIAL PROVISIONS:** **If tenant does not**
**provide proof of paid renter's insurance**
**to landlord, a $10 monthly surcharge will**
**be due each month and shall be deemed**
**additional rent. Upon providing proof of**
**renter's insurance the $10 monthly**
**surcharge will be removed, however any**
**past month's surcharge(s) will not be**
**refunded even if coverage was in effect.**
**Tenant understands that the $15 surcharge**
**is not a premium and does not provide**
**personal property insurance coverage for**
**Resident.**
_____
_____
_____
_____
_____
_____

I have read, understand and agree to comply with the preceding provisions.

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| *(All residents must sign here)* | *(signs here)* |
| *Lorraine Hatcher* | *Ralph B Scrotten IV* |
| | |
| | **Date of Lease Contract** |
| | |
| | **June 24, 2020** |

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

**LEASE ADDENDUM FOR RENT CONCESSION
OR OTHER RENT DISCOUNT**

ELECTRONICALLY FILED
Pulaski County Circuit Court
_____ollingsworth, Circuit/County Clerk
2021-May-14  15:32:23
_____ 60CV-21-2858
C06D05 : 21 Pages

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**528**_____, **2100 Rebsamen Park
Rd**
_____ (street address) in
_____**Little Rock**_____
(city), Arkansas, _____**72202**_____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3. CONCESSION/DISCOUNT AGREEMENT.** As consideration
for your agreement to remain in your dwelling and to fulfill
your Lease obligations throughout the full term of your Lease,
you will receive the following rent Concession and or Discount.

(Check all that apply)

☒ **One-Time Concession.** You will receive a One-Time
Concession off the rent indicated in the Rent and Charges
paragraph of the Lease Contract in the total amount of
$ **200.00** . This Concession will be credited to
your rent due for the month(s) of: **July**
_____
_____

☐ **Monthly Discount/Concession.** The rent indicated in
the Rent and Charges paragraph of the Lease Contract
includes a Monthly Discount of $_____ per
month off of the suggested rental rate for your dwelling.

☐ **Other Discount/Concession.** You will receive the
following discount off the rent indicated in the Rent and
Charges paragraph of the Lease Contract:
_____
_____
_____
_____
_____

☐ **Non-Monetary Concession.** You will receive the
following non-monetary concession during the term of
the Lease:
_____
_____
_____
_____
_____

**4. CONCESSION CANCELLATION AND CHARGE-BACK.**
The concession and discounts indicated above are provided
to you as an incentive and with the understanding that you
will fulfill your obligations under the Lease Contract through
the entire term of your Lease.

If your lease is terminated early due to your default (for
example, if you abandon the premises without paying rent or
are evicted), this Concession/Discount Agreement will be
immediately terminated, and you will be required to
immediately repay to the Owner the amounts of all (Check all
that apply)

☒ Concessions
☒ Discounts

that you have actually received for the months you resided
in the Premises, and without further notice from us.

**5. MARKET RENT.** The market rent for this dwelling is the
rent stated in the Lease Contract. You acknowledge that the
market rent is a fair representation of what the specific
dwelling would actually rent for at the time the Lease Contract
was negotiated and executed, and is reflective of the rent for
a similar dwelling at comparable properties.

**6. SPECIAL PROVISIONS.** The following special provisions
control over any conflicting provisions of this printed
Addendum form or the Lease Contract.

**$200.00 off July rent-for signing a 13
month lease**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
(All residents must sign)

*Lorraine Hatcher*
_____
_____
_____
_____

**Owner or Owner's Representative**
(signs here)

*Ralph B Streetin IV*
_____

**Date of Lease Contract**

**June 24, 2020**
_____

© 2019, National Apartment Association, Inc. - 2/2019, Arkansas

[V] Blue Moon eSignature Services Document ID: 223936775

## COMMUNITY POLICIES, RULES AND REGULATIONS
## ADDENDUM



*This addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. This Addendum shall apply to all renewals of the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling:*

*Property Owner:* __Little Rock Ventures III, LLC__

*Resident(s):* __Lorraine A. Hatcher__

*Unit No./Address:* __#528, 2100 Rebsamen Park Rd, Little Rock, AR 72202__

*Lease Date:* __06/24/2020__

**I.    GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.**
Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time.

**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

**II.    POOL.**  This Community ☒ DOES;  ☐ DOES NOT have a pool. When using the pool, Resident(s) agrees to the following:
* Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
* All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries.
* For their safety, Residents should not swim alone.
* Pool hours are posted at the pool.
* No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
* Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool.
* No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
* Resident(s) must accompany their guests.
* Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

### IN CASE OF EMERGENCY DIAL 911

**III.    FITNESS CENTER.**  This Community ☒ DOES;  ☐ DOES NOT have a fitness center. When using the fitness center, Resident agrees to the following:
* Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
* The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
* Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
* Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
* Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
* Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
* Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
* Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.

Card # issued:   (1) _____   (3) _____   (5) _____
                 (2) _____   (4) _____   (6) _____

☑ Blue Moon eSignature Services Document ID: 223936775

**IV.    PACKAGE RELEASE.**    This Community ☐ **DOES;**   ☒ **DOES NOT** accept packages on behalf of Residents.

For communities that do accept packages on behalf of its Residents:
Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident agrees that Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same.

**V.    BUSINESS CENTER.**    This Community ☐ **DOES;**   ☒ **DOES NOT** have a business center.
agrees to use the business center at Resident(s) sole risk and according to the Rules and regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to _____ minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center.

**VI.    AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.**    The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only _____1_____ vehicle per licensed Resident is allowed.
- All vehicles must be registered at the Management office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management, will be towed at the vehicle owner's expense after a ___24___ hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.

**VII.    FIRE HAZARDS.**    In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of ___10___ feet from any building.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- Fireplaces:    Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairway breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**VIII.    EXTERMINATING.**    Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner will prepare Residents' dwelling and charge Residents accordingly. Residents must request extermination treatments in addition to those regularly provided by Owner in writing. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets or place them in bedrooms, and notify Owner of such placement.
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean, off premises, all luggage, handbags, shoes and clothes hanging containers.
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

<u>**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**</u>

**IX.    DRAPES AND SHADES.**    Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

☑ Blue Moon eSignature Services Document ID: 223936775

**X.**  **WATER BEDS.**  Resident shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**XI.**  **BALCONY or PATIO.**  Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios. No misuse of the space is permitted, including but not limited to, throwing, spilling or pouring liquids or other items, whether intentionally or negligently, over the balconies or patios.

**XII.**  **SIGNS.**  Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**XIII.**  **SATELLITE DISHES/ANTENNAS.**  You must complete a satellite addendum and abide by its terms prior to installation or use.

**XIV.**  **WAIVER/SEVERABILITY CLAUSE.**  No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this addendum, the Lease Contract or any other addenda to the Lease Contract.

**XV.**  **SPECIAL PROVISIONS.**  The following special provisions control over conflicting provisions of this printed form:

NO GRILLS ALLOWED ON PROPERTY.

I have read, understand and agree to comply with the preceding provisions.

| | | | |
|---|---|---|---|
| *Lorraine Hatcher* | 06/24/2020 | | |
| Resident | Date | Resident | Date |
| | | | |
| Resident | Date | Resident | Date |
| | | | |
| Resident | Date | Resident | Date |
| *Ralph B Streetman IV* | | 06/24/2020 | |
| Owner Representative | | Date | |

## LEASE CONTRACT BUY-OUT AGREEMENT



**1. DWELLING UNIT DESCRIPTION.**

Unit No. _____528_____ _____2100 Rebsamen_____
_____Park Rd_____
_____ (street address) in
_____Little Rock_____
(city), Arkansas, _____72202_____
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**

Lease Contract date: _June 24, 2020_
Owner's name: _Little Rock Ventures III.LLC_
_____
_____
_____
_____

Residents (list all residents):
_Lorraine A. Hatcher_
_____
_____
_____
_____
_____
_____
_____
_____

This Buy-Out Agreement shall apply to all renewals of the Lease Contract between Owner and the Resident. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

**4. BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term if all of the following occur:

(a) you give us written notice of buy-out at least __60__ days prior to the new termination date (i.e., your new move-out date), which (check one) ☒ must be the last day of a month or ☐ may be during a month;

(b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

(c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

(d) you are not in default under the Lease Contract on the new termination date (move-out date);

(e) you move out on or before the new termination date and do not hold over;

(f) you pay us a buy-out fee (consideration) of $_____;

(g) you pay us the amount of any concessions you received when signing the Lease Contract; and

(h) you comply with any special provisions in paragraph 9 below.

**5. WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than __30__ days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $_____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

**6. SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

**7. COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

**8. MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

**9. SPECIAL PROVISIONS.** Your right of buy-out (check one) ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
(All residents must sign)

_Lorraine Hatcher_
_____
_____
_____
_____

**Owner or Owner's Representative**
(signs below)

_Ralph B Scruton IV_

**Date of Lease Contract**
June 24, 2020

© 2018, National Apartment Association, Inc. · 6/2018, Arkansas

## ASBESTOS ADDENDUM



Date: **June 24, 2020**
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **528** , **2100 Rebsamen**
**Park Rd**
_____ *(street address)* in
**Little Rock**
*(city)*, Arkansas, **72202**
*(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____

Residents *(list all residents)*:
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____

This Addendum shall apply to all renewals of the Lease Contract between Owner and the Resident. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ASBESTOS.** In most dwellings which were built prior to 1981 and in some built after that, asbestos was commonly used as a construction material. In various parts of your dwelling, asbestos materials may have been used in the original construction or in renovations prior to the enactment of federal laws which limit asbestos in certain construction materials.

**4. FEDERAL RECOMMENDATIONS.** The United States Environmental Protection Agency (EPA) has determined that the mere presence of asbestos materials does not pose a health risk to residents and that such materials are safe so long as they are not dislodged or disturbed in a manner that causes the asbestos fibers to be released. Disturbances include sanding, scraping, pounding, or other techniques that produce dust and cause the asbestos particles to become airborne. The EPA does not require that intact asbestos materials be removed. Instead, the law simply requires that we take reasonable precautions to minimize the chance of damage or disturbance of those materials.

**5. COMMUNITY POLICIES AND RULES.** You, your families, other occupants, and guests must not disturb or attach anything to the walls, ceilings, floor tiles, or insulation behind the walls or ceilings in your dwelling unless specifically allowed in owner's rules or community policies that are separately attached to this Lease Contract. The foregoing prevails over other provisions of the Lease Contract to the contrary. Please report any ceiling leaks to management promptly so that pieces of acoustical ceiling material or ceiling tiles do not fall to the floor and get disturbed by people walking on the fallen material.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident(s)** *(All residents must sign)* | **Date of Signing Addendum** |
|---|---|
| *Lorraine Hatcher* | 06/24/2020 |
| | |
| | |
| | |
| | |
| **Owner or Owner's Representative** | **Date of Signing Addendum** |
| *Ralph B Streetin IV* | 06/24/2020 |

Arkansas/National Apartment Association Official Form, June 2018
© 2018, National Apartment Association, Inc.

# MOLD INFORMATION AND PREVENTION ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**

Unit No. _____528_____, _2100 Rebsamen_
_Park Rd_ _____ _(street address)_ in
_____Little Rock_____
_(city)_, Arkansas, _____72202_____
_(zip code)._

**2. LEASE CONTRACT DESCRIPTION.**

Lease Contract date: _June 24, 2020_
Owner's name: _Little Rock Ventures III, LLC_

_____
_____
_____

Residents *(list all residents)*:
_Lorraine A. Batcher_

_____
_____
_____
_____
_____
_____
_____

This Addendum shall apply to all renewals of the Lease Contract between Owner and the Resident. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

**4. PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and

discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain inside the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

**5. IN ORDER TO AVOID MOLD GROWTH**, it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

**6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. Be sure to follow the instructions on the container. Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner

☑ Blue Moon eSignature Services Document ID: 223936775

with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from porous items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

|                          Resident or Residents                          |                   Owner or Owner's Representative                   |
|:------------------------------------------------------------------------:|:-------------------------------------------------------------------:|
|                      *(All residents must sign here)*                    |                           *(Signs here)*                            |

*Lorraine Hatcher*

*Ralph B Scruggs IV*

**Date of Lease Contract**

**June 24, 2020**

Arkansas/National Apartment Association Official Form, June 2018
© 2018, National Apartment Association, Inc.

☑ Blue Moon eSignature Services Document ID: 223936775

# BED BUG ADDENDUM



Date: _____ **June 24, 2020** _____
(when this Addendum is filled out)

## 1. DWELLING UNIT DESCRIPTION.

Unit No. _____ **528** ___ **2100 Rebsamen Park**
**Rd** _____
_____ (street address) in
_____ **Little Rock** _____
(city), Arkansas, ___ **72202** ___ (zip code).

## 2. LEASE CONTRACT DESCRIPTION.

Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

## 3. PURPOSE.
This Addendum modifies the Lease Contract and addresses situations related to bed bugs (cimex lectularius) which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

## 4. INSPECTION AND INFESTATIONS.
BY SIGNING THIS ADDENDUM, YOU REPRESENT THAT:

- YOU HAVE INSPECTED THE DWELLING PRIOR TO MOVING IN, OR PRIOR TO SIGNING THIS ADDENDUM, AND YOU DID NOT FIND ANY EVIDENCE OF BED BUGS OR A BED BUG INFESTATION;

OR

- YOU WILL INSPECT THE DWELLING WITHIN 48 HOURS AFTER MOVING IN, OR WITHIN 48 HOURS AFTER SIGNING THIS ADDENDUM AND WILL NOTIFY US OF ANY BED BUGS OR BED BUG INFESTATIONS.

You agree that you have read the information provided in this Addendum and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property, or possessions. You also acknowledge that you have fully disclosed to us any previous bed bug infestations or bed bug issues that you have experienced.

If you disclose to us a previous experience with bed bug infestations or other bed bug related issues, we can review documentation of the previous treatment(s) and inspect your personal property and possession to confirm the absence of bed bugs.

## 5. ACCESS FOR INSPECTION AND PEST TREATMENT.
You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. Unless otherwise prohibited by law, you are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

## 6. NOTIFICATION.
You must promptly notify us:

- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

## 7. COOPERATION.
If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

## 8. RESPONSIBILITIES.
You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

☑ Blue Moon eSignature Services Document ID: 223936775

**9. TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

**10. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

| **Resident or Residents**<br>*(All residents must sign)* | **Owner or Owner's Representative**<br>*(Signs below)* |
|---|---|
| *Lorraine Hatcher* | *Ralph B Screatin IV* |
| | **Date of Signing Addendum** |
| | 06/24/2020 |

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*

☑ Blue Moon eSignature Services Document ID: 223936775

## BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

### Bed bugs don't discriminate

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

### Bed bugs don't transmit disease

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

### Identifying bed bugs

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors

- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

### Preventing bed bug encounters when traveling

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

### Bed bug do's and don'ts

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

☑ Blue Moon eSignature Services Document ID: 223936775

## UTILITY AND SERVICES ADDENDUM



This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated _____**June 24, 2020**_____ between **Little Rock Ventures III, LLC** _____

_____

("We") and **Lorraine A. Hatcher** _____

_____
_____
_____
_____
_____

("You") of Apt. No. _____**528**_____ located at **2100 Rebsamen Park Rd** _____

(street address) in _____**Little Rock, AR 72202**_____ and is in addition to all terms and conditions in the Lease.This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

1. Responsibility for payment of utility and service bills, including charges for usage, deposits, and any charges, taxes, fees, administrative fees or costs associated with the utility services or billing (collectively, "costs"), and the method of metering or otherwise allocating the payment of utility services and costs, will be as indicated below.

    a) **Water** service to your dwelling and costs will be paid by you either:
    ☐ directly to the utility service provider; or
    ☒ water service will be billed by the service provider to us and then allocated to you based on the following formula: _____
    (NOTE: if flat rate is selected, the flat rate for water service is $ _____ per month.)

    b) **Sewer** service to your dwelling and costs will be paid by you either:
    ☐ directly to the utility service provider; or
    ☒ sewer service will be billed by the service provider to us and then allocated to you based on the following formula: _____
    (NOTE: if flat rate is selected, the flat rate for sewer service is $ _____ per month.)

    c) **Gas** service to your dwelling and costs will be paid by you either:
    ☒ directly to the utility service provider; or
    ☐ gas service will be billed by the service provider to us and then allocated to you based on the following formula:_____
    (NOTE: if flat rate is selected, the flat rate for gas service is $ _____ per month.)

    d) **Trash** service to your dwelling and costs will be paid by you either:
    ☐ directly to the service provider; or
    ☒ trash service will be billed to you based on the following formula:
    (NOTE: if flat rate is selected, the flat rate for trash service is $ _____**7.00**_____ per month.)

    e) **Electric** service to your dwelling and costs will be paid by you either:
    ☒ directly to the utility service provider; or
    ☐ electric service will be billed by the service provider to us and then allocated to you based on the following formula:_____
    (NOTE: if flat rate is selected, the flat rate for electric service is $_____ per month.)

    f) (Other) **Pest Control** _____ service to your dwelling and costs will be paid by you either:
    ☐ directly to the utility service provider(s); or
    ☒ This service will be billed by the service provider to us and then allocated to you based on the following formula: _____
    (NOTE: if flat rate is selected, the flat rate for service is $_____**3.00**_____ per month.)

    METERING/ALLOCATION METHOD KEY
    "1"  - Sub-metering of all of your water/gas/electric use
    "2"  - Calculation of your total water use based on sub-metering of hot water
    "3"  - Calculation of your total water use based on sub-metering of cold water
    "4"  - Flat rate per month
    "5"  - Allocation based on the number of persons residing in your dwelling unit
    "6"  - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
    "7"  - Allocation based on square footage of your dwelling unit
    "8"  - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
    "9"  - Allocation based on the number of bedrooms in your dwelling unit
    "10" - Allocation based on a lawful formula not listed here
          (Note: if "10" is selected, a separate "Exhibit A" will be attached describing the formula used)

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

    If a flat fee method for trash service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

   ☑ Blue Moon eSignature Services Document ID: 223936775   Apartment Association, Inc. - 6/2018, Arkansas

3. When billed by us directly or through our billing company, your payment of utility and/or services bills must be received within ____14____ days of the date when the bill is issued at the place indicated on your bills, or the payment will be late. If a payment is late, you will be responsible for a late fee in the amount of $_____. The late payment of a bill or failure to pay any utility and/or service bill is a material breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there is a billing fee for the production of any services bill or a set-up charge or initiation fee by us our billing company, you shall pay such billing fee in an amount not to exceed $_____ per billing period and such set-up charge/initiation fee in an amount not to exceed $_____.

4. You will be charged for the full period of time that you are living in, occupying, or responsible for payment of rent and utility or service charges on the dwelling. If you breach the Lease, you will be responsible for utility and service charges for the time period you were obligated to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utilities and services, we may charge you for any utilities and services billed to us with respect to your dwelling and may charge a reasonable administration fee for billing you for such utilities and services in an amount not to exceed $_____.

5. When you move out, you will receive a final bill, which may be estimated by us based on your prior utility and services usage. This bill must be paid at the time you move out or it will be deducted from the security deposit, as permitted by state law. Unless prohibited by law, bills may also be estimated on a temporary basis when necessary due to equipment malfunctions or other problems.

6. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utilities or any other services provided to the dwelling unless such loss or damage was the direct result of an intentional or negligent act or omission by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7. You agree not to tamper with, adjust, or disconnect any utility or services sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease and this Addendum.

8. Owner has the sole authority to select and approve all utility and services providers who may provide services to Resident(s) at the dwelling community, to the extent not prohibited by law.

9. Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

10. This Addendum shall be enforced to the fullest extent lawful. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. Any determination by a court of competent jurisdiction that a provision of this Addendum is legally invalid or unenforceable shall not diminish the validity or enforceability of the remaining provisions.

11. Special Provisions.    The terms of this section supersede any other conflicting terms of this Addendum.

**Electric confirmation must be provided prior to move-in. Vacant cost recovery fee is $50 per month and the cost for the electric. Failure to pay utilities as required by this Addendum will be treated as non-payment of rent and will result in Resident being assessed a fee as per your lease for each such late payment, in addition to all other remedies contained in the Lease**

I have read, understand, and agree to comply with the preceding provisions: *(All residents must sign here)*

Resident Signature _*Lorraine Hatcher*_____     Date _06/24/2020_____

Resident Signature _____     Date _____

Resident Signature _____     Date _____

Resident Signature _____     Date _____

Resident Signature _____     Date _____

Resident Signature _____     Date _____

Management _*Ralph B Scroclass IV*_____     Date _06/24/2020_____

☑ Blue Moon eSignature Services Document ID: 223936775          ...nt Association, Inc. - 6/2018, Arkansas

**ANIMAL ADDENDUM**
*Becomes part of Lease Contract*



Date: _____**June 24, 2020**_____
(when this Addendum is filled out)

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not to the property manager or anyone else).*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**528**_____, **2100 Rebsamen**
**Park Rd** _____
_____ (street address) in
_____**Little Rock**_____
(city), Arkansas, _____**72202**_____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. A. ☐ NO APPROVED ANIMALS.** If this box is checked, you are not allowed to have animals (including mammals, reptiles, birds, fish, rodents, and insects), even temporarily, anywhere in the apartment or apartment community unless we've authorized so in writing. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Federal Fair Housing Act, HUD regulatory guidelines, and any applicable state and/or local laws.

**B. ☐ CONDITIONAL AUTHORIZATION FOR ANIMAL.** If this box is checked, you may keep the animal that is described below in the dwelling until the Lease Contract expires. But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you and your animal, your guests, or any occupant violate any of the rules in this Addendum.

**4. ANIMAL DEPOSIT.** An animal deposit of $ _____ will be charged. We [check one] ☐ will consider, or ☐ will not consider this additional security deposit the general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract [check one] ☐ does, or ☐ does not include this additional deposit amount. Refund of the animal deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

**5. ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ ___**10.00**___. The monthly rent amount in the Rent and Charges paragraph of the Lease Contract [check one] ☐ includes ☒ does not include this additional animal rent.

**6. ADDITIONAL FEE.** You must also pay a one-time fee of $ ___**300.00**___ for having the animal in the dwelling unit. It is our policy to not charge a deposit for support animals.

**7. LIABILITY NOT LIMITED.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

**8. DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or apartment community.

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
**Due to insurance restrictions, the**
**following dog breeds are not allowed on**
**the property. If a tenant is found in**
**violation of the "Restricted Breed Policy"**
**it will be considered a lease violation**
**and grounds for termination. *Akita**
***American Pit Bull Terrier * American**
**Staffordshire Terrier * Anatolian Sheppard**
***Bull Mastiffs *Chow Chow *Doberman**
**Pinscher * German Shepherd *Great Dane**
***Huskie *Malamute * Pit Bull Terrier**
***Presa Canario *Rhodesian Ridgeback**
***Rottweiler *Saint Bernard *Staffordshire**
**Bull Terrier *Wolf Dog Hybrids**
_____
_____
_____

**10. EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.

© 2020, National Apartment Association, Inc. ☑ Blue Moon eSignature Services Document ID: 223936775

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

**11. ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

- Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

- Inside, the animal may urinate or defecate *only* in these designated areas: **litter box or potty pads** ___

- Outside, the animal may urinate or defecate *only* in these designated areas: **Pet walk area only** ___

- Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

- You must not let an animal other than support animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

- Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

- Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

**12. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**13. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must permanently remove the animal from the premises within the time period specified in our notice. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the extent allowed by law.

**14. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**15. OUR REMOVAL OF ANIMAL.** In some circumstances, we may enter the dwelling unit and remove the animal with one day's notice left in a conspicuous place. We can do this if, in our sole judgment, you have:

- abandoned the animal;
- left the animal in the dwelling unit for an extended period of time without food or water;
- failed to care for a sick animal;
- violated our animal rules; or
- let the animal defecate or urinate where it's not supposed to.

In doing this, we must follow the procedures of the Lease Contract, and we may board the animal or turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within 5 days after we remove it, it will be considered abandoned.

**16. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you may pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

**17. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**18. JOINT AND SEVERAL RESPONSIBILITY.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**19. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 9 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Please read it carefully before signing.**

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All resident's must sign)* | *(Signs below)* |
| *Lorraine Hatcher* | *Ralph B Scrutton IV* |
| _____ | |
| _____ | |
| _____ | |
| _____ | |

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**
*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (*check (i) or (ii) below*):
    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____
    _____
    _____
    _____
    _____
    _____

    (ii) ☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):
    (i) ☐ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    _____
    _____
    _____
    _____
    _____
    _____

    (ii) ☒ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgement** (*initial*)

(c) *AH* _____ Lessee has received copies of all information listed above.

(d) *AH* _____ Lessee has received the pamphlet Protect Your Family from Lead in Your Home.

**Agent's Acknowledgement** (*initial*)

(e) *RS* _____ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

<u>**Little Rock Ventures III, LLC, 2100 Rebsamen Park Rd #528**</u>
_____

                                                    <u>**Little Rock**</u>
Apartment Name & unit number OR street address of dwelling          City

*Lorraine Hatcher*                06/24/2020        _____
Lessee (Resident)                 Date             Lessee (Resident)                    Date

_____        _____   _____
Lessee (Resident)                 Date             Lessee (Resident)                    Date

_____        _____   _____
Lessee (Resident)                 Date             Lessee (Resident)                    Date

<u>**Little Rock Ventures III, LLC**</u>
_____

_____
                                                   *Ralph B. Scrastin IV*
_____        _____   _____
Lessor (Owner)                                     Agent

                                                   06/24/2020
_____        _____   _____
Date

☑ Blue Moon eSignature Services Document ID: 223936775



# Protect Your Family From Lead in Your Home


**EPA** United States Environmental Protection Agency


United States Consumer Product Safety Commission


United States Department of Housing and Urban Development

June 2017

## Are You Planning to Buy or Rent a Home Built Before 1978?

Did you know that many homes built before 1978 have **lead-based paint**? Lead from paint, chips, and dust can pose serious health hazards.

**Read this entire brochure to learn:**

- How lead gets into the body
- How lead affects health
- What you can do to protect your family
- Where to go for more information

**Before renting or buying a pre-1978 home or apartment, federal law requires:**

- Sellers must disclose known information on lead-based paint or lead-based paint hazards before selling a house.
- Real estate sales contracts must include a specific warning statement about lead-based paint. Buyers have up to 10 days to check for lead.
- Landlords must disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a specific warning statement about lead-based paint.

**If undertaking renovations, repairs, or painting (RRP) projects in your pre-1978 home or apartment:**

- Read EPA's pamphlet, *The Lead-Safe Certified Guide to Renovate Right*, to learn about the lead-safe work practices that contractors are required to follow when working in your home (see page 12).



## Simple Steps to Protect Your Family from Lead Hazards

**If you think your home has lead-based paint:**

- Don't try to remove lead-based paint yourself.
- Always keep painted surfaces in good condition to minimize deterioration.
- Get your home checked for lead hazards. Find a certified inspector or risk assessor at epa.gov/lead.
- Talk to your landlord about fixing surfaces with peeling or chipping paint.
- Regularly clean floors, window sills, and other surfaces.
- Take precautions to avoid exposure to lead dust when remodeling.
- When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe certified renovation firms.
- Before buying, renting, or renovating your home, have it checked for lead-based paint.
- Consult your health care provider about testing your children for lead. Your pediatrician can check for lead with a simple blood test.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children eat healthy, low-fat foods high in iron, calcium, and vitamin C.
- Remove shoes or wipe soil off shoes before entering your house.

## Lead Gets into the Body in Many Ways

**Adults and children can get lead into their bodies if they:**

- Breathe in lead dust (especially during activities such as renovations, repairs, or painting that disturb painted surfaces).
- Swallow lead dust that has settled on food, food preparation surfaces, and other places.
- Eat paint chips or soil that contains lead.

**Lead is especially dangerous to children under the age of 6.**



- At this age, children's brains and nervous systems are more sensitive to the damaging effects of lead.
- Children's growing bodies absorb more lead.
- Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.

**Women of childbearing age should know that lead is dangerous to a developing fetus.**

- Women with a high lead level in their system before or during pregnancy risk exposing the fetus to lead through the placenta during fetal development.

1

2

## Health Effects of Lead

**Lead affects the body in many ways.** It is important to know that even exposure to low levels of lead can severely harm children.

**In children, exposure to lead can cause:**

- Nervous system and kidney damage

- Learning disabilities, attention-deficit disorder, and decreased intelligence

- Speech, language, and behavior problems

- Poor muscle coordination

- Decreased muscle and bone growth

- Hearing damage

While low-lead exposure is most common, exposure to high amounts of lead can have devastating effects on children, including seizures, unconsciousness, and in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults, too.

**In adults, exposure to lead can cause:**

- Harm to a developing fetus

- Increased chance of high blood pressure during pregnancy

- Fertility problems (in men and women)

- High blood pressure

- Digestive problems

- Nerve disorders

- Memory and concentration problems

- Muscle and joint pain

3

## Check Your Family for Lead

**Get your children and home tested if you think your home has lead.**

Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect lead. Blood lead tests are usually recommended for:

- Children at ages 1 and 2

- Children or other family members who have been exposed to high levels of lead

- Children who should be tested under your state or local health screening plan

**Your doctor can explain what the test results mean and if more testing will be needed.**

4

## Where Lead-Based Paint Is Found

In general, the older your home or childcare facility, the more likely it has lead-based paint.[1]

**Many homes, including private, federally-assisted, federally-owned housing, and childcare facilities built before 1978 have lead-based paint.** In 1978, the federal government banned consumer uses of lead-containing paint.[2]

Learn how to determine if paint is lead-based paint on page 7.

**Lead can be found:**

- In homes and childcare facilities in the city, country, or suburbs,

- In private and public single-family homes and apartments,

- On surfaces inside and outside of the house, and

- In soil around a home. (Soil can pick up lead from exterior paint or other sources, such as past use of leaded gas in cars.)

Learn more about where lead is found at epa.gov/lead.

---

[1] "Lead-based paint" is currently defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter (mg/cm), or more than 0.5% by weight.

[2] "Lead-containing paint" is currently defined by the federal government as lead in new dried paint in excess of 90 parts per million (ppm) by weight.

5

## Identifying Lead-Based Paint and Lead-Based Paint Hazards

**Deteriorating lead-based paint (peeling, chipping, chalking, cracking, or damaged paint)** is a hazard and needs immediate attention. Lead-based paint may also be a hazard when found on surfaces that children can chew or that get a lot of wear and tear, such as:

- On windows and window sills

- Doors and door frames

- Stairs, railings, banisters, and porches

**Lead-based paint is usually not a hazard if it is in good condition** and if it is not on an impact or friction surface like a window.

**Lead dust** can form when lead-based paint is scraped, sanded, or heated. Lead dust also forms when painted surfaces containing lead bump or rub together. Lead paint chips and dust can get on surfaces and objects that people touch. Settled lead dust can reenter the air when the home is vacuumed or swept, or when people walk through it. EPA currently defines the following levels of lead in dust as hazardous:

- 40 micrograms per square foot ($\mu g/ft^2$) and higher for floors, including carpeted floors

- 250 $\mu g/ft^2$ and higher for interior window sills

**Lead in soil** can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. EPA currently defines the following levels of lead in soil as hazardous:

- 400 parts per million (ppm) and higher in play areas of bare soil

- 1,200 ppm (average) and higher in bare soil in the remainder of the yard

**Remember, lead from paint chips—which you can see—and lead dust—which you may not be able to see—both can be hazards.**

The only way to find out if paint, dust, or soil lead hazards exist is to test for them. The next page describes how to do this.

6

## Checking Your Home for Lead

You can get your home tested for lead in several different ways:

- A lead-based paint **inspection** tells you if your home has lead-based paint and where it is located. It won't tell you whether your home currently has lead hazards. A trained and certified testing professional, called a lead-based paint inspector, will conduct a paint inspection using methods, such as:

  - Portable x-ray fluorescence (XRF) machine

  - Lab tests of paint samples

- A **risk assessment** tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards. A trained and certified testing professional, called a risk assessor, will:

  - Sample paint that is deteriorated on doors, windows, floors, stairs, and walls

  - Sample dust near painted surfaces and sample bare soil in the yard

  - Get lab tests of paint, dust, and soil samples

- A combination inspection and risk assessment tells you if your home has any lead-based paint and if your home has any lead hazards, and where both are located.

Be sure to read the report provided to you after your inspection or risk assessment is completed, and ask questions about anything you do not understand.

## Checking Your Home for Lead, continued

In preparing for renovation, repair, or painting work in a pre-1978 home, Lead-Safe Certified renovators (see page 12) may:

- Take paint chip samples to determine if lead-based paint is present in the area planned for renovation and send them to an EPA-recognized lead lab for analysis. In housing receiving federal assistance, the person collecting these samples must be a certified lead-based paint inspector or risk assessor

- Use EPA-recognized tests kits to determine if lead-based paint is absent (but not in housing receiving federal assistance)

- Presume that lead-based paint is present and use lead-safe work practices

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency for more information, visit epa.gov/lead, or call **1-800-424-LEAD (5323)** for a list of contacts in your area.[3]

---

[3] Hearing- or speech-challenged individuals may access this number through TTY by calling the Federal Relay Service at 1-800-877-8339.

## What You Can Do Now to Protect Your Family

**If you suspect that your house has lead-based paint hazards, you can take some immediate steps to reduce your family's risk:**

- If you rent, notify your landlord of peeling or chipping paint.

- Keep painted surfaces clean and free of dust. Clean floors, window frames, window sills, and other surfaces weekly. Use a mop or sponge with warm water and a general all-purpose cleaner. (Remember: never mix ammonia and bleach products together because they can form a dangerous gas.)

- Carefully clean up paint chips immediately without creating dust.

- Thoroughly rinse sponges and mop heads often during cleaning of dirty or dusty areas, and again afterward.

- Wash your hands and your children's hands often, especially before they eat and before nap time and bed time.

- Keep play areas clean. Wash bottles, pacifiers, toys, and stuffed animals regularly.

- Keep children from chewing window sills or other painted surfaces, or eating soil.

- When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe Certified renovation firms (see page 12).

- Clean or remove shoes before entering your home to avoid tracking in lead from soil.

- Make sure children eat nutritious, low-fat meals high in iron, and calcium, such as spinach and dairy products. Children with good diets absorb less lead.

## Reducing Lead Hazards

**Disturbing lead-based paint or removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.**



- In addition to day-to-day cleaning and good nutrition, you can temporarily reduce lead-based paint hazards by taking actions, such as repairing damaged painted surfaces and planting grass to cover lead-contaminated soil. These actions are not permanent solutions and will need ongoing attention.

- You can minimize exposure to lead when renovating, repairing, or painting by hiring an EPA- or state-certified renovator who is trained in the use of lead-safe work practices. If you are a do-it-yourselfer, learn how to use lead-safe work practices in your home.

- To remove lead hazards permanently, you should hire a certified lead abatement contractor. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not permanent control.

**Always use a certified contractor who is trained to address lead hazards safely.**

- Hire a Lead-Safe Certified firm (see page 12) to perform renovation, repair, or painting (RRP) projects that disturb painted surfaces.

- To correct lead hazards permanently, hire a certified lead abatement professional. This will ensure your contractor knows how to work safely and has the proper equipment to clean up thoroughly.

Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

☑ Blue Moon eSignature Services Document ID: 223996775

## Reducing Lead Hazards, continued

If your home has had lead abatement work done or if the housing is receiving federal assistance, once the work is completed, dust cleanup activities must be conducted until clearance testing indicates that lead dust levels are below the following levels:

- 40 micrograms per square foot (µg/ft²) for floors, including carpeted floors
- 250 µg/ft² for interior windows sills
- 400 µg/ft² for window troughs

For help in locating certified lead abatement professionals in your area, call your state or local agency (see pages 14 and 15), or visit epa.gov/lead, or call 1-800-424-LEAD.

## Renovating, Repairing or Painting a Home with Lead-Based Paint

If you hire a contractor to conduct renovation, repair, or painting (RRP) projects in your pre-1978 home or childcare facility (such as pre-school and kindergarten), your contractor must:

- Be a Lead-Safe Certified firm approved by EPA or an EPA-authorized state program



- Use qualified trained individuals (Lead-Safe Certified renovators) who follow specific lead-safe work practices to prevent lead contamination
- Provide a copy of EPA's lead hazard information document, *The Lead-Safe Certified Guide to Renovate Right*

RRP contractors working in pre-1978 homes and childcare facilities must follow lead-safe work practices that:

- **Contain the work area.** The area must be contained so that dust and debris do not escape from the work area. Warning signs must be put up, and plastic or other impermeable material and tape must be used.
- **Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:
  - Open-flame burning or torching
  - Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment
  - Using a heat gun at temperatures greater than 1100°F
- **Clean up thoroughly.** The work area should be cleaned up daily. When all the work is done, the area must be cleaned up using special cleaning methods.
- **Dispose of waste properly.** Collect and seal waste in a heavy duty bag or sheeting. When transported, ensure that waste is contained to prevent release of dust and debris.

To learn more about EPA's requirements for RRP projects, visit epa.gov/getleadsafe, or read *The Lead-Safe Certified Guide to Renovate Right*.

11

12

## Other Sources of Lead

### Lead in Drinking Water

The most common sources of lead in drinking water are lead pipes, faucets, and fixtures.

Lead pipes are more likely to be found in older cities and homes built before 1986.

You can't smell or taste lead in drinking water.

To find out for certain if you have lead in drinking water, have your water tested.

Remember older homes with a private well can also have plumbing materials that contain lead.

### Important Steps You Can Take to Reduce Lead in Drinking Water

- Use only cold water for drinking, cooking and making baby formula. Remember, boiling water does not remove lead from water.
- Before drinking, flush your home's pipes by running the tap, taking a shower, doing laundry, or doing a load of dishes.
- Regularly clean your faucet's screen (also known as an aerator).
- If you use a filter certified to remove lead, don't forget to read the directions to learn when to change the cartridge. Using a filter after it has expired can make it less effective at removing lead.

Contact your water company to determine if the pipe that connects your home to the water main (called a service line) is made from lead. Your area's water company can also provide information about the lead levels in your system's drinking water.

For more information about lead in drinking water, please contact EPA's Safe Drinking Water Hotline at 1-800-426-4791. If you have other questions about lead poisoning prevention, call 1-800 424-LEAD.*

Call your local health department or water company to find out about testing your water, or visit epa.gov/safewater for EPA's lead in drinking water information. Some states or utilities offer programs to pay for water testing for residents. Contact your state or local water company to learn more.

\* Hearing- or speech-challenged individuals may access this number through TTY by calling the Federal Relay Service at 1-800-877-8339.

13

## Other Sources of Lead, continued

- **Lead smelters** or other industries that release lead into the air.
- **Your job.** If you work with lead, you could bring it home on your body or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.
- **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture. Call your local health department for information about hobbies that may use lead.
- **Old toys and furniture** may have been painted with lead-containing paint. Older toys and other children's products may have parts that contain lead.⁴
- **Food and liquids** cooked or stored in **lead crystal** or **lead-glazed pottery or porcelain** may contain lead.
- **Folk remedies**, such as "greta" and "azarcon," used to treat an upset stomach.

⁴ In 1978, the federal government banned toys, other children's products, and furniture with lead-containing paint. In 2008, the federal government banned lead in most children's products. The federal government currently bans lead in excess of 100 ppm by weight in most children's products.

14

☑ Blue Moon eSignature Services Document ID: 223936775

## For More Information

**The National Lead Information Center**
Learn how to protect children from lead poisoning and get other information about lead hazards on the Web at epa.gov/safewater and hud.gov/lead, or call **1-800-424-LEAD (5323).**

**EPA's Safe Drinking Water Hotline**
For information about lead in drinking water, call **1-800-426-4791,** or visit epa.gov/lead for information about lead in drinking water.

**Consumer Product Safety Commission (CPSC) Hotline**
For information on lead in toys and other consumer products, or to report an unsafe consumer product or a product-related injury, call **1-800-638-2772,** or visit CPSC's website at cpsc.gov or saferproducts.gov.

**State and Local Health and Environmental Agencies**
Some states, tribes, and cities have their own rules related to lead-based paint. Check with your local agency to see which laws apply to you. Most agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for your state or local contacts on the Web at epa.gov/safewater, or contact the National Lead Information Center at **1-800-424-LEAD.**

Hearing- or speech-challenged individuals may access any of the phone numbers in this brochure through TTY by calling the toll-free Federal Relay Service at **1-800-877-8339.**

## U. S. Environmental Protection Agency (EPA) Regional Offices

The mission of EPA is to protect human health and the environment. Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
5 Post Office Square, Suite 100, OES 05-4
Boston, MA 02109-3912
(888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3** (Delaware, Maryland, Pennsylvania, Virginia, DC, West Virginia)
Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA 19103
(215) 814-2088

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
AFC Tower, 12th Floor, Air, Pesticides & Toxics
61 Forsyth Street, SW
Atlanta, GA 30303
(404) 562-8998

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5 (DT-8J)
77 West Jackson Boulevard
Chicago, IL 60604-3666
(312) 886-7836

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas, and 66 Tribes)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue, 12th Floor
Dallas, TX 75202-2733
(214) 665-2704

**Region 7** (Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7
11201 Renner Blvd.
WWPD/TOPE
Lenexa, KS 66219
(800) 223-0425

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop St.
Denver, CO 80202
(303) 312-6966

**Region 9** (Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. EPA Region 9 (CMD-4-2)
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-4280

**Region 10** (Alaska, Idaho, Oregon, Washington)
Regional Lead Contact
U.S. EPA Region 10
Solid Waste & Toxics Unit (WCM-128)
1200 Sixth Avenue, Suite 900
Seattle, WA 98101
(206) 553-1200

15          16

## Consumer Product Safety Commission (CPSC)

The CPSC protects the public against unreasonable risk of injury from consumer products through education, safety standards activities, and enforcement. Contact CPSC for further information regarding consumer product safety and regulations.

**CPSC**
4330 East West Highway
Bethesda, MD 20814-4421
1-800-638-2772
cpsc.gov or saferproducts.gov

## U. S. Department of Housing and Urban Development (HUD)

HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. Contact HUD's Office of Healthy Homes and Lead Hazard Control for further information regarding the Lead Safe Housing Rule, which protects families in pre-1978 assisted housing, and for the lead hazard control and research grant programs.

**HUD**
451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
(202) 402-7698
hud.gov/offices/lead/

This document is in the public domain. It may be produced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following this advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

U. S. EPA Washington DC 20460
U. S. CPSC Bethesda MD 20814
U. S. HUD Washington DC 20410

EPA-747-K-12-001
June 2017

## IMPORTANT!

### Lead From Paint, Dust, and Soil in and Around Your Home Can Be Dangerous if Not Managed Properly

- Children under 6 years old are most at risk for lead poisoning in your home.

- Lead exposure can harm young children and babies even before they are born.

- Homes, schools, and child care facilities built before 1978 are likely to contain lead-based paint.

- Even children who seem healthy may have dangerous levels of lead in their bodies.

- Disturbing surfaces with lead-based paint or removing lead-based paint improperly can increase the danger to your family.

- People can get lead into their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

- People have many options for reducing lead hazards. Generally, lead-based paint that is in good condition is not a hazard (see page 10).

17

☑ Blue Moon eSignature Services Document ID: 223936775

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-May-28 15:30:20
60CV-21-2858
C06D05 : 44 Pages

# IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## CIVIL DIVISION

**LORRAINE HATCHER, on behalf of herself
and all others in a class similarly situated**        **PLAINTIFF**

### CASE NO. 60CV-21-2858

**vs.**

**DLP PROPERTY MANAGEMENT, LLC
d/b/a PROSPER RIVERDALE, CHERYL
CRAIG, and KAREN ROBERTSON**        **DEFENDANTS**

### UNIFORM COVER PAGE FOR
### EXHIBITS (PAGES 1-41)

**EXHIBIT A**

# APARTMENT LEASE CONTRACT



Date of Lease Contract: _____ **June 24, 2020** _____
(when the lease contract is filled out)

*This is a binding document. Read carefully before signing.*

Moving In — General Information

**1. PARTIES.** This Lease Contract is between *you*, the resident(s) *(list all people signing the Lease Contract):*

**Lorraine A. Hatcher**

_____

_____

_____

_____

_____

_____

and *us*, the owner: **Little Rock Ventures III,LLC**

_____

_____

*(name of apartment community or title holder).* You've
agreed to rent Apartment No. _____ **528** _____
at **2100 Rebsamen Park Rd**

*(street address)* in **Little Rock**
*(city)*, Arkansas, _____ **72202** _____
*(zip code)* (the "apartment" or the "premises") for use as a private
residence only. The terms "you" and "your" refer to all residents
listed above. The terms "we," "us," and "our" refer to the owner
listed above (or any of owner's successors' in interest or assigns).
Written notice to or from our managers constitutes notice to or
from us. If anyone else has guaranteed performance of this Lease
Contract, a separate Lease Contract Guaranty for each guarantor is
attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and
*(list all other occupants not signing the Lease Contract):*

_____

_____

_____

_____

_____

_____

_____

No one else may occupy the apartment. Persons not listed above
must not stay in the apartment for more than ___ **7** ___ consecutive
days without our prior written consent, and no more than twice
that many days in any one month. *If the previous space isn't filled in,
two days per month is the limit.*

**3. LEASE TERM.** The initial term of the Lease Contract begins on
the **27th** day of _____ **June** _____ , **2020** , and
ends at 11:59 p.m. the **26th** day of _____ **July**
**2021** .

**Renewal.** This Lease Contract will automatically renew month-
to-month unless either party gives at least ___ **60** ___ days written
notice of termination or intent to move-out as required by paragraph
46 (Move-Out Notice). If the number of days isn't filled in, at least
30 days notice is required.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security
deposit at the time of execution of this Lease Contract for all residents
in the apartment is $ ___ **300.00** ___ due on or before the date this
Lease Contract is signed.

**5. KEYS.** You will be provided ___ **1** ___ apartment key(s),
_____ mailbox key(s), _____ FOB(s), and/or _____ other access
device(s) for access to the building and amenities at no additional
cost at move-in. If the key, FOB, or other access device is lost or
becomes damaged during your tenancy or is not returned or is
returned damaged when you move out, you will be responsible for
the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay
$ ___ **933.00** ___ per month for rent, payable in advance and
without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____

_____

_____

Prorated rent of $ ___ **124.40** ___ is due for the remainder of *(check
one)*: ☒ 1st month or ☐ 2nd month, on _____

_____

*Otherwise, you must pay your rent on or before the 1st day of each
month (due date) with no grace period. Cash is unacceptable without
our prior written permission. You must not withhold or offset rent
unless expressly authorized by statute.* We may, at our option, require
at any time that you pay all rent and other sums in cash, certified
or cashier's check, money order, or one monthly check rather than
multiple checks.

If you don't pay all rent on or before the **3rd** day of the month,
you'll pay a late charge of $_____, in the alternative, we
may simply charge you ___ **10** ___ % of your monthly rent payment as
a late fee. You'll also pay a charge of $ ___ **35.00** ___ for each
returned check or rejected electronic payment (not to exceed $30)
plus the amount of any fees charged to the Owner by any financial
institution as a result of the check not being honored, plus the late
charge. At our discretion, we may convert any and all checks via the
Automated Clearing House (ACH) system for the purposes of
collecting payment. Rent is not considered accepted, if the payment/
ACH is rejected, does not clear, or is stopped for any reason. If you
don't pay rent on time, you'll be delinquent and all remedies under
this Lease Contract will be authorized. All payment obligations
under this Lease Contract shall constitute rent under this Lease
Contract.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ water    ☐ gas    ☐ electricity    ☐ master antenna
☐ wastewater    ☐ trash    ☐ cable TV
☐ other _____

You'll pay for all other utilities, related deposits, and any charges,
fees, or services on such utilities. You must not allow utilities to be
disconnected—including disconnection for not paying your bills—
until the Lease Contract or renewal period ends. Cable channels
that are provided may be changed during the Lease Contract term
if the change applies to all residents. Utilities may be used only for
normal household purposes and must not be wasted. If your
electricity is ever interrupted, you must use only battery-powered
lighting. If the apartment is submetered for electricity, water, or
gas, a submetering addendum is attached to this Lease Contract in
compliance with state agency rules. If a mastermetered water bill
or any central system costs for the apartment are prorated among
our residents by an allocation formula, a utility allocation addendum
is attached in compliance with applicable law.

**8. INSURANCE.** We do not maintain insurance to cover your personal
property or personal injury.

In addition, we urge all Tenants, and particularly those residing in
coastal areas, areas near rivers, and areas prone to flooding, to
obtain flood insurance. Renter's insurance may not cover damage
to your property due to flooding. A flood insurance resource which
may be available includes the National Flood Insurance Program
managed by the Federal Emergency Management Agency (FEMA).
We are not responsible to any resident, guest, or occupant for damage
or loss of personal property or personal injury from (including but
not limited to) fire, smoke, rain, flood, water and pipe leaks, hail,
ice, snow, lightning, wind, explosions, earthquake, interruption of
utilities, theft, hurricane, negligence of other residents, occupants,
or invited/uninvited guests or vandalism unless otherwise required
by law.

We ☒ require ☐ do not require you to get your own insurance
for losses to your personal property or injuries due to theft, fire,
water damage, pipe leaks and the like. If no box is checked, renter's
insurance is not required.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, may be an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written notices furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

**In office payments must be made in the form of a "POSTAL" money order or a "BANK" cashier's check ONLY.**

See any additional special provisions.

**11. LEASE DEFAULT-RELETTING CHARGES.** You'll be liable to us for a reletting charge of $_____ (not to exceed 100% of the highest monthly rent during the Lease Contract term) if you:

(1) fail to give written move-out notice as required in paragraph 46 (Move-Out Notice) or any other applicable laws; or
(2) move out without paying rent in full for the entire Lease Contract term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

*The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.*

**Not a Release.** The reletting charge is not a Lease Contract cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages; that is, our time, effort, and expense in finding and processing a replacement. Those amounts are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to violation of the Lease Contract or rules, improper use, or negligence by you or your guests or occupants. Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from you or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. DISPOSITION OF PROPERTY LEFT IN YOUR APARTMENT AFTER SURRENDER, ABANDONMENT, OR EVICTION.**
**Definition of Surrender And Abandonment of Apartment.** You have "surrendered" the apartment when: (1) the move out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where rent is paid—whichever date occurs first.

You have "abandoned" the apartment when you have not responded for 2 days to our notice left on the inside of the main entry door stating that we consider the apartment "abandoned" and one of the following have occurred: (1) everyone appears to have moved out in our reasonable judgment; (2) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; or (3) you've been in default for nonpayment of rent for 5 consecutive days or water, gas, or electric service for the apartment not connected in our name has been terminated. An apartment is also "abandoned" ten [10] days after the death of a sole resident.

**Entry and Disposition of Your Property.** Immediately after surrender, abandonment, or eviction, we have the right to: enter and take possession of the apartment; remove, store, sell, or throw away property left in the apartment when authorized below; and exercise other rights under paragraph 51 (Deposit Return) relating to clean-up, repairs, and security deposit deductions. We may at our discretion allow any emergency contact person named in your application or provided to us in writing to remove your abandoned property left in your apartment and take possession. We have a lien on all property left in the apartment to secure all sums you owe us.

**Removal of Your Property.** All property left in the apartment or common areas by you or others after eviction or after surrender or abandonment of the apartment may be removed by us or (law officers), at your expense. We may, at our option, allow any emergency contact person named in your application or person named in a separate writing to remove your abandoned property left in or about the apartment, including motor vehicles, and take possession.

**Storage of Your Property.** We may store but have no duty to store property removed after judicial eviction or after you have surrendered or abandoned the apartment. We're not liable for casualty loss, damage or theft of stored property. You must pay reasonable charges for our packing, removing, storing, selling, and disposing of such property.

**Redemption of Your Property.** If we've stored property under this paragraph, you may redeem it prior to sale or disposition under the following subparagraph by paying all sums you owe, including rent, late charges, reletting charges, storage, damages, attorney's fees, etc. You must pay reasonable charges for our packing, removing, and storing such property. We may require payment by cash, money order, or certified check. If you request in writing, we will provide you an accounting of amounts owed. We may return redeemed property at the place of storage, the management office, or the apartment (at our option).

**Disposition or Sale of Your Property.** Immediately after removal, we may throw away or give to a charitable organization property removed by us under this paragraph (except for animals and property removed after a death of a sole resident). If we've stored property under this paragraph, we will sell it by sale which will be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice will itemize the amounts you owe and the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. Animals removed after surrender, abandonment, or judicial eviction will not be sold; but we may board them or turn them over to local authorities or humane societies. If property is sold: the sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. Any item that cannot be sold may at our discretion be thrown away or donated to charity.

**14. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, all future rent will be automatically accelerated without notice and immediately due. We may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 (Lease Default-Reletting Charges) and 33 (Default by Resident) apply to acceleration under this paragraph.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.**
No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by any signed written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 19 (Community Policies or Rules). If, at least 5 days before the advance notice deadline referred to in paragraph 3 (Lease Term), we give you written notice of rent increases or Lease Contract changes effective when the Lease Contract term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or Lease Contract changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 46 (Move-Out Notice).

**16. DELAY OF OCCUPANCY.**  If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay so long as the delay is not wilful or in bad faith on our part. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date —you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. AD VALOREM TAXES/FEES AND CHARGES - ADDITIONAL RENT.**
Unless otherwise prohibited by law, if, during the term of this Agreement, any locality, city, state, or Federal Government imposes upon Us, any fee, charge, or tax, which is related to or charged by the number of occupants, or by the apartment unit itself, such that we are charged a fee, charge, or tax, based upon your use or occupancy of the apartment, we may add this charge as Additional Rent, during the term of the Lease Contract, with thirty (30) days advance written notice to you. After this written notice (the amount or approximate amount of the charge, will be included), you agree to pay, as Additional Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

**18. DISCLOSURE RIGHTS.**  If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it.

**While You're Living in the Apartment**

**19. COMMUNITY POLICIES OR RULES.**  You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Any rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**20. LIMITATIONS ON CONDUCT.**  The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or heaters without our prior written approval; store anything in closets having gas appliances; cook on balconies or outside; or solicit business or contributions.

Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, and other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are charged or convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**21. PROHIBITED CONDUCT.**  You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: loud or obnoxious conduct; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in a way that may alarm others; tampering with utilities or telecommunications; or bringing hazardous materials into the apartment community.

**22. PARKING.**  We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in a space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**23. RELEASE OF RESIDENT.**  Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 32 (Responsibilities Of Owner), or 46 (Move-Out Notice), or any other applicable laws, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**24. MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**25. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke detectors and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and access control devices.

**Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish smoke detectors and carbon monoxide detectors only if required by any state or local government, and we'll test them and provide working batteries when you first take possession. After that, you must test the smoke detectors and the carbon monoxide detectors on a regular basis, and you must pay for and replace batteries as needed, unless the law provides otherwise. We will comply with other requirements of any applicable government entity regarding smoke detectors and carbon monoxide detectors. We may replace dead or missing batteries at your expense. You must immediately report smoke-detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable neither the smoke detectors nor the carbon monoxide detectors. You will be liable to us and others for any loss, damage, or fines from fire, smoke, or water if that condition arises from disabling or damaging the smoke detector or carbon monoxide detector, or from your failure to replace a dead battery or report malfunctions to us.

**Casualty Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, theft, or vandalism unless otherwise required by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for these services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident-report number upon request.

**26. CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You'll be given two copies of an Inventory and Condition form on or before move-in. You must note on the forms all defects or damage and return one copy to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets,

alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**27. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or nonsecurity matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. You must promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary. We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty insurance proceeds are received. Rent will not abate in whole or in part. If we believe that fire, water damage or catastrophic damage is substantial, or that mold, allergens, or hazardous materials are present in or around the apartment, or that performance of needed repairs or restoration poses a danger to you, your occupants or guests, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

**28. ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, 24 hours written notice of intent to remove the animal, and, (2) following the procedures of paragraph 29 (When We May Enter). We may keep or kennel the

animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for our purpose.

**29. WHEN WE MAY ENTER.** If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, then such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary in emergencies) if:

(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; *and*

(2) entry is for: responding to your request; making repairs or re-placements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector and carbon monoxide detector batteries; retrieving unreturned tools, equipment, or appliances; preventing waste of utilities; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous

materials) or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; cutting off electricity according to statute; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with search or arrest warrant or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

**30. JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of Lease Contract termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds may be by one check jointly payable to all residents; the check and any deduction itemizations may be mailed to one resident only.

Replacements

**31. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment, or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents procure a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement subletting assignment, or granting a right or any license to occupy, then:

(1) a reletting charge *will not* be due;

(2) a reasonable administrative (paperwork) and/or transfer fee will be due, and a rekeying fee *will be* due if rekeying is requested or required; and

(3) you *will* remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

**Procedures for Replacement.** If we approve a subletting resident, then at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right of occupancy or security-deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

Responsibilities of Owner and Resident

**32. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 26 (Condition of the Premises and Alterations);

(2) maintain fixtures, furniture, hot water, heating and A/C equipment;

(3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and

(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If you violate any of the above, you may terminate your tenancy and exercise other remedies only as follows: (a) you must make a written request for repair or remedy of the condition, and all rent must be current at the time; (b) after receiving your request, we have a reasonable time to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities; (c) if we haven't diligently tried to repair within a reasonable time, you must then give us written notice of intent to terminate your tenancy unless the repair is made within 7 days; and (d) if repair hasn't been made within 7 days, you may terminate your tenancy and exercise other lawful remedies. Security deposits and prorated rent will be refunded as required by law.

**33. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application or you provide false or fraudulent documentation requested by us; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or

drug paraphernalia as defined under state statute; (6) any illegal drugs or paraphernalia are found in your apartment; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 21 (Prohibited Conduct); or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government.

**Lease Renewal When A Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, we may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Eviction.** If you are in default, we may file suit for Lease Contract termination or for possession after giving you three (3) days written notice of Lease Contract termination. After giving notice of Lease Contract termination, we may still accept rent, late fees or other sums due; and the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages, past or future rent, or other sums, or to file or continue with eviction proceedings.

**Acceleration.** All monthly rent for the rest of the Lease Contract term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the Lease Contract term or renewal period ends; *and* (2) you've not paid all rent for the entire Lease Contract term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be three times the contract rent or twice the actual damages sustained by an owner, which ever is greater, and reasonable attorney's fees as provided by state statute, without notice; (3) you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the Lease Contract term—for up to one month from the date of notice of Lease Contract extension—by delivering written notice to you or your apartment while you continue to hold over.

**Remedies Cumulative.** Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

**Other Remedies.** Under state statute, if your rent is delinquent, you immediately forfeit all right to occupy the apartment any longer, and if we've given you ten (10) days notice in writing to vacate the apartment and you have not vacated by the 10th day, you are guilty of a misdemeanor. Each day of your unlawful presence in the

apartment constitutes a separate offense. We may report unpaid amounts to credit agencies. Upon your default and early move-out, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including suit for Lease Contract termination, possession, damages, rent, and all other monies due. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the nonprevailing party attorney's fees and all other litigation costs. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear the highest lawful rate of interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within ten (10) days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline. We may turn any returned checks over to law enforcement officials for prosecution according to law.

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 (Lease Default-Reletting Charges) and all other remedies. We'll exercise customary diligence to relet and mitigate damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

General Clauses

**34. ENTIRE AGREEMENT.** *Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us.*

**35. NO AUTHORITY TO AMEND UNLESS IN WRITING.** *Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.*

**36. WRITTEN RELEASE.** Our representatives must give you a written release when this Lease Contract entitles you to a release.

**37. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances.

**38. NOTICE.** Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo or letter that was given. All notices must be signed. Delivery of notice by us to you may be made by personal delivery to you, or mailed by registered or certified mail to you at the apartment address or, your last known place of residence, or the place held out by you as a place of receipt of notices. Proof of mailing constitutes notice without proof of receipt. You must give notice to us in writing by delivering a copy of any notice or other document to the apartment community leasing office or some other place that we designate as the place that you send us notices.

**39. MISCELLANEOUS.**
A. Exercising one remedy won't constitute an election or waiver of other remedies.
B. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties.
C. All remedies are cumulative.
D. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
E. This Lease Contract binds subsequent owners.
F. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
G. All provisions regarding our nonliability and nonduty apply to our employees, agents, and management companies.
H. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
I. All Lease Contract obligations must be performed in the county where the apartment is located.
J. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**40. WAIVER OF JURY TRIAL.** To minimize legal expenses and, to the extent allowed by law, you and we agree that a trial of any lawsuit based on statute common law, and/or related to this Lease Contract shall be to a judge and not a jury.

**41. CONTACTING YOU.** By signing this lease, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**42. OBLIGATION TO VACATE.** If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with paragraph 3 (Lease Term), and we accept such written notice, then you are required to vacate the Apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us. Written notice to or from our managers constitutes notice to or from us. Notice of lease termination and demand for possession will be served by either hand-delivery (actual notice) or certified mail.

**43. FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**44. PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 (Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction) or utility payments subject to governmental regulations) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent (which is due on the first) are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**45. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or;(2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**46. MOVE-OUT NOTICE.** Before moving out, either at the end of the lease term, any extension of the lease term, or prior to the end of the lease term, you must give our representative advance written notice of your intention to vacate as required by paragraph 3 (Lease Term). If you move out prior to the end of the lease term, your notice does not act as a release of liability for the full term of the Lease Contract. You will still be liable for the entire Lease Contract term if you move out early under paragraph 23 (Release of Resident) except if you are able to terminate your tenancy under the statutory rights explained under paragraphs 11, or 23 (Lease Default-Reletting Charges, or Release of Resident) or any other applicable laws. All notices to vacate must be in writing and must provide the date by which you intend to vacate. If the notice does not comply with the time requirements of paragraph 3 (Lease Term), even if you move by the last date in the lease term, you will be responsible for an additional month's rent. If you fail to vacate by the date set forth in your notice, you will automatically and immediately become a holdover tenant pursuant to state law, and we will have all remedies available under this Lease Contract and state law.

**47. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease Contract term or renewal period ends unless all rent for the entire Lease Contract term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 (Lease Default-Reletting Charges) and 33 (Default by Resident). You're prohibited from applying any security deposit to rent. You won't stay beyond the date you are supposed to move-out. All residents, guests, and occupants must surrender the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**48. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**49. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**50. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector and carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false-security-alarm charges unless due to our negligence; animal-related charges under paragraph 28 (Animals); government fees or fines against us for violation (by you, your occupant, or guest) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 33 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Lease Default-Reletting Charges).

**51. DEPOSIT RETURNS.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. We'll mail you, to the forwarding address you provide, your security deposit refund (less lawful deductions) and an itemized accounting of any deductions within the time frames and parameters set forth under state law. If you fail to provide us with your forwarding address in writing, as required above, we will process the unclaimed security deposit in accordance with state law.

*Surrender* and *abandonment* are defined in paragraph 13 (Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction). Surrender, abandonment, and eviction ends your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and eviction affect your rights to property left in the apartment (paragraph 13 -Disposition of Property Left in Your Apartment After Surrender, Abandonment, or Eviction). Surrender, abandonment, and eviction do not affect our mitigation obligations (paragraph 33 - Default by Resident).

## Severability, Originals and Attachments, and Signatures

**52. SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**53. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

Date form is filled out *(same as on top of page 1)*

06/24/2020

---

*You are legally bound by this document.*
*Please read it carefully.*

Name and address of locator service *(if applicable)*

_____
_____
_____
_____

Resident or Residents *(all sign below)*

*Lorraine Hatcher*

_____
_____
_____
_____
_____
_____

Owner or Owner's Representative *(signing on behalf of owner)*

*Ralph B Scroatter IV*

Address and phone number of owner's representative for notice purposes

2100 Rebsamen Park Road
_____
Little Rock, AR 72202
(501) 904-5300

**SPECIAL PROVISIONS (CONTINUED FROM PAGE 2)** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

PACKAGE ACCEPTANCE ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____528_____, 2100 Rebsamen
Park Rd _____
_____ (street address) in
_____Little Rock_____
(city), Arkansas, _____72202_____
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: June 24, 2020
Owner's name: Little Rock Ventures III,LLC
_____
_____
_____
_____

Residents (list all residents):
Lorraine A. Hatcher
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you
wish for us to sign for, and to accept, U.S. mail and privately-
delivered packages or other items on your behalf, subject to
the terms and conditions set forth herein.

**4. PACKAGE ACCEPTANCE.**
**A. Generally.** You hereby authorize us and our agent to accept,
on your behalf, any package or item delivered to our on-site
management office during disclosed business hours, including
but not limited to any package delivered by the U.S. Postal
Service or by any private courier service or individual. You
also specifically authorize us to sign on your behalf if the
person or entity delivering said package or item requires an
adult signature prior to delivery, including but not limited to
the delivery of certified or registered mail. A photo I.D. is
required before any packages will be released. Packages will
only be released to verified Residents or approved
representatives.

**B. Limitations.** You understand and agree that we may refuse
to accept any package for any reason or no reason at all.

**5. TIME LIMITATION.** Due to limited storage space, we must
ask that you pick up your package as soon as possible. You
also agree that we shall have no duty whatsoever to hold or
store any package for more than _____3_____ days after receipt
(accordingly, you should notify the management office if you
are going to be away from the apartment home and expect to
be receiving a package(s)). After said time, you agree that any
such package is deemed abandoned and you authorize us to
return the package to its original sender.

**6. DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF
RISKS AND WAIVER.** As to any package for which we sign
and/or receive on your behalf, you understand and agree that
we have no duty to notify you of our receipt of such package,
nor do we have any duty to maintain, protect, or deliver said
package to you, nor do we have any duty to make said package
available to you outside disclosed business hours. Any
packages or personal property delivered to us or stored by
us shall be at your sole risk, and you assume all risks
whatsoever associated with any loss or damage to your
packages and personal property. You, your guests, family,
invitees, and agents hereby waive any and all claims against
us or our agents of any nature regarding or relating to any
package or item received by us, including but not limited to,
claims for theft, misplacing or damaging any such package,
except in the event of our or our agent's gross negligence or
willful misconduct. You also agree to defend and indemnify
us and our agents and hold us both harmless from any and
all claims that may be brought by any third party relating to
any injury sustained relating to or arising from any package
that we received on your behalf. You also agree to indemnify
us and our agents and hold us harmless from any damage
caused to us or our agents by any package received by us for
you. You also authorize us to throw away or otherwise dispose
of any package that we, in our sole discretion, deem to be
dangerous, noxious, or in the case of packaged food, spoiled,
and waive any claim whatsoever resulting from such disposal.

**7. SEVERABILITY.** If any provision of this Addendum or the
Lease Contract is illegal, invalid or unenforceable under any
applicable law, then it is the intention of the parties that (a)
such provision be ineffective to the extent of such
invalidity or unenforceability only without invalidating or
otherwise affecting the remainder of this Addendum or the
Lease, (b) the remainder of this Addendum shall not be affected
thereby, and (c) it is also the intention of the parties to this
Addendum that in lieu of each clause or provision that is illegal,
invalid or unenforceable, there be added as a part of this
Addendum a clause or provision similar in terms to such
illegal, invalid or unenforceable clause or provision as may
be possible and be legal, valid and enforceable.

**8. SPECIAL PROVISIONS.** The following special provisions
control over conflicting provisions of this printed form:
NOT ACCEPTING PACKAGES AT THIS TIME.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| (All residents must sign) | (Signs below) |
| *Lorraine Hatcher* | *Ralph B. Scrosten IV* |
| | |
| | **Date of Signing Addendum** |
| | 06/24/2020 |

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

## ADDENDUM PROHIBITING
## SHORT-TERM SUBLETTING OR RENTAL



**1. DWELLING UNIT DESCRIPTION.**
Unit No. ___528___, __2100 Rebsamen__
__Park Rd_____
_____ (street address) in
_____ Little Rock _____
(city), Arkansas, _____72202_____
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: June 24, 2020
Owner's name: Little Rock Ventures III,LLC
_____
_____
_____
_____

Residents (list all residents):
Lorraine A. Hatcher
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. SHORT TERM SUBLEASE OR RENTING PROHIBITED.**
Without limiting the prohibition in the Lease on subletting and assignment and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

**4. PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.**
You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

**5. VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted

by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

**6. REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including, termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

**7. RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

**8. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| (All residents must sign) | (Signs below) |

_Lorraine Hatcher_                    _Ralph B Scrوع، IV_
_____
_____              **Date of Signing Addendum**
_____                   06/24/2020
_____

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

**PHOTO, VIDEO, AND STATEMENT
RELEASE ADDENDUM**



1. **DWELLING UNIT DESCRIPTION.**
   Unit No. _____**528**_____, **2100 Rebsamen**
   **Park Rd**
   _____ *(street address)* in
   _____**Little Rock**_____
   *(city)*, Arkansas, _____**72202**
   *(zip code).*

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract date: **June 24, 2020**
   Owner's name: **Little Rock Ventures III, LLC**
   _____
   _____
   _____
   _____
   _____

   Residents *(list all residents):*
   **Lorraine A. Hatcher**
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

   Occupants *(list all occupants):*
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **PURPOSE OF ADDENDUM.** By signing this Addendum, you, without payment or other consideration, agree to grant us permission to use your likeness in photographs, videos and/or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

   A. **Consent for Minor Occupants.** By signing this Addendum, if any minor occupants are named above, you further certify that you are the parent, or legal guardian of the minor occupant(s) named above, and you, without payment or other consideration, agree to grant us permission to use their likeness in photographs, videos and/ or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

4. **PHOTO AND VIDEO RELEASE.** You hereby grant us and our agents and affiliates (collectively, the "Released Parties") permission and a license to take, use, reuse, and publish the likeness of you and any minor occupants in all photographs or other electronic and/or digital media in any and all of our publications, including, without limitation, any website entries, advertising websites, and any other marketing materials. You understand and agree that these materials will become the property of the Released Parties and will not be returned. You agree to irrevocably authorize the Released Parties to edit, alter, copy, exhibit, publish, or distribute this media for any lawful purpose whatsoever including, without limitation, promotional and advertising uses. You waive the right to inspect or approve the finished product, including any written or electronic copy, wherein your likeness appears now or in the future. In addition, you waive any right to payment, royalties, or any other compensation arising or related to the use of the media.

5. **CONSENT TO USE YOUR NAME, LIKENESS , WRITTEN COMMENTS, AND STATEMENTS.** You are expressly agreeing to allow us to post your name, picture, written comments, and statements, and/or the names, pictures, written comments and statements of any minor occupants in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. You hereby grant the Released Parties permission and a license to use, reproduce, and publish any media on its website, social media platforms, or in other marketing-related materials, whether in electronic or print form.

6. **RELEASE OF LIABILITY.** You hereby release, hold harmless, and forever discharge us from any claims or causes of actions including, without limitation, any and all claims for libel or violation of any right of publicity or privacy, related to our use of the media in any and all of our publications, including any website entries, advertising websites, social media websites, and any other marketing material so long as the claim or cause of action does not result from our intentional misconduct or gross negligence. This consent and release shall be binding upon you and your heirs, legal representatives and assigns.

7. **REVOCATION.** You have the right to revoke your consent to our use of your name, picture, video, voice, written comments, or statement, and/or the name, picture, video, voice, written comments, or statement of any minor occupants, by written notice to us.

8. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

| **Resident or Residents**<br>*(All residents must sign)* | **Owner or Owner's Representative**<br>*(signs below)* |
|---|---|
| *Lorraine Hatcher* | *Ralph B Screeton IV* |
| | **Date of Signing Addendum** |
| | 06/24/2020 |

## E-SIGNATURE CERTIFICATE

*This certificate details the actions recorded during the signing of this Document.*


bluemoon
SOFTWARE

### DOCUMENT INFORMATION

| | |
|---|---|
| Status | Signed |
| Document ID | 223936775 |
| Signed on | 06/24/20 |
| Total Pages | 40 |
| Document Name | Apartment Lease Form, Lead Hazard Disclosure Addendum, Animal Addendum, All-In-One Utility Addendum, Bed Bug Addendum, Mold Information and Prevention Addendum, Asbestos Addendum, Lease Contract Buy-Out Agreement, Community Policies, Rules, & Regulations, Addendum for Rent Concession, Renter's or Liability Insurance Addendum, No-Smoking Addendum, Short-Term Subletting or Rental Prohibited, Package Acceptance Addendum, Photo, Video, and Statement Release Addendum, Crime/Drug Free Housing Addendum, Parking Addendum, Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |

### PARTIES

**Lorraine Hatcher**
signer key: 592693618cae8982ed199b0d526c165e
IP address: 107.77.200.144
signing method: Blue Moon eSignature Services
authentication method: eSignature by email lorrainehatcher@yahoo.com
browser: Mozilla/5.0 (iPad; CPU OS 12_4_5 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.1.2 Mobile/15E148 Safari/604.1



**Ralph B Screeton IV**
signer key: e4622bdb4bcb077c63b10582d44de5ca
IP address: 10.100.10.121
signing method: Blue Moon eSignature Services
authentication method: eSignature by email prosperriverdale@dlpre.com
browser: GuzzleHttp/6.5.4 curl/7.64.0 PHP/7.3.19



### DOCUMENT AUDIT

| | | |
|---|---|---|
| 1 | 06/24/20 09:43:54 PM CDT | Lorraine Hatcher accepted Consumer Disclosure |
| 2 | 06/24/20 09:43:54 PM CDT | Lorraine Hatcher signed Apartment Lease Form |
| 3 | 06/24/20 09:44:13 PM CDT | Lorraine Hatcher dated Lead Hazard Disclosure Addendum |
| 4 | 06/24/20 09:44:19 PM CDT | Lorraine Hatcher signed Lead Hazard Disclosure Addendum |
| 5 | 06/24/20 09:44:21 PM CDT | Lorraine Hatcher initialed Lead Hazard Disclosure Addendum |
| 6 | 06/24/20 09:44:21 PM CDT | Lorraine Hatcher initialed Lead Hazard Disclosure Addendum |
| 7 | 06/24/20 09:44:26 PM CDT | Lorraine Hatcher signed Animal Addendum |
| 8 | 06/24/20 09:44:58 PM CDT | Lorraine Hatcher signed All-In-One Utility Addendum |
| 9 | 06/24/20 09:44:58 PM CDT | Lorraine Hatcher dated All-In-One Utility Addendum |
| 10 | 06/24/20 09:45:03 PM CDT | Lorraine Hatcher signed Bed Bug Addendum |
| 11 | 06/24/20 09:05:20 PM CDT | Lorraine Hatcher signed Mold Information and Prevention Addendum |
| 12 | 06/24/20 09:05:46 PM CDT | Lorraine Hatcher signed Asbestos Addendum |
| 13 | 06/24/20 09:45:46 PM CDT | Lorraine Hatcher dated Asbestos Addendum |

**DOCUMENT AUDIT CONTINUED**

| # | Timestamp | Description |
|---|---|---|
| 14 | | Lorraine Hatcher signed Lease Contract Buy-Out Agreement |
| 15 | | Lorraine Hatcher signed Community Policies, Rules, & Regulations |
| 16 | | Lorraine Hatcher dated Community Policies, Rules, & Regulations |
| 17 | | Lorraine Hatcher signed Addendum for Rent Concession |
| 18 | | Lorraine Hatcher signed Renter's or Liability Insurance Addendum |
| 19 | | Lorraine Hatcher signed No-Smoking Addendum |
| 20 | | Lorraine Hatcher signed Short-Term Subletting or Rental Prohibited |
| 21 | | Lorraine Hatcher signed Package Acceptance Addendum |
| 22 | | Lorraine Hatcher signed Photo, Video, and Statement Release Addendum |
| 23 | | Lorraine Hatcher signed Crime/Drug Free Housing Addendum |
| 24 | | Lorraine Hatcher dated Crime/Drug Free Housing Addendum |
| 25 | | Lorraine Hatcher signed Parking Addendum |
| 26 | | Lorraine Hatcher signed Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 27 | | Lorraine Hatcher dated Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 28 | | Lorraine Hatcher submitted signed documents |
| 29 | | Ralph B Screeton IV signed Apartment Lease Form |
| 30 | | Ralph B Screeton IV initialed Lead Hazard Disclosure Addendum |
| 31 | | Ralph B Screeton IV signed Lead Hazard Disclosure Addendum |
| 32 | | Ralph B Screeton IV dated Lead Hazard Disclosure Addendum |
| 33 | | Ralph B Screeton IV signed Animal Addendum |
| 34 | | Ralph B Screeton IV signed All-In-One Utility Addendum |
| 35 | | Ralph B Screeton IV dated All-In-One Utility Addendum |
| 36 | | Ralph B Screeton IV signed Bed Bug Addendum |
| 37 | | Ralph B Screeton IV dated Bed Bug Addendum |
| 38 | | Ralph B Screeton IV signed Mold Information and Prevention Addendum |
| 39 | | Ralph B Screeton IV signed Asbestos Addendum |
| 40 | | Ralph B Screeton IV dated Asbestos Addendum |
| 41 | | Ralph B Screeton IV signed Lease Contract Buy-Out Agreement |
| 42 | | Ralph B Screeton IV signed Community Policies, Rules, & Regulations |
| 43 | | Ralph B Screeton IV dated Community Policies, Rules, & Regulations |
| 44 | | Ralph B Screeton IV signed Addendum for Rent Concession |
| 45 | | Ralph B Screeton IV signed Renter's or Liability Insurance Addendum |
| 46 | | Ralph B Screeton IV signed No-Smoking Addendum |
| 47 | | Ralph B Screeton IV dated Short-Term Subletting or Rental Prohibited |
| 48 | | Ralph B Screeton IV signed Short-Term Subletting or Rental Prohibited |
| 49 | | Ralph B Screeton IV dated Package Acceptance Addendum |
| 50 | | Ralph B Screeton IV signed Package Acceptance Addendum |
| 51 | | Ralph B Screeton IV dated Photo, Video, and Statement Release Addendum |
| 52 | | Ralph B Screeton IV signed Photo, Video, and Statement Release Addendum |
| 53 | | Ralph B Screeton IV signed Crime/Drug Free Housing Addendum |
| 54 | | Ralph B Screeton IV dated Crime/Drug Free Housing Addendum |
| 55 | | Ralph B Screeton IV signed Parking Addendum |
| 56 | | Ralph B Screeton IV dated Parking Addendum |
| 57 | | Ralph B Screeton IV signed Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 58 | | Ralph B Screeton IV dated Addendum Regarding Marijuana Use and Landlord's Commitment to Enforcement of Crime/Drug Free Housing |
| 59 | | Ralph B Screeton IV submitted signed documents |

**ADDENDUM REGARDING MEDICAL MARIJUANA USE**
**and**
**LANDLORD'S COMMITMENT TO ENFORCEMENT OF CRIME/DRUG FREE ADDENDUM**



**1. DWELLING UNIT DESCRIPTION.**
Unit. No. _____528_____, 2100 Rebsamen
Park Rd _____
_____ (street address) in
_____Little Rock_____
(city), Arkansas, ___72202___ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: June 24, 2020
Owner's name: Little Rock Ventures III,LLC
_____
_____
_____
_____

Residents (list all residents):

Lorraine A. Hatcher
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3.** The Arkansas Medical Marijuana Amendment of 2016,
(Arkansas Const. of 1874, Amend. 98.) permits the limited
use of medical marijuana in specific and limited circumstances.
However, this is not the case under federal law. Under federal
law, specifically the Controlled Substances Act (CSA), marijuana
is still categorized as a Schedule I substance. This means that
under federal law, the manufacture, distribution, or possession
of marijuana is strictly prohibited. Because the U.S. Department
of Housing and Urban Development is controlled by the federal
government, it agrees that the use of marijuana, whether
prescribed for medical reasons or not, is a criminal offense
and will not be protected under the fair housing laws.
Therefore, apartment complexes are not required to
accommodate the use of marijuana by a tenant who is a current
medical marijuana user. Disabled tenants who are registered
medical marijuana users, however, should not feel discouraged
to request reasonable accommodations if the need arises.

**4.** The Premises listed above follows and complies with federal
law regarding marijuana use and is, and will continue to be,
a drug free community. Possession, use, manufacture or sale
of any illegal substance, including marijuana, or any use of
marijuana by the tenant and/or guests will result in immediate
termination. If you have any questions or concerns about this
policy, please speak to management.

**5.** By signing below, the resident acknowledges his or her
understanding of the terms and conditions as stated above,
and his or her agreement to comply with those terms and
conditions.

**6. SPECIAL PROVISIONS.** The following special provisions
control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents** (sign here)           **Date of Signing Addendum**

_Lorraine Hatcher_                                06/24/2020
_____        _____
_____        _____
_____        _____
_____        _____

**Owner or Owner's Representative** (signs here)    **Date of Signing Addendum**

_Ralph B Scott IV_                                06/24/2020

© 2019, National Apartment Association, Inc. - 8/2019, Arkansas

☑ Blue Moon eSignature Services Document ID: 223936775

## RESIDENT PARKING ADDENDUM



Date: _____ **June 24, 2020** _____
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **528** _____, **2100 Rebsamen**
**Park Rd** _____
_____ (street address) in
_____ **Little Rock** _____
(city), Arkansas, _____ **72202** _____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The term of this Parking Addendum is as follows:
Begins on _____, _____ and
ending on _____, _____.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**RESIDENT AND OWNER AGREE AS FOLLOWS:**

3. You agree to properly register all vehicles with management. If you get a new or replacement vehicle you must notify us and complete a revised agreement.

4. If you are provided with a parking tag or sticker it must be properly installed and displayed.

5. Unless your vehicle(s) has been assigned a specific space(s) you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any marked handicap space, unless you possess a government issued handicap decal or similar signage.

6. If you are assigned a specific parking space(s) we shall assign you the space(s) and retain the right to change assigned space(s) at our sole discretion.

7. You understand and accept that we have the right at any time, without notice, to tow unauthorized or non-registered vehicles from any parking space on the property.

8. You agree to use parking spaces in accord with the terms of the Lease and Community Rules.

9. Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Community Rules will be towed at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

10. You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) is parked on any part of the property. Upon signing this agreement you knowingly accept the risk of parking any vehicle(s) on the property.

11. Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a violation of the Lease Contract.

12. You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**COST FOR PARKING**

Resident agrees to pay a onetime fee of $ _____ per vehicle on or before the _____ day of _____. In alternative resident agress to pay $ _____ monthly per vehicle due on or before the _____ day of the month. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is _____ days delinquent in paying the required parking fee.

Resident agress to pay $ __**35.00**__ NSF fee for all checks returned for non-sufficient funds.

**VEHICLE INFORMATION**

**Vehicle 1**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 2**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 3**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

☑ Blue Moon eSignature Services Document ID: 223936775

**13. SPECIAL PROVISIONS.**

All vehicles on property must have current
tags and be in working condition, no flat
tires or broken windows. No maintenance
allowed of vehicles on property at any
time.

Resident or Residents
*(All residents must sign)*

*Lorraine Hatcher*

Owner or Owner's Representative
*(Signs below)*

*Ralph B Streeton IV*

Date of Signing Addendum

06/24/2020

## CRIME/DRUG FREE HOUSING ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **528** _____, **2100 Rebsamen Park Rd** _____
_____ *(street address)* in
_____ **Little Rock** _____
*(city)*, Arkansas, _____ **72202** _____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.

2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging such activity is a member of the household, or a guest.

3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Arkansas and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident or Residents** *(sign here)* | **Date of Signing Addendum** |
|---|---|
| *Lorraine Hatcher* | 06/24/2020 |
| | |
| | |
| | |
| **Owner or Owner's Representative** *(signs here)* | **Date of Signing Addendum** |
| *Ralph B Sorrells IV* | 06/24/2020 |

© 2019, National Apartment Association, Inc. - 3/2019, Arkansas

☑ Blue Moon eSignature Services Document ID: 223936775

# NO-SMOKING ADDENDUM

**NAA**

Date: _____**June 24, 2020**_____
(when this Addendum is filled out)

*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**528**_____, **2100 Rebsamen Park Rd** _____
_____ *(street address)* in
_____**Little Rock**_____
*(city)*, Arkansas, _____**72202**_____
*(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____
_____
_____

Residents *(list all residents):*
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

**4. SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

**5. SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least ___**10**___ feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☒ is ☐ is not permitted.

The following outside areas of the community may be used for smoking: _____
_____

_____
_____

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

**6. YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

**7. YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

**8. LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

☑ Blue Moon eSignature Services Document ID: 223936775

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

No smoking is permitted in the Premises. If there is any evidence of smoking in the premises you will incur a $500.00 fine.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

*Lorraine Hatcher*
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Sign here)*

*Ralph B Sorrction IV*
_____

☑ Blue Moon eSignature Services Document ID: 223936775

**LEASE ADDENDUM**
**LIABILITY INSURANCE REQUIRED OF RESIDENT**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____528_____ _2100 Rebsamen_
**Park Rd**
_____ _(street address)_ in
_____ **Little Rock**
_(city)_, Arkansas,_____ **72202**
_(zip code)._

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____
_____

Residents _(list all residents):_
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ACKNOWLEDGMENT CONCERNING INSURANCE OR DAMAGE WAIVER.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) or the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that paragraph 8 of the Lease Contract requires you to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $ **100000.00** per occurrence. You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods a policy of personal liability insurance satisfying the requirements listed below, at your sole expense.

**4. REQUIRED POLICY.** You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third parties (including damage to our property), in a minimum policy coverage amount of

$_____from a carrier with an AM Best rating of A-VII or better, licensed to do business in Arkansas. The carrier is required to provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

**5. We may provide you with information of an insurance program that we make available to residents, which provides you with an opportunity to buy renter's insurance from a preferred company. However, you are free to contract for the required insurance with a provider of your choosing.**

**6. SUBROGATION ALLOWED.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract.

**7. YOUR INSURANCE COVERAGE.** You have purchased the required personal liability insurance from the insurance company of your choosing listed below that is licensed to do business in this state, and have provided us with written proof of this insurance prior to the execution and commencement of the Lease Contract. You will provide additional proof of insurance in the future at our request.

Insurance Company: _____
_____

**8. DEFAULT.** Any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law.

**9. MISCELLANEOUS.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

**10. SPECIAL PROVISIONS: If tenant does not provide proof of paid renter's insurance to landlord, a $10 monthly surcharge will be due each month and shall be deemed additional rent. Upon providing proof of renter's insurance the $10 monthly surcharge will be removed, however any past month's surcharge(s) will not be refunded even if coverage was in effect. Tenant understands that the $15 surcharge is not a premium and does not provide personal property insurance coverage for Resident.**
_____
_____
_____
_____
_____

I have read, understand and agree to comply with the preceding provisions.

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| _(All residents must sign here)_ | _(signs here)_ |
| _Lorraine Hatcher_ | _Ralph B Streetion IV_ |

**Date of Lease Contract**

**June 24, 2020**

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

☑ Blue Moon eSignature Services Document ID: 223936775

**LEASE ADDENDUM FOR RENT CONCESSION
OR OTHER RENT DISCOUNT**



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**528**_____, **2100 Rebsamen Park
Rd**
_____ *(street address)* in
_____**Little Rock**_____
*(city),* Arkansas, ____**72202**____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____

Residents *(list all residents):*
**Lorraine A. Hatcher**_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3. CONCESSION/DISCOUNT AGREEMENT.** As consideration
for your agreement to remain in your dwelling and to fulfill
your Lease obligations throughout the full term of your Lease,
you will receive the following rent Concession and or Discount.

*(Check all that apply)*

☒ **One-Time Concession.** You will receive a One-Time
Concession off the rent indicated in the Rent and Charges
paragraph of the Lease Contract in the total amount of
$____**200.00**____. This Concession will be credited to
your rent due for the month(s) of: **July**
_____
_____

☐ **Monthly Discount/Concession.** The rent indicated in
the Rent and Charges paragraph of the Lease Contract
includes a Monthly Discount of $_____ per
month off of the suggested rental rate for your dwelling.

☐ **Other Discount/Concession.** You will receive the
following discount off the rent indicated in the Rent and
Charges paragraph of the Lease Contract:
_____
_____
_____
_____

☐ **Non-Monetary Concession.** You will receive the
following non-monetary concession during the term of
the Lease:
_____
_____
_____
_____
_____

**4. CONCESSION CANCELLATION AND CHARGE-BACK.**
The concession and discounts indicated above are provided
to you as an incentive and with the understanding that you
will fulfill your obligations under the Lease Contract through
the entire term of your Lease.

If your lease is terminated early due to your default (for
example, if you abandon the premises without paying rent or
are evicted), this Concession/Discount Agreement will be
immediately terminated, and you will be required to
immediately repay to the Owner the amounts of all *(Check all
that apply)*

☒ Concessions
☒ Discounts

that you have actually received for the months you resided
in the Premises, and without further notice from us.

**5. MARKET RENT.** The market rent for this dwelling is the
rent stated in the Lease Contract. You acknowledge that the
market rent is a fair representation of what the specific
dwelling would actually rent for at the time the Lease Contract
was negotiated and executed, and is reflective of the rent for
a similar dwelling at comparable properties.

**6. SPECIAL PROVISIONS.** The following special provisions
control over any conflicting provisions of this printed
Addendum form or the Lease Contract.

**$200.00 off July rent-for signing a 13
month lease**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

|  |  |
|---|---|
| **Resident or Residents**<br>*(All residents must sign)* | **Owner or Owner's Representative**<br>*(signs here)* |
| *Lorraine Hatcher* | *Ralph B Screeten IV* |
| _____ | _____ |
| _____ | **Date of Lease Contract** |
| _____ | **June 24, 2020** |
| _____ | _____ |

© 2019, National Apartment Association, Inc. - 2/2019, Arkansas
☑ Blue Moon eSignature Services Document ID: 223936775

## COMMUNITY POLICIES, RULES AND REGULATIONS ADDENDUM



*This addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. This Addendum shall apply to all renewals of the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling:*

*Property Owner:* __Little Rock Ventures III, LLC__

*Resident(s):* __Lorraine A. Hatcher__

*Unit No./Address:* __#528, 2100 Rebsamen Park Rd, Little Rock, AR 72202__

*Lease Date:* __06/24/2020__

**I.    GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.**

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time.

**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

**II.    POOL.**  This Community ☒ **DOES;** ☐ **DOES NOT** have a pool. When using the pool, Resident(s) agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries.
- For their safety, Residents should not swim alone.
- Pool hours are posted at the pool.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool.
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
- Resident(s) must accompany their guests.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

### IN CASE OF EMERGENCY DIAL 911

**III.    FITNESS CENTER.**  This Community ☒ **DOES;** ☐ **DOES NOT** have a fitness center. When using the fitness center, Resident agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
- The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
- Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.

Card # issued:   (1) _____   (3) _____   (5) _____
(2) _____   (4) _____   (6) _____

☑ Blue Moon eSignature Services Document ID: 223936775

**IV.  PACKAGE RELEASE.**   This Community ☐ DOES;   ☒ DOES NOT accept packages on behalf of Residents.

For communities that do accept packages on behalf of its Residents:
Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident agrees that Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same.

**V.  BUSINESS CENTER.**   This Community ☐ DOES;   ☒ DOES NOT have a business center.
agrees to use the business center at Resident(s) sole risk and according to the Rules and regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to _____ minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center.

**VI.  AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.**   The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only _____**1**_____ vehicle per licensed Resident is allowed.
- All vehicles must be registered at the Management office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management, will be towed at the vehicle owner's expense after a __**24**__ hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.

**VII.  FIRE HAZARDS.**   In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of _____10_____ feet from any building.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- Fireplaces:   Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairways breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**VIII.  EXTERMINATING.**   Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner will prepare Residents' dwelling and charge Residents accordingly. Residents must request extermination treatments in addition to those regularly provided by Owner in writing. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets or place them in bedrooms, and notify Owner of such placement.
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean, off premises, all luggage, handbags, shoes and clothes hanging containers.
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

<u>**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**</u>

**IX.  DRAPES AND SHADES.**   Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

☑ Blue Moon eSignature Services Document ID: 223936775

**X.    WATER BEDS.**   Resident shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**XI.    BALCONY or PATIO.**   Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios. No misuse of the space is permitted, including but not limited to, throwing, spilling or pouring liquids or other items, whether intentionally or negligently, over the balconies or patios.

**XII.    SIGNS.**   Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**XIII.    SATELLITE DISHES/ANTENNAS.**   You must complete a satellite addendum and abide by its terms prior to installation or use.

**XIV.    WAIVER/SEVERABILITY CLAUSE.**   No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this addendum, the Lease Contract or any other addenda to the Lease Contract.

**XV.    SPECIAL PROVISIONS.**   The following special provisions control over conflicting provisions of this printed form:

NO GRILLS ALLOWED ON PROPERTY.

I have read, understand and agree to comply with the preceding provisions.

| _Lorraine Hatcher_ | 06/24/2020 | | |
|---|---|---|---|
| Resident | Date | Resident | Date |
| | | | |
| Resident | Date | Resident | Date |
| | | | |
| Resident | Date | Resident | Date |
| _Ralph B Scruton IV_ | | 06/24/2020 | |
| Owner Representative | | Date | |

☑ Blue Moon eSignature Services Document ID: 223936775

## LEASE CONTRACT BUY-OUT AGREEMENT



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **528**       **2100 Rebsamen**
**Park Rd**
_____ (street address) in
**Little Rock**
(city), Arkansas, **72202**
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Buy-Out Agreement shall apply to all renewals of the Lease Contract between Owner and the Resident. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

**4. BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term if all of the following occur:

(a)  you give us written notice of buy-out at least __60__ days prior to the new termination date (i.e., your new move-out date), which (check one) ☒ must be the last day of a month or ☐ may be during a month;

(b)  you specify the new termination date in the notice, i.e., the date by which you'll move out;

(c)  you are not in default under the Lease Contract on the date you give us the notice of buy-out;

(d)  you are not in default under the Lease Contract on the new termination date (move-out date);

(e)  you move out on or before the new termination date and do not hold over;

(f)  you pay us a buy-out fee (consideration) of $_____;

(g)  you pay us the amount of any concessions you received when signing the Lease Contract; and

(h)  you comply with any special provisions in paragraph 9 below.

**5. WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than __30__ days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $_____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

**6. SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

**7. COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

**8. MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

**9. SPECIAL PROVISIONS.** Your right of buy-out (check one) ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| Resident or Residents (All residents must sign) | Owner or Owner's Representative (signs below) |
|---|---|
| _Lorraine Hatcher_ | _Ralph B Streeter IV_ |
| _____ | |
| _____ | **Date of Lease Contract** |
| _____ | **June 24, 2020** |
| _____ | |

© 2018, National Apartment Association, Inc. - 6/2018, Arkansas

## ASBESTOS ADDENDUM



Date: **June 24, 2020**
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **528**, **2100 Bebysmsn Park Rd**
_____ (street address) in
**Little Rock**
(city), Arkansas, **72202**
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____
_____

Residents (list all residents):

**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum shall apply to all renewals of the Lease Contract between Owner and the Resident. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ASBESTOS.** In most dwellings which were built prior to 1981 and in some built after that, asbestos was commonly used as a construction material. In various parts of your dwelling, asbestos materials may have been used in the original construction or in renovations prior to the enactment of federal laws which limit asbestos in certain construction materials.

**4. FEDERAL RECOMMENDATIONS.** The United States Environmental Protection Agency (EPA) has determined that the mere presence of asbestos materials does not pose a health risk to residents and that such materials are safe so long as they are not dislodged or disturbed in a manner that causes the asbestos fibers to be released. Disturbances include sanding, scraping, pounding, or other techniques that produce dust and cause the asbestos particles to become airborne. The EPA does not require that intact asbestos materials be removed. Instead, the law simply requires that we take reasonable precautions to minimize the chance of damage or disturbance of those materials.

**5. COMMUNITY POLICIES AND RULES.** You, your families, other occupants, and guests must not disturb or attach anything to the walls, ceilings, floor tiles, or insulation behind the walls or ceilings in your dwelling unless specifically allowed in owner's rules or community policies that are separately attached to this Lease Contract. The foregoing prevails over other provisions of the Lease Contract to the contrary. Please report any ceiling leaks to management promptly so that pieces of acoustical ceiling material or ceiling tiles do not fall to the floor and get disturbed by people walking on the fallen material.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident(s)**<br>(All residents must sign) | **Date of Signing Addendum** |
|---|---|
| *Lorraine Hatcher* | 06/24/2020 |
| | |
| | |
| | |
| | |
| | |
| **Owner or Owner's Representative** | **Date of Signing Addendum** |
| *Ralph B Scruton IV* | 06/24/2020 |

Arkansas/National Apartment Association Official Form, June 2018
© 2018, National Apartment Association, Inc.

## MOLD INFORMATION AND PREVENTION ADDENDUM



### 1. DWELLING UNIT DESCRIPTION.

Unit No. **528** , **2100 Rebsamen Park Rd**

_____ *(street address)* in

**Little Rock**

*(city)*, Arkansas, **72202**

*(zip code).*

### 2. LEASE CONTRACT DESCRIPTION.

Lease Contract date: **June 24, 2020**

Owner's name: **Little Rock Ventures III,LLC**

_____

_____

_____

_____

Residents *(list all residents):*

**Lorraine A. Hatcher**

_____

_____

_____

_____

_____

_____

_____

_____

This Addendum shall apply to all renewals of the Lease Contract between Owner and the Resident. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

### 3. ABOUT MOLD.

Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

### 4. PREVENTING MOLD BEGINS WITH YOU.

In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.
- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain inside the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.
- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.
- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.
- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

### 5. IN ORDER TO AVOID MOLD GROWTH,

it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;
- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;
- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;
- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;
- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and
- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

### 6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES

(such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. Be sure to follow the instructions on the container. Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner

☑ Blue Moon eSignature Services Document ID: 223936775

with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from porous items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:**   (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.**   Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

   **If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **SPECIAL PROVISIONS.**   The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

*Lorraine Hatcher*
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs here)*

*Ralph B Smith IV*
_____

**Date of Lease Contract**

**June 24, 2020**
_____

Arkansas/National Apartment Association Official Form, June 2018
© 2018, National Apartment Association, Inc.

☑ Blue Moon eSignature Services Document ID: 223936775

# BED BUG ADDENDUM



Date: _____ **June 24, 2020** _____
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **528** _____, **2100 Rebsamen Park Rd** _____
_____ (street address) in
_____ **Little Rock** _____
(city), Arkansas, _____ **72202** _____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **June 24, 2020**
Owner's name: **Little Rock Ventures III, LLC**
_____
_____
_____
_____

Residents (list all residents):
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs (cimex lectularius) which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

**4. INSPECTION AND INFESTATIONS.** BY SIGNING THIS ADDENDUM, YOU REPRESENT THAT:

- YOU HAVE INSPECTED THE DWELLING PRIOR TO MOVING IN, OR PRIOR TO SIGNING THIS ADDENDUM, AND YOU DID NOT FIND ANY EVIDENCE OF BED BUGS OR A BED BUG INFESTATION;

OR

- YOU WILL INSPECT THE DWELLING WITHIN 48 HOURS AFTER MOVING IN, OR WITHIN 48 HOURS AFTER SIGNING THIS ADDENDUM AND WILL NOTIFY US OF ANY BED BUGS OR BED BUG INFESTATIONS.

You agree that you have read the information provided in this Addendum and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property, or possessions. You also acknowledge that you have fully disclosed to us any previous bed bug infestations or bed bug issues that you have experienced.

If you disclose to us a previous experience with bed bug infestations or other bed bug related issues, we can review documentation of the previous treatment(s) and inspect your personal property and possession to confirm the absence of bed bugs.

**5. ACCESS FOR INSPECTION AND PEST TREATMENT.**
You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. Unless otherwise prohibited by law, you are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

**6. NOTIFICATION.** You must promptly notify us:
- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

**7. COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

**8. RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

☑ Blue Moon eSignature Services Document ID: 223936775

**9. TRANSFERS.**  If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

**10. SPECIAL PROVISIONS.**  The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

| **Resident or Residents**<br>*(All residents must sign)* | **Owner or Owner's Representative**<br>*(Signs below)* |
|---|---|
| *Lorraine Hatcher* | *Ralph B Streetson IV* |
| | **Date of Signing Addendum** |
| | 06/24/2020 |

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*

☑ Blue Moon eSignature Services Document ID: 223936775

## BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

### Bed bugs don't discriminate

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

### Bed bugs don't transmit disease

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

### Identifying bed bugs

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors

- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

### Preventing bed bug encounters when traveling

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

### Bed bug do's and don'ts

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.



☑ Blue Moon eSignature Services Document ID: 223936775

## UTILITY AND SERVICES ADDENDUM



This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated
_____**June 24, 2020**_____ between **Little Rock Ventures III,LLC**
_____
_____
("We") and **Lorraine A. Hatcher**_____
_____
_____
_____
_____
_____

("You") of Apt. No. _____**528**_____ located at **2100 Rebsamen Park Rd**_____

(street address) in _____**Little Rock, AR 72202**_____ and is in addition to all terms and conditions
in the Lease.This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and
is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or
contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

1. Responsibility for payment of utility and service bills, including charges for usage, deposits, and any charges, taxes, fees,
   administrative fees or costs associated with the utility services or billing (collectively, "costs"), and the method of metering and
   otherwise allocating the payment of utility services and costs, will be as indicated below.

   a) **Water** service to your dwelling and costs will be paid by you either:
      ❑ directly to the utility service provider; or
      ☒ water service will be billed by the service provider to us and then allocated to you based on the following formula: _____
      (NOTE: if flat rate is selected, the flat rate for water service is $ _____ per month.)

   b) **Sewer** service to your dwelling and costs will be paid by you either:
      ❑ directly to the utility service provider; or
      ☒ sewer service will be billed by the service provider to us and then allocated to you based on the following formula: _____
      (NOTE: if flat rate is selected, the flat rate for sewer service is $ _____ per month.)

   c) **Gas** service to your dwelling and costs will be paid by you either:
      ☒ directly to the utility service provider; or
      ❑ gas service will be billed by the service provider to us and then allocated to you based on the following formula: _____
      (NOTE: if flat rate is selected, the flat rate for gas service is $ _____ per month.)

   d) **Trash** service to your dwelling and costs will be paid by you either:
      ❑ directly to the service provider; or
      ☒ trash service will be billed to you based on the following formula: _____
      (NOTE: if flat rate is selected, the flat rate for trash service is $ _____**7.00**_____ per month.)

   e) **Electric** service to your dwelling and costs will be paid by you either:
      ☒ directly to the utility service provider; or
      ❑ electric service will be billed by the service provider to us and then allocated to you based on the following formula:_____
      (NOTE: if flat rate is selected, the flat rate for electric service is $_____ per month.)

   f) (Other) **Pest Control**_____ service to your dwelling and costs will be paid by you either:
      ❑ directly to the utility service provider(s); or
      ☒ This service will be billed by the service provider to us and then allocated to you based on the following formula: _____
      (NOTE: if flat rate is selected, the flat rate for service is $_____**3.00**_____ per month.)

### METERING/ALLOCATION METHOD KEY
"1" - Sub-metering of all of your water/gas/electric use
"2" - Calculation of your total water use based on sub-metering of hot water
"3" - Calculation of your total water use based on sub-metering of cold water
"4" - Flat rate per month
"5" - Allocation based on the number of persons residing in your dwelling unit
"6" - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7" - Allocation based on square footage of your dwelling unit
"8" - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your
       dwelling unit
"9" - Allocation based on the number of bedrooms in your dwelling unit
"10" - Allocation based on a lawful formula not listed here
       (Note: if "10" is selected, a separate "Exhibit A" will be attached describing the formula used)

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided
   and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility
   usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using
   a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing
   that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may
   change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole
   discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation
   formulas will be provided upon request.

   If a flat fee method for trash service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be
   amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the
   amount billed is not based on a monthly per unit cost.

3. When billed by us directly or through our billing company, your payment of utility and/or services bills must be received within ____14____ days of the date when the bill is issued at the place indicated on your bills, or the payment will be late. If a payment is late, you will be responsible for a late fee in the amount of $_____. The late payment of a bill or failure to pay any utility and/or service bill is a material breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there is a billing fee for the production of any services bill or a set-up charge or initiation fee by us our billing company, you shall pay such billing fee in an amount not to exceed $_____ per billing period and such set-up charge/initiation fee in an amount not to exceed $_____.

4. You will be charged for the full period of time that you are living in, occupying, or responsible for payment of rent and utility or service charges on the dwelling. If you breach the Lease, you will be responsible for utility and service charges for the time period you were obligated to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utilities and services, we may charge you for any utilities and services billed to us with respect to your dwelling and may charge a reasonable administration fee for billing you for such utilities and services in an amount not to exceed $_____.

5. When you move out, you will receive a final bill, which may be estimated by us based on your prior utility and services usage. This bill must be paid at the time you move out or it will be deducted from the security deposit, as permitted by state law. Unless prohibited by law, bills may also be estimated on a temporary basis when necessary due to equipment malfunctions or other problems.

6. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utilities or any other services provided to the dwelling unless such loss or damage was the direct result of an intentional or negligent act or omission by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7. You agree not to tamper with, adjust, or disconnect any utility or services sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease and this Addendum.

8. Owner has the sole authority to select and approve all utility and services providers who may provide services to Resident(s) at the dwelling community, to the extent not prohibited by law.

9. Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

10. This Addendum shall be enforced to the fullest extent lawful. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. Any determination by a court of competent jurisdiction that a provision of this Addendum is legally invalid or unenforceable shall not diminish the validity or enforceability of the remaining provisions.

11. Special Provisions.    The terms of this section supersede any other conflicting terms of this Addendum.

Electric confirmation must be provided prior to move-in. Vacant cost recovery fee is $50 per month and the cost for the electric. Failure to pay utilities as required by this Addendum will be treated as non-payment of rent and will result in Resident being assessed a fee as per your lease for each such late payment, in addition to all other remedies contained in the Lease

**I have read, understand, and agree to comply with the preceding provisions:** *(All residents must sign here)*

Resident Signature *Lorraine Hatcher*                    Date _06/24/2020_

Resident Signature _____    Date _____

Resident Signature _____    Date _____

Resident Signature _____    Date _____

Resident Signature _____    Date _____

Resident Signature _____    Date _____

Management *Ralph B Scranton IV*                    Date _06/24/2020_

☑ Blue Moon eSignature Services Document ID: 223936775 _____ ent Association, Inc. - 6/2018, Arkansas

**ANIMAL ADDENDUM**
*Becomes part of Lease Contract*



Date: _____ **June 24, 2020**
(when this Addendum is filled out)

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not to the property manager or anyone else).*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **528** _____, **2100 Rahsaman Park Rd**
_____ *(street address)* in
_____ **Little Rock** _____
*(city)*, Arkansas, _____ **72202** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **June 24, 2020**
Owner's name: **Little Rock Ventures III,LLC**
_____
_____
_____

Residents *(list all residents)*:
**Lorraine A. Hatcher**
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. A. ☐ NO APPROVED ANIMALS.** If this box is checked, you are not allowed to have animals (including mammals, reptiles, birds, fish, rodents, and insects), even temporarily, anywhere in the apartment or apartment community unless we're authorized so in writing. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Federal Fair Housing Act, HUD regulatory guidelines, and any applicable state and/or local laws.

**B. ☐ CONDITIONAL AUTHORIZATION FOR ANIMAL.** If this box is checked, you may keep the animal that is described below in the dwelling until the Lease Contract expires. But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you and your animal, your guests, or any occupant violate any of the rules in this Addendum.

**4. ANIMAL DEPOSIT.** An animal deposit of $ _____ will be charged. We *[check one]* ☐ will consider, or ☐ will not consider this additional security deposit the general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *[check one]* ☐ does, or ☐ does not include this additional deposit amount. Refund of the animal deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

**5. ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ ___ **10.00** ___. The monthly rent amount in the Rent and Charges paragraph of the Lease Contract *[check one]* ☐ includes ☒ does not include this additional animal rent.

**6. ADDITIONAL FEE.** You must also pay a one-time fee of $ ___ **300.00** ___ for having the animal in the dwelling unit. It is our policy to not charge a deposit for support purposes.

**7. LIABILITY NOT LIMITED.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

**8. DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or apartment community.

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
**Due to insurance restrictions, the following dog breeds are not allowed on the property. If a tenant is found in violation of the "Restricted Breed Policy" it will be considered a lease violation and grounds for termination. *Akita *American Pit Bull Terrier * American Staffordshire Terrier * Anatolian Sheppard *Bull Mastiffs *Chow Chow *Doberman Pinscher * German Shepherd *Great Dane *Huskie *Malamute * Pit Bull Terrier *Presa Canario *Rhodesian Ridgeback *Rottweiler *Saint Bernard *Staffordshire Bull Terrier *Wolf Dog Hybrids**
_____
_____
_____
_____
_____

**10. EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

**11. ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

- Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

- Inside, the animal may urinate or defecate *only* in these designated areas: **litter box or potty pads**
  _____

- Outside, the animal may urinate or defecate *only* in these designated areas: **Pet walk area only**
  _____

- Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

- You must not let an animal other than support animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

- Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

- Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

**12. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**13. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must permanently remove the animal from the premises within the time period specified in our notice. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the extent allowed by law.

**14. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**15. OUR REMOVAL OF ANIMAL.** In some circumstances, we may enter the dwelling unit and remove the animal with one day's notice left in a conspicuous place. We can do this if, in our sole judgment, you have:

- abandoned the animal;
- left the animal in the dwelling unit for an extended period of time without food or water;
- failed to care for a sick animal;
- violated our animal rules; or
- let the animal defecate or urinate where it's not supposed to.

In doing this, we must follow the procedures of the Lease Contract, and we may board the animal or turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within 5 days after we remove it, it will be considered abandoned.

**16. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

**17. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**18. JOINT AND SEVERAL RESPONSIBILITY.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**19. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 9 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Please read it carefully before signing.**

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All resident's must sign)* | *(Signs below)* |
| *Lorraine Hatcher* | *Ralph B Screeton IV* |

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (*check (i) or (ii) below*):

   (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

   _____
   _____
   _____
   _____
   _____
   _____

   (ii) ☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):

   (i) ☐ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

   _____
   _____
   _____
   _____
   _____
   _____

   (ii) ☒ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgement** (*initial*)

(c) _A.H._____ Lessee has received copies of all information listed above.

(d) _A.H._____ Lessee has received the pamphlet Protect Your Family from Lead in Your Home.

**Agent's Acknowledgement** (*initial*)

(e) _RS_____ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

<u>**Little Rock Ventures III, LLC, 2100 Rebsamen Park Rd #528**</u>

_____ <u>**Little Rock**</u>

Apartment Name & unit number OR street address of dwelling       City

| | | | |
|---|---|---|---|
| *Lorraine Hatcher* / 06/24/2020 | | | |
| Lessee (Resident) / Date | | Lessee (Resident) / Date | |
| | | | |
| Lessee (Resident) / Date | | Lessee (Resident) / Date | |
| | | | |
| Lessee (Resident) / Date | | Lessee (Resident) / Date | |

<u>**Little Rock Ventures III, LLC**</u>
_____

_____       *Ralph B Smith IV*
Lessor (Owner)                                Agent

                                              06/24/2020
_____
Date





# Protect Your Family From Lead in Your Home

 **EPA** United States Environmental Protection Agency

 United States Consumer Product Safety Commission

 United States Department of Housing and Urban Development

June 2017

## Are You Planning to Buy or Rent a Home Built Before 1978?

Did you know that many homes built before 1978 have lead-based paint? Lead from paint, chips, and dust can pose serious health hazards.

**Read this entire brochure to learn:**

- How lead gets into the body
- How lead affects health
- What you can do to protect your family
- Where to go for more information

**Before renting or buying a pre-1978 home or apartment, federal law requires:**

- Sellers must disclose known information on lead-based paint or lead-based paint hazards before selling a house.
- Real estate sales contracts must include a specific warning statement about lead-based paint. Buyers have up to 10 days to check for lead.
- Landlords must disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a specific warning statement about lead-based paint.

**If undertaking renovations, repairs, or painting (RRP) projects in your pre-1978 home or apartment:**

- Read EPA's pamphlet, *The Lead-Safe Certified Guide to Renovate Right*, to learn about the lead-safe work practices that contractors are required to follow when working in your home (see page 12).



## Simple Steps to Protect Your Family from Lead Hazards

**If you think your home has lead-based paint:**

- Don't try to remove lead-based paint yourself.
- Always keep painted surfaces in good condition to minimize deterioration.
- Get your home checked for lead hazards. Find a certified inspector or risk assessor at epa.gov/lead.
- Talk to your landlord about fixing surfaces with peeling or chipping paint.
- Regularly clean floors, window sills, and other surfaces.
- Take precautions to avoid exposure to lead dust when remodeling.
- When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe certified renovation firms.
- Before buying, renting, or renovating your home, have it checked for lead-based paint.
- Consult your health care provider about testing your children for lead. Your pediatrician can check for lead with a simple blood test.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children eat healthy, low-fat foods high in iron, calcium, and vitamin C.
- Remove shoes or wipe soil off shoes before entering your house.

## Lead Gets into the Body in Many Ways

**Adults and children can get lead into their bodies if they:**

- Breathe in lead dust (especially during activities such as renovations, repairs, or painting that disturb painted surfaces).
- Swallow lead dust that has settled on food, food preparation surfaces, and other places.
- Eat paint chips or soil that contains lead.

**Lead is especially dangerous to children under the age of 6.**

- At this age, children's brains and nervous systems are more sensitive to the damaging effects of lead.
- Children's growing bodies absorb more lead.
- Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.



**Women of childbearing age should know that lead is dangerous to a developing fetus.**

- Women with a high lead level in their system before or during pregnancy risk exposing the fetus to lead through the placenta during fetal development.

1

2

☑ Blue Moon eSignature Services Document ID: 223996775

## Health Effects of Lead

**Lead affects the body in many ways.** It is important to know that even exposure to low levels of lead can severely harm children.

**In children, exposure to lead can cause:**

- Nervous system and kidney damage
- Learning disabilities, attention-deficit disorder, and decreased intelligence
- Speech, language, and behavior problems
- Poor muscle coordination
- Decreased muscle and bone growth
- Hearing damage

While low-lead exposure is most common, exposure to high amounts of lead can have devastating effects on children, including seizures, unconsciousness, and in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults, too.

**In adults, exposure to lead can cause:**

- Harm to a developing fetus
- Increased chance of high blood pressure during pregnancy
- Fertility problems (in men and women)
- High blood pressure
- Digestive problems
- Nerve disorders
- Memory and concentration problems
- Muscle and joint pain

3

## Check Your Family for Lead

**Get your children and home tested if you think your home has lead.**

Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect lead. Blood lead tests are usually recommended for:

- Children at ages 1 and 2
- Children or other family members who have been exposed to high levels of lead
- Children who should be tested under your state or local health screening plan

**Your doctor can explain what the test results mean and if more testing will be needed.**

4

## Where Lead-Based Paint Is Found

In general, the older your home or childcare facility, the more likely it has lead-based paint.[1]

**Many homes, including private, federally-assisted, federally-owned housing, and childcare facilities built before 1978 have lead-based paint.** In 1978, the federal government banned consumer uses of lead-containing paint.[2]

Learn how to determine if paint is lead-based paint on page 7.

**Lead can be found:**

- In homes and childcare facilities in the city, country, or suburbs,
- In private and public single-family homes and apartments,
- On surfaces inside and outside of the house, and
- In soil around a home. (Soil can pick up lead from exterior paint or other sources, such as past use of leaded gas in cars.)

Learn more about where lead is found at epa.gov/lead.

[1] "Lead-based paint" is currently defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter (mg/cm), or more than 0.5% by weight.

[2] "Lead-containing paint" is currently defined by the federal government as lead in new dried paint in excess of 90 parts per million (ppm) by weight.

5

## Identifying Lead-Based Paint and Lead-Based Paint Hazards

**Deteriorating lead-based paint (peeling, chipping, chalking, cracking, or damaged paint)** is a hazard and needs immediate attention. Lead-based paint may also be a hazard when found on surfaces that children can chew or that get a lot of wear and tear, such as:

- On windows and window sills
- Doors and door frames
- Stairs, railings, banisters, and porches

**Lead-based paint is usually not a hazard if it is in good condition** and if it is not on an impact or friction surface like a window.

**Lead dust** can form when lead-based paint is scraped, sanded, or heated. Lead dust also forms when painted surfaces containing lead bump or rub together. Lead paint chips and dust can get on surfaces and objects that people touch. Settled lead dust can reenter the air when the home is vacuumed or swept, or when people walk through it. EPA currently defines the following levels of lead in dust as hazardous:

- 40 micrograms per square foot ($\mu g/ft^2$) and higher for floors, including carpeted floors
- 250 $\mu g/ft^2$ and higher for interior window sills

**Lead in soil** can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. EPA currently defines the following levels of lead in soil as hazardous:

- 400 parts per million (ppm) and higher in play areas of bare soil
- 1,200 ppm (average) and higher in bare soil in the remainder of the yard

**Remember, lead from paint chips—which you can see—and lead dust—which you may not be able to see—both can be hazards.**

The only way to find out if paint, dust, or soil lead hazards exist is to test for them. The next page describes how to do this.

6

## Checking Your Home for Lead

You can get your home tested for lead in several different ways:

- A lead-based paint **inspection** tells you if your home has lead-based paint and where it is located. It won't tell you whether your home currently has lead hazards. A trained and certified testing professional, called a lead-based paint inspector, will conduct a paint inspection using methods, such as:

  

  - Portable x-ray fluorescence (XRF) machine
  - Lab tests of paint samples

- A **risk assessment** tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards. A trained and certified testing professional, called a risk assessor, will:

  - Sample paint that is deteriorated on doors, windows, floors, stairs, and walls
  - Sample dust near painted surfaces and sample bare soil in the yard
  - Get lab tests of paint, dust, and soil samples

- A combination inspection and risk assessment tells you if your home has any lead-based paint and if your home has any lead hazards, and where both are located.

Be sure to read the report provided to you after your inspection or risk assessment is completed, and ask questions about anything you do not understand.

7

## Checking Your Home for Lead, continued

In preparing for renovation, repair, or painting work in a pre-1978 home, Lead-Safe Certified renovators (see page 12) may:

- Take paint chip samples to determine if lead-based paint is present in the area planned for renovation and send them to an EPA-recognized lead lab for analysis. In housing receiving federal assistance, the person collecting these samples must be a certified lead-based paint inspector or risk assessor
- Use EPA-recognized tests kits to determine if lead-based paint is absent (but not in housing receiving federal assistance)
- Presume that lead-based paint is present and use lead-safe work practices

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency for more information, visit epa.gov/lead, or call **1-800-424-LEAD (5323)** for a list of contacts in your area.[1]

---

[1] Hearing- or speech-challenged individuals may access this number through TTY by calling the Federal Relay Service at 1-800-877-8339.

8

## What You Can Do Now to Protect Your Family

If you suspect that your house has lead-based paint hazards, you can take some immediate steps to reduce your family's risk:

- If you rent, notify your landlord of peeling or chipping paint.
- Keep painted surfaces clean and free of dust. Clean floors, window frames, window sills, and other surfaces weekly. Use a mop or sponge with warm water and a general all-purpose cleaner. (Remember: never mix ammonia and bleach products together because they can form a dangerous gas.)
- Carefully clean up paint chips immediately without creating dust.
- Thoroughly rinse sponges and mop heads often during cleaning of dirty or dusty areas, and again afterward.
- Wash your hands and your children's hands often, especially before they eat and before nap time and bed time.
- Keep play areas clean. Wash bottles, pacifiers, toys, and stuffed animals regularly.
- Keep children from chewing window sills or other painted surfaces, or eating soil.
- When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe Certified renovation firms (see page 12).
- Clean or remove shoes before entering your home to avoid tracking in lead from soil.
- Make sure children eat nutritious, low-fat meals high in iron, and calcium, such as spinach and dairy products. Children with good diets absorb less lead.

9

## Reducing Lead Hazards

**Disturbing lead-based paint or removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.**

- In addition to day-to-day cleaning and good nutrition, you can temporarily reduce lead-based paint hazards by taking actions, such as repairing damaged painted surfaces and planting grass to cover lead-contaminated soil. These actions are not permanent solutions and will need ongoing attention.
- You can minimize exposure to lead when renovating, repairing, or painting by hiring an EPA- or state-certified renovator who is trained in the use of lead-safe work practices. If you are a do-it-yourselfer, learn how to use lead–safe work practices in your home.
- To remove lead hazards permanently, you should hire a certified lead abatement contractor. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not permanent control.

**Always use a certified contractor who is trained to address lead hazards safely.**

- Hire a Lead-Safe Certified firm (see page 12) to perform renovation, repair, or painting (RRP) projects that disturb painted surfaces.
- To correct lead hazards permanently, hire a certified lead abatement professional. This will ensure your contractor knows how to work safely and has the proper equipment to clean up thoroughly.

Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

10

## Reducing Lead Hazards, continued

If your home has had lead abatement work done or if the housing is receiving federal assistance, once the work is completed, dust cleanup activities must be conducted until clearance testing indicates that lead dust levels are below the following levels:

- 40 micrograms per square foot (µg/ft²) for floors, including carpeted floors

- 250 µg/ft² for interior windows sills

- 400 µg/ft² for window troughs

For help in locating certified lead abatement professionals in your area, call your state or local agency (see pages 14 and 15), or visit epa.gov/lead, or call 1-800-424-LEAD.

## Renovating, Repairing or Painting a Home with Lead-Based Paint

If you hire a contractor to conduct renovation, repair, or painting (RRP) projects in your pre-1978 home or childcare facility (such as pre-school and kindergarten), your contractor must:

- Be a Lead-Safe Certified firm approved by EPA or an EPA-authorized state program

- Use qualified trained individuals (Lead-Safe Certified renovators) who follow specific lead-safe work practices to prevent lead contamination

- Provide a copy of EPA's lead hazard information document, *The Lead-Safe Certified Guide to Renovate Right*



RRP contractors working in pre-1978 homes and childcare facilities must follow lead-safe work practices that:

- **Contain the work area.** The area must be contained so that dust and debris do not escape from the work area. Warning signs must be put up, and plastic or other impermeable material and tape must be used.

- **Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:

  - Open-flame burning or torching

  - Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment

  - Using a heat gun at temperatures greater than 1100°F

- **Clean up thoroughly.** The work area should be cleaned up daily. When all the work is done, the area must be cleaned up using special cleaning methods.

- **Dispose of waste properly.** Collect and seal waste in a heavy duty bag or sheeting. When transported, ensure that waste is contained to prevent release of dust and debris.

To learn more about EPA's requirements for RRP projects, visit epa.gov/getleadsafe, or read *The Lead-Safe Certified Guide to Renovate Right*.

11

12

## Other Sources of Lead

### Lead in Drinking Water

The most common sources of lead in drinking water are lead pipes, faucets, and fixtures.

Lead pipes are more likely to be found in older cities and homes built before 1986.

You can't smell or taste lead in drinking water.

To find out for certain if you have lead in drinking water, have your water tested.

Remember older homes with a private well can also have plumbing materials that contain lead.

### Important Steps You Can Take to Reduce Lead in Drinking Water

- Use only cold water for drinking, cooking and making baby formula. Remember, boiling water does not remove lead from water.

- Before drinking, flush your home's pipes by running the tap, taking a shower, doing laundry, or doing a load of dishes.

- Regularly clean your faucet's screen (also known as an aerator).

- If you use a filter certified to remove lead, don't forget to read the directions to learn when to change the cartridge. Using a filter after it has expired can make it less effective at removing lead.

Contact your water company to determine if the pipe that connects your home to the water main (called a service line) is made from lead. Your area's water company can also provide information about the lead levels in your system's drinking water.

For more information about lead in drinking water, please contact EPA's Safe Drinking Water Hotline at 1-800-426-4791. If you have other questions about lead poisoning prevention, call 1-800 424-LEAD.*

Call your local health department or water company to find out about testing your water, or visit epa.gov/safewater for EPA's lead in drinking water information. Some states or utilities offer programs to pay for water testing for residents. Contact your state or local water company to learn more.

\* Hearing- or speech-challenged individuals may access this number through TTY by calling the Federal Relay Service at 1-800-877-8339.

13

## Other Sources of Lead, continued

- **Lead smelters** or other industries that release lead into the air.

- **Your job.** If you work with lead, you could bring it home on your body or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.

- **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture. Call your local health department for information about hobbies that may use lead.

- **Old toys and furniture** may have been painted with lead-containing paint. Older toys and other children's products may have parts that contain lead.*

- Food and liquids cooked or stored in **lead crystal** or **lead-glazed pottery or porcelain** may contain lead.

- Folk remedies, such as **"greta"** and **"azarcon,"** used to treat an upset stomach.

\* In 1978, the federal government banned toys, other children's products, and furniture with lead-containing paint. In 2008, the federal government banned lead in most children's products. The federal government currently bans lead in excess of 100 ppm by weight in most children's products.

14

☑ Blue Moon eSignature Services Document ID: 223936775

## For More Information

**The National Lead Information Center**
Learn how to protect children from lead poisoning and get other information about lead hazards on the Web at epa.gov/safewater and hud.gov/lead, or call **1-800-424-LEAD (5323)**.

**EPA's Safe Drinking Water Hotline**
For information about lead in drinking water, call **1-800-426-4791**, or visit epa.gov/lead for information about lead in drinking water.

**Consumer Product Safety Commission (CPSC) Hotline**
For information on lead in toys and other consumer products, or to report an unsafe consumer product or a product-related injury, call **1-800-638-2772**, or visit CPSC's website at cpsc.gov or saferproducts.gov.

**State and Local Health and Environmental Agencies**
Some states, tribes, and cities have their own rules related to lead-based paint. Check with your local agency to see which laws apply to you. Most agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for your state or local contacts on the Web at epa.gov/safewater, or contact the National Lead Information Center at **1-800-424-LEAD**.

Hearing- or speech-challenged individuals may access any of the phone numbers in this brochure through TTY by calling the toll-free Federal Relay Service at **1-800-877-8339**.

## U. S. Environmental Protection Agency (EPA) Regional Offices

The mission of EPA is to protect human health and the environment. Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
5 Post Office Square, Suite 100, OES 05-4
Boston, MA 02109-3912
(888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3** (Delaware, Maryland, Pennsylvania, Virginia, DC, West Virginia)
Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA 19103
(215) 814-2088

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
AFC Tower, 12th Floor, Air, Pesticides & Toxics
61 Forsyth Street, SW
Atlanta, GA 30303
(404) 562-8998

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5 (DT-8J)
77 West Jackson Boulevard
Chicago, IL 60604-3666
(312) 886-7836

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas, and 66 Tribes)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue, 12th Floor
Dallas, TX 75202-2733
(214) 665-2704

**Region 7** (Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7
11201 Renner Blvd.
WWPD/TDPE
Lenexa, KS 66219
(800) 223-0425

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop St.
Denver, CO 80202
(303) 312-6966

**Region 9** (Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. EPA Region 9 (CMD-4-2)
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-4280

**Region 10** (Alaska, Idaho, Oregon, Washington)
Regional Lead Contact
U.S. EPA Region 10
Solid Waste & Toxics Unit (WCM-128)
1200 Sixth Avenue, Suite 900
Seattle, WA 98101
(206) 553-1200

15

16

## Consumer Product Safety Commission (CPSC)

The CPSC protects the public against unreasonable risk of injury from consumer products through education, safety standards activities, and enforcement. Contact CPSC for further information regarding consumer product safety and regulations.

**CPSC**
4330 East West Highway
Bethesda, MD 20814-4421
1-800-638-2772
cpsc.gov or saferproducts.gov

## U. S. Department of Housing and Urban Development (HUD)

HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. Contact HUD's Office of Healthy Homes and Lead Hazard Control for further information regarding the Lead Safe Housing Rule, which protects families in pre-1978 assisted housing, and for the lead hazard control and research grant programs.

**HUD**
451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
(202) 402-7698
hud.gov/offices/lead/

This document is in the public domain. It may be produced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following the advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

U. S. EPA Washington DC 20460        EPA-747-K-12-001
U. S. CPSC Bethesda MD 20814        June 2017
U. S. HUD Washington DC 20410

## IMPORTANT!

### Lead From Paint, Dust, and Soil in and Around Your Home Can Be Dangerous if Not Managed Properly

- Children under 6 years old are most at risk for lead poisoning in your home.

- Lead exposure can harm young children and babies even before they are born.

- Homes, schools, and child care facilities built before 1978 are likely to contain lead-based paint.

- Even children who seem healthy may have dangerous levels of lead in their bodies.

- Disturbing surfaces with lead-based paint or removing lead-based paint improperly can increase the danger to your family.

- People can get lead in their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

- People have many options for reducing lead hazards. Generally, lead-based paint that is in good condition is not a hazard (see page 10).

17

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-May-28  16:33:30
60CV-21-2858
C06D05 : 13 Pages

### IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
### CIVIL DIVISION

**LORRAINE HATCHER, on behalf of herself
and all others in a class similarly situated**                     **PLAINTIFF**

**CASE NO. 60CV-21-2858**

**vs.**

**DLP PROPERTY MANAGEMENT, LLC
d/b/a PROSPER RIVERDALE, CHERYL
CRAIG, and KAREN ROBERTSON**                     **DEFENDANTS**

### SECOND AMENDED COMPLAINT

Plaintiff files this Second Amended Complaint to add DLP Real Estate

Management, LLC, Don Wenner, Robert Peterson, Prosper Riverdale, and Ebony

Joshua, as Defendants, including information as to their respective relationship to

this action.

Plaintiff, Lorraine Hatcher, on behalf of herself and all others similarly situated,

brings her Complaint for damages based on the Arkansas Deceptive Trade Practices

Act, codified at Ark. Code Ann. §§4-88-107 *et seq.*, and states that:

### I.    PARTIES

1.  Plaintiff is an individual residing in Little Rock, Arkansas, within Pulaski County.

2. Defendant, DLP Property Management, LLC, is a corporation authorized to do business within the state of Arkansas with its principal place of business located in Little Rock, Arkansas. Its agent for service of process is Karen Robertson at 20 Hunters Cove, Cabot, Arkansas 72023.

3. Based upon information and belief, Defendant Karen Robertson is a managing member or officer of DLP Property Management, LLC, (hereinafter, "DLP").

4. **Defendant DLP Real Estate Management, LLC is a Florida limited liability corporation, licensed under document number L18000278251 as of December 3, 2018. Its principal place of business is located at 605 Palencia Club Drive, Saint Augustine, FL 32095.**

5. **Defendant Don Wenner, is President and CEO of Defendant DLP Real Estate Management, LLC.**

6. **DLP Real Estate Management, LLC lists Barry W. DeGroot as its registered agent for service of process at 605 Palencia Club Drive, Saint Augustine, FL 32095.**

7. **DLP Real Estate Management, LLC, is not licensed or registered to do business in the state of Arkansas pursuant to records maintained by the Arkansas Secretary of State's office as of the date of this filing.**

8. **Upon information and belief, Ebony Joshua is a manager, employed by, and authorized to bring suit on behalf of, DLP Real Estate Management, LLC, hereinafter, "DLP REM, LLC" to enforce property rights, including, but not limited to unlawful detainer and/or eviction.**

9.  On six occasions, Ebony Joshua represented herself as "owner" of apartment units in properties owned and managed by DLP REM, LLC in legal pleadings filed in Pulaski County Circuit Court as 60CV-20-7150, on December 16, 2020; 60CV-20-7163, on December 16, 2020; 60CV-20-6277, on November 6, 2020; 60CV-20-6275, on November 6, 2020; 60CV-20-6263, on November 5, 2020; and 60CV-20-6092, on November 2, 2020.

10. On each of the occasions listed in the preceding paragraph, Prosper Riverdale was listed as Plaintiff, a domestic limited liability company.

11. Defendant Prosper Riverdale is not licensed or registered to do business in the state of Arkansas as a domestic limited liability company or any other business entity pursuant to records maintained by the Arkansas Secretary of State's office as of the date of this filing.

12. Defendant Prosper Riverdale is listed on Defendant DLP Real Estate Management, LLC's website as one of the latter's properties, one of two located in Little Rock, Pulaski County, Arkansas.

13. Upon information and belief, Cheryl Craig is a manager or employee authorized to issue eviction notices on behalf of Defendant DLP REM, LLC and/or Defendant Prosper Riverdale.

14. Upon information and belief, DLP REM, LLC is engaged in the business of leasing, managing, and maintaining real property, and it owns and manages the property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202

(hereinafter "Property"), as well as Prosper Pleasant Valley, located at 1602 Green Mountain Drive, Little Rock, Arkansas 72211.

15. **Defendants DLP Property Management, LLC, DLP REM, LLC, Don Wenner, Prosper Riverdale, Cheryl Craig, Ebony Joshua, and Karen Robertson conduct and/or have conducted business in Arkansas through entities DLP REM, LLC owns, operates, and controls.**

16. **Defendants are engaging, and have engaged, in fraudulent, deceptive and unlawful acts in the state of Arkansas.**

## II.    JURISDICTION

17. This Court has jurisdiction pursuant to Ark. Code Ann. §16-13-201(a). This Court also has jurisdiction pursuant to Rule 23 of the Arkansas Rules of Civ. P.

18. Allegations set forth herein relevant to these causes of action occurred at all times in Little Rock, Arkansas.

19. Jurisdiction and venue are both proper in this Court.

20. The named Plaintiff and potential Class Members assert no federal question. The state law causes of action asserted herein are not federally pre-empted.

21. The named Plaintiff and potential Class Members assert that the amount in controversy will not exceed the sum or value of $4,999,999, including compensatory damages, restitution, interest, costs and attorney's fees. Plaintiff specifically waives any right to any amount in controversy which exceeds $4,999,999, including compensatory damages, restitution, interest, costs and

attorney's fees. The aggregate amount in controversy of the potential Class Members' claims does not and will not exceed $4,999,999.

### III.    INTRODUCTION

22. Plaintiff brings this action on behalf of herself and all other persons similarly situated. Plaintiff will fairly and adequately protect the interests of the potential class and is an adequate representative of the class of persons defined herein. Plaintiff is interested in the outcome of this lawsuit and understands the importance of adequately representing every potential member of the class described herein.

23. The proposed class is defined as all persons who paid utility fees ("Utility Fees") to Defendants and their agent for billing, ConService, from the date of filing this Complaint forward and for the immediately preceding five (5) years ("potential Class Period").

24. Defendants lease residential apartment homes at their properties located at 2100 Rebsamen Park Rd, Little Rock, Pulaski County, Arkansas, 72202, and 1602 Mountain Drive, Little Rock, Pulaski County, Arkansas, 72211.

25. Defendants' apartment homes include one-, two-, and three-bedroom units.

26. A lease agreement is required of a tenant of Defendants' apartment homes and may be of variable length.

27. The proposed class is defined as all persons who executed lease agreements of one month or longer from the date of filing this Complaint forward and for the

immediately preceding five (5) years prior to filing, including both former, and existing tenants.

28. On or about August 1, 2020, Plaintiff executed a Lease contract (hereinafter "Lease") for property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202, Apartment 528, Pulaski County, Arkansas. The term of the lease was for thirteen months and was executed by Defendant's agent. Attached as Exhibit "A" is a true and correct copy of the aforesaid Agreement.

29. The number of tenants, both former and existing, who agreed to the lease terms illustrated in the Exhibit referenced in the preceding paragraph, is so numerous that it is impracticable to bring all before the Court within a reasonable time, and a class action is therefore superior to other methods for the fair and efficient adjudication of this controversy.

30. There are common questions of law and fact affecting the potential members of the class. Such common questions predominate over any questions affecting only individual potential class members. These questions include, but are not limited to: (1) Whether the Defendants engage in a uniform practice of deferring billing for utilities, namely water and sewer to ConService; (2) Whether the rates charged for water and sewer are apportioned based on actual usage by the occupant(s) of each leased unit; (3) Whether the rate(s) charged each tenant exceed the rate authorized for the same rate of consumption by the direct provider of water and sewer services, Central Arkansas Water (hereinafter, "CAW"); (4) Whether the re-billing of water and sewer services constitutes an unlawful practice of re-selling of

water and sewer services without metering the actual usage by a non-utility provider; (5) Whether Defendants' actions violate §4-88-107(a)(9) and (a)(10) of the Arkansas Deceptive Trade Practices Act; (6) Whether the charging of arbitrary amounts through a third-party billing agent, with an additional fee tacked on violates the Arkansas Deceptive Trade Practices Act; (7) Whether the means or method of determining allocated charges constitutes an arbitrary, capricious and/or discriminatory practice; (8) Whether the non-disclosure of these practices violates the terms and conditions of the lease agreement; (9) Whether, the uniform practice of imposing late fees constitutes unlawful coercion and intimidation; and, (10) whether the uniform practice of threatening eviction on three (3) days' notice constitutes unlawful coercion and intimidation.

31. Claims of the named Plaintiff are typical of the claims of other potential members of the class in that they all arise from Defendants' normal business practice of including the obligation for utility payments in each lease agreement, and deferring utility billing to their third-party vendor, ConService without notice to the tenant as to the manner for determining, and the amount, to be billed for utility services.

32. Proceeding as a Class Action is superior to individual cases. Although the aggregate damages sustained by the potential Class are significant, the individual damages incurred by each potential Class Member are too small to warrant the expense of individual lawsuits.

IV.    ALLEGATIONS

33. Plaintiff is the sole occupant of her apartment home, a three bedroom, two bath unit.

34. Rent for the unit is $933 monthly, due on the first of every month, and collected by Defendant through its electronic online payment portal.

35. A term of the Lease requires Plaintiff, as tenant, to pay for utilities, including electricity, gas, water, and sewage. Utility charges for electricity and gas are separately metered and billed to Plaintiff directly by Entergy (Arkansas), and Centerpoint Energy, respectively.

36. ConService, a utility billing agent for Defendant bills Plaintiff separately for the remaining utilities.

37. ConService generates a monthly statement that is mailed to Plaintiff coinciding with when rent is due on or before the first of each month.

38. Since on or about September 2020, ConService has sent Plaintiff a bill for $93 each and every month. The statement itemizes charges as follows: pest control - $3.00; sewer - $62.04; trash 5 - $7.00; water - $17.96; and a service fee - $3.00. From month to month, the only variable in the billing statement are the amounts charged for sewer and water, but the aggregate total charged remains exactly $93.

39. Upon information and belief, there are no separate meters for each apartment unit to record actual usage for water or sewage.

40. Upon information and belief, water is provided by Central Arkansas Water. CAW is responsible for water mains in and for the City of Little Rock, and connects the properties herein described to its water and sewer lines.

41. CAW is a regulated direct provider of water and sewer services to Defendant. CAW determines the manner, means, and rates applicable to the provision of its services to Defendant, and is held to regulatory standards of quality and pricing.

42. CAW bills Defendant for water and sewer services provided to its property based on monthly meter readings that reflect actual usage.

43. Upon information and belief, CAW does not contract separately with Defendant to resell its water or sewer services to individual units or customers other than DLP at the property addresses listed herein.

44. The manner, means, quality, and or rate for water provided to the property addresses listed herein is within the sole purview of CAW.

45. Defendant imposes arbitrary amounts on Plaintiff for water and sewer utilities. The amounts charged do not correlate to the amount actually consumed. The frequency and existence of water outages and poor maintenance become Plaintiff's cross to bear with no recourse to CAW, the water and sewer system provider.

46. The practice of arbitrarily assessing water and sewer rates was not disclosed to Plaintiff at the time the lease was executed, nor are such terms otherwise itemized in the lease.

47. The calculus for determining the amount to bill Plaintiff for water and sewer services was not disclosed to Plaintiff at the time the lease was executed; spaces for that information were left blank by Defendant.

48. Each monthly billing generated by ConService and sent to Plaintiff by U.S. Mail constitutes a fraudulent misrepresentation of the actual cost of the services enumerated on the statement.

49. Water and sewer charges as imposed by Defendant are *per se* fraudulent, deceptive, and unreasonable.

50. Water service outages are not abated in monthly billing statements, nor are there adjustments to the cost for sewer services.

51. Defendant has conspired with other landlords/property managers to perpetrate this fraudulent billing scheme on rental housing consumers.

52. Defendant maintains a practice of serving tenants with unlawful detainer, and/or three-day (3) notice to quit for failure to pay the utility charges they unilaterally and arbitrarily assess.

53. Defendants' practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(1) in that Defendant knowingly makes false representations regarding the water usage and the cost of providing the service.

54. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(2) in that Defendants conceal, suppress, or omit a material fact or facts concerning how the rate billed to Plaintiff is apportioned or calculated.

55. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(10) in that Defendants commit any other unconscionable, false, or deceptive act, such as failing to disclose that it makes money off Plaintiff

by reselling water and sewer services above that which is established by regulation or law imposed on CAW, and passed on to its direct customers.

56. Defendants assess a late fee in the amount of $100 for any month in which the water, sewer and other charges billed by ConService are not paid by Plaintiff.

57. The imposition of the late fee referenced in the preceding paragraph, creates a delinquency and adverse rating on the overall tenancy of Plaintiff.

58. Plaintiff is denied a satisfactory rating to prospective creditors based on a delinquent status of utility payments to ConService and/or Defendants.

59. Upon information and belief, there are numerous tenants, both former and current, who have been harmed by the practices herein described.

60. Questions of law and fact are common to the class of tenants, both former and current, who have been harmed by the practices herein described committed by Defendants.

61. Upon information and belief, Defendants own more than one property, other than that described herein, and subjected to tenants, both former and current, to this deceptive, fraudulent, and unlawful practice.

62. Defendants have conspired with other rental property owners to uniformly, and systematically engage in the practices described herein for the purpose of remaining competitive, unjustly enriching themselves, and harming the class of tenants, both former and current.

63. Plaintiff, on behalf of herself and those similarly situated seeks an Order certifying this cause of action as a class action.

WHEREFORE, Plaintiff, Lorraine Hatcher, herself, and on behalf of all others similarly situated, prays this Court certify this cause as a class action; award actual damages in an amount to be proved at trial; award punitive damages to be determined by this court; pre-and post-judgment interest at the prevailing rate; reasonable attorney's fees and costs; and all other just and equitable relief to which Plaintiff, and on behalf of all others similarly situated, may be entitled.

A jury trial is requested.

Respectfully submitted,

BY:_____
LORRAINE HATCHER, Attorney at Law,
AR SUP CT # 2003-009
Plaintiff, and on behalf of all others similarly situated
P.O. Box 21294
Little Rock, AR 72221
Phone: (501) 681-2402
e-mail: lorrainehatcher@yahoo.com

**EXHIBIT A**

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-May-28  16:38:06
60CV-21-2858
C06D05 : 13 Pages

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
CIVIL DIVISION

**LORRAINE HATCHER, on behalf of herself
and all others in a class similarly situated**                          **PLAINTIFF**

CASE NO. 60CV-21-2858

**vs.**

**DLP PROPERTY MANAGEMENT, LLC
d/b/a PROSPER RIVERDALE, CHERYL
CRAIG, and KAREN ROBERTSON**                          **DEFENDANTS**

SECOND AMENDED COMPLAINT

Plaintiff files this Second Amended Complaint to add DLP Real Estate

Management, LLC, Don Wenner, Robert Peterson, Prosper Riverdale, and Ebony

Joshua, as Defendants, including information as to their respective relationship to

this action.

Plaintiff, Lorraine Hatcher, on behalf of herself and all others similarly situated,

brings her Complaint for damages based on the Arkansas Deceptive Trade Practices

Act, codified at Ark. Code Ann. §§4-88-107 *et seq.*, and states that:

I.      PARTIES

1.   Plaintiff is an individual residing in Little Rock, Arkansas, within Pulaski County.

2. Defendant, DLP Property Management, LLC, is a corporation authorized to do business within the state of Arkansas with its principal place of business located in Little Rock, Arkansas. Its agent for service of process is Karen Robertson at 20 Hunters Cove, Cabot, Arkansas 72023.

3. Based upon information and belief, Defendant Karen Robertson is a managing member or officer of DLP Property Management, LLC, (hereinafter, "DLP").

4. **Defendant DLP Real Estate Management, LLC is a Florida limited liability corporation, licensed under document number L18000278251 as of December 3, 2018. Its principal place of business is located at 605 Palencia Club Drive, Saint Augustine, FL 32095.**

5. **Defendant Don Wenner, is President and CEO of Defendant DLP Real Estate Management, LLC.**

6. **DLP Real Estate Management, LLC lists Barry W. DeGroot as its registered agent for service of process at 605 Palencia Club Drive, Saint Augustine, FL 32095.**

7. **DLP Real Estate Management, LLC, is not licensed or registered to do business in the state of Arkansas pursuant to records maintained by the Arkansas Secretary of State's office as of the date of this filing.**

8. **Upon information and belief, Ebony Joshua is a manager, employed by, and authorized to bring suit on behalf of, DLP Real Estate Management, LLC, hereinafter, "DLP REM, LLC" to enforce property rights, including, but not limited to unlawful detainer and/or eviction.**

9. On six occasions, Ebony Joshua represented herself as "owner" of apartment units in properties owned and managed by DLP REM, LLC in legal pleadings filed in Pulaski County Circuit Court as 60CV-20-7150, on December 16, 2020; 60CV-20-7163, on December 16, 2020; 60CV-20-6277, on November 6, 2020; 60CV-20-6275, on November 6, 2020; 60CV-20-6263, on November 5, 2020; and 60CV-20-6092, on November 2, 2020.

10. On each of the occasions listed in the preceding paragraph, Prosper Riverdale was listed as Plaintiff, a domestic limited liability company.

11. Defendant Prosper Riverdale is not licensed or registered to do business in the state of Arkansas as a domestic limited liability company or any other business entity pursuant to records maintained by the Arkansas Secretary of State's office as of the date of this filing.

12. Defendant Prosper Riverdale is listed on Defendant DLP Real Estate Management, LLC's website as one of the latter's properties, one of two located in Little Rock, Pulaski County, Arkansas.

13. Upon information and belief, Cheryl Craig is a manager or employee authorized to issue eviction notices on behalf of Defendant DLP REM, LLC and/or Defendant Prosper Riverdale.

14. Upon information and belief, DLP REM, LLC is engaged in the business of leasing, managing, and maintaining real property, and it owns and manages the property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202

(hereinafter "Property"), as well as Prosper Pleasant Valley, located at 1602 Green Mountain Drive, Little Rock, Arkansas 72211.

15. **Defendants DLP Property Management, LLC, DLP REM, LLC, Don Wenner, Prosper Riverdale, Cheryl Craig, Ebony Joshua, and Karen Robertson conduct and/or have conducted business in Arkansas through entities DLP REM, LLC owns, operates, and controls.**

16. **Defendants are engaging, and have engaged, in fraudulent, deceptive and unlawful acts in the state of Arkansas.**

## II.    JURISDICTION

17. This Court has jurisdiction pursuant to Ark. Code Ann. §16-13-201(a).  This Court also has jurisdiction pursuant to Rule 23 of the Arkansas Rules of Civ. P.

18. Allegations set forth herein relevant to these causes of action occurred at all times in Little Rock, Arkansas.

19. Jurisdiction and venue are both proper in this Court.

20. The named Plaintiff and potential Class Members assert no federal question.  The state law causes of action asserted herein are not federally pre-empted.

21. The named Plaintiff and potential Class Members assert that the amount in controversy will not exceed the sum or value of $4,999,999, including compensatory damages, restitution, interest, costs and attorney's fees.  Plaintiff specifically waives any right to any amount in controversy which exceeds $4,999,999, including compensatory damages, restitution, interest, costs and

attorney's fees. The aggregate amount in controversy of the potential Class Members' claims does not and will not exceed $4,999,999.

## III.    INTRODUCTION

22. Plaintiff brings this action on behalf of herself and all other persons similarly situated. Plaintiff will fairly and adequately protect the interests of the potential class and is an adequate representative of the class of persons defined herein. Plaintiff is interested in the outcome of this lawsuit and understands the importance of adequately representing every potential member of the class described herein.

23. The proposed class is defined as all persons who paid utility fees ("Utility Fees") to Defendants and their agent for billing, ConService, from the date of filing this Complaint forward and for the immediately preceding five (5) years ("potential Class Period").

24. Defendants lease residential apartment homes at their properties located at 2100 Rebsamen Park Rd, Little Rock, Pulaski County, Arkansas, 72202, and 1602 Mountain Drive, Little Rock, Pulaski County, Arkansas, 72211.

25. Defendants' apartment homes include one-, two-, and three-bedroom units.

26. A lease agreement is required of a tenant of Defendants' apartment homes and may be of variable length.

27. The proposed class is defined as all persons who executed lease agreements of one month or longer from the date of filing this Complaint forward and for the

immediately preceding five (5) years prior to filing, including both former, and existing tenants.

28. On or about August 1, 2020, Plaintiff executed a Lease contract (hereinafter "Lease") for property located at 2100 Rebsamen Park Road, Little Rock, Arkansas 72202, Apartment 528, Pulaski County, Arkansas. The term of the lease was for thirteen months and was executed by Defendant's agent. Attached as Exhibit "A" is a true and correct copy of the aforesaid Agreement.

29. The number of tenants, both former and existing, who agreed to the lease terms illustrated in the Exhibit referenced in the preceding paragraph, is so numerous that it is impracticable to bring all before the Court within a reasonable time, and a class action is therefore superior to other methods for the fair and efficient adjudication of this controversy.

30. There are common questions of law and fact affecting the potential members of the class. Such common questions predominate over any questions affecting only individual potential class members. These questions include, but are not limited to: (1) Whether the Defendants engage in a uniform practice of deferring billing for utilities, namely water and sewer to ConService; (2) Whether the rates charged for water and sewer are apportioned based on actual usage by the occupant(s) of each leased unit; (3) Whether the rate(s) charged each tenant exceed the rate authorized for the same rate of consumption by the direct provider of water and sewer services, Central Arkansas Water (hereinafter, "CAW"); (4) Whether the re-billing of water and sewer services constitutes an unlawful practice of re-selling of

water and sewer services without metering the actual usage by a non-utility provider; (5) Whether Defendants' actions violate §4-88-107(a)(9) and (a)(10) of the Arkansas Deceptive Trade Practices Act; (6) Whether the charging of arbitrary amounts through a third-party billing agent, with an additional fee tacked on violates the Arkansas Deceptive Trade Practices Act; (7) Whether the means or method of determining allocated charges constitutes an arbitrary, capricious and/or discriminatory practice; (8) Whether the non-disclosure of these practices violates the terms and conditions of the lease agreement; (9) Whether, the uniform practice of imposing late fees constitutes unlawful coercion and intimidation; and, (10) whether the uniform practice of threatening eviction on three (3) days' notice constitutes unlawful coercion and intimidation.

31. Claims of the named Plaintiff are typical of the claims of other potential members of the class in that they all arise from Defendants' normal business practice of including the obligation for utility payments in each lease agreement, and deferring utility billing to their third-party vendor, ConService without notice to the tenant as to the manner for determining, and the amount, to be billed for utility services.

32. Proceeding as a Class Action is superior to individual cases. Although the aggregate damages sustained by the potential Class are significant, the individual damages incurred by each potential Class Member are too small to warrant the expense of individual lawsuits.

IV.    ALLEGATIONS

33. Plaintiff is the sole occupant of her apartment home, a three bedroom, two bath unit.

34. Rent for the unit is $933 monthly, due on the first of every month, and collected by Defendant through its electronic online payment portal.

35. A term of the Lease requires Plaintiff, as tenant, to pay for utilities, including electricity, gas, water, and sewage.  Utility charges for electricity and gas are separately metered and billed to Plaintiff directly by Entergy (Arkansas), and Centerpoint Energy, respectively.

36. ConService, a utility billing agent for Defendant bills Plaintiff separately for the remaining utilities.

37. ConService generates a monthly statement that is mailed to Plaintiff coinciding with when rent is due on or before the first of each month.

38. Since on or about September 2020, ConService has sent Plaintiff a bill for $93 each and every month.  The statement itemizes charges as follows: pest control - $3.00; sewer - $62.04; trash 5 - $7.00; water - $17.96; and a service fee - $3.00.  From month to month, the only variable in the billing statement are the amounts charged for sewer and water, but the aggregate total charged remains exactly $93.

39. Upon information and belief, there are no separate meters for each apartment unit to record actual usage for water or sewage.

40. Upon information and belief, water is provided by Central Arkansas Water.  CAW is responsible for water mains in and for the City of Little Rock, and connects the properties herein described to its water and sewer lines.

41. CAW is a regulated direct provider of water and sewer services to Defendant. CAW determines the manner, means, and rates applicable to the provision of its services to Defendant, and is held to regulatory standards of quality and pricing.

42. CAW bills Defendant for water and sewer services provided to its property based on monthly meter readings that reflect actual usage.

43. Upon information and belief, CAW does not contract separately with Defendant to resell its water or sewer services to individual units or customers other than DLP at the property addresses listed herein.

44. The manner, means, quality, and or rate for water provided to the property addresses listed herein is within the sole purview of CAW.

45. Defendant imposes arbitrary amounts on Plaintiff for water and sewer utilities. The amounts charged do not correlate to the amount actually consumed. The frequency and existence of water outages and poor maintenance become Plaintiff's cross to bear with no recourse to CAW, the water and sewer system provider.

46. The practice of arbitrarily assessing water and sewer rates was not disclosed to Plaintiff at the time the lease was executed, nor are such terms otherwise itemized in the lease.

47. The calculus for determining the amount to bill Plaintiff for water and sewer services was not disclosed to Plaintiff at the time the lease was executed; spaces for that information were left blank by Defendant.

48. Each monthly billing generated by ConService and sent to Plaintiff by U.S. Mail constitutes a fraudulent misrepresentation of the actual cost of the services enumerated on the statement.

49. Water and sewer charges as imposed by Defendant are *per se* fraudulent, deceptive, and unreasonable.

50. Water service outages are not abated in monthly billing statements, nor are there adjustments to the cost for sewer services.

51. Defendant has conspired with other landlords/property managers to perpetrate this fraudulent billing scheme on rental housing consumers.

52. Defendant maintains a practice of serving tenants with unlawful detainer, and/or three-day (3) notice to quit for failure to pay the utility charges they unilaterally and arbitrarily assess.

53. Defendants' practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(1) in that Defendant knowingly makes false representations regarding the water usage and the cost of providing the service.

54. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(2) in that Defendants conceal, suppress, or omit a material fact or facts concerning how the rate billed to Plaintiff is apportioned or calculated.

55. Defendant's practice of re-selling CAW's water and sewer services violate the ADTPA §4-88-107(a)(10) in that Defendants commit any other unconscionable, false, or deceptive act, such as failing to disclose that it makes money off Plaintiff

by reselling water and sewer services above that which is established by regulation
or law imposed on CAW, and passed on to its direct customers.

56. Defendants assess a late fee in the amount of $100 for any month in which the
water, sewer and other charges billed by ConService are not paid by Plaintiff.

57. The imposition of the late fee referenced in the preceding paragraph, creates a
delinquency and adverse rating on the overall tenancy of Plaintiff.

58. Plaintiff is denied a satisfactory rating to prospective creditors based on a
delinquent status of utility payments to ConService and/or Defendants.

59. Upon information and belief, there are numerous tenants, both former and
current, who have been harmed by the practices herein described.

60. Questions of law and fact are common to the class of tenants, both former and
current, who have been harmed by the practices herein described committed by
Defendants.

61. Upon information and belief, Defendants own more than one property, other than
that described herein, and subjected to tenants, both former and current, to this
deceptive, fraudulent, and unlawful practice.

62. Defendants have conspired with other rental property owners to uniformly, and
systematically engage in the practices described herein for the purpose of
remaining competitive, unjustly enriching themselves, and harming the class of
tenants, both former and current.

63. Plaintiff, on behalf of herself and those similarly situated seeks an Order certifying
this cause of action as a class action.

WHEREFORE, Plaintiff, Lorraine Hatcher, herself, and on behalf of all others similarly situated, prays this Court certify this cause as a class action; award actual damages in an amount to be proved at trial; award punitive damages to be determined by this court; pre-and post-judgment interest at the prevailing rate; reasonable attorney's fees and costs; and all other just and equitable relief to which Plaintiff, and on behalf of all others similarly situated, may be entitled.

A jury trial is requested.

Respectfully submitted,

BY:_____
LORRAINE HATCHER, Attorney at Law,
AR SUP CT # 2003-009
Plaintiff, and on behalf of all others similarly situated
P.O. Box 21294
Little Rock, AR 72221
Phone: (501) 681-2402
e-mail: lorrainehatcher@yahoo.com

**EXHIBIT A**